```
 1                IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4   UNITED STATES OF AMERICA      :   CRIMINAL ACTION
                                   :
 5             vs.                 :
                                   :
 6   ROBERT COYLE, SR.             :   NO. 12-84

 7

 8                     PHILADELPHIA, PENNSYLVANIA

                            MAY 16, 2013
 9

10   BEFORE:       THE HONORABLE STEWART DALZELL, J.

11

                              SENTENCING
12

13   APPEARANCES:

14                 OFFICE OF THE UNITED STATES ATTORNEY
                   BY:  MARY KAY COSTELLO, ESQUIRE
15                 Assistant United States Attorney
                   Eastern District of Pennsylvania
16                 Suite 1250 - 615 Chestnut Street
                   Philadelphia, PA  19106
17                 Counsel for the Government

18                 NASUTI & MILLER
                   BY:  JEFFREY M. MILLER, ESQUIRE
19                 150 S. Independence Mall West
                   The Public Ledger Building, Suite 1064
20                 Philadelphia, PA  19106
                   Counsel for the Defendant
21

22                 KATHLEEN FELDMAN, CSR, CRR, RPR, CM
                   Official Court Reporter
23                 Room 1234 - U.S. Courthouse
                   601 Market Street
24                 Philadelphia, PA 19106
                   (215) 779-5578
25
             (Transcript produced by machine shorthand via C.A.T.)
```

```
 1   IN ATTENDANCE:

 2                   T. Sean Norman
                     Federal Bureau of Investigation
 3
                     Jacqueline Widmeier
 4                   United States Probation Office

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  (Proceedings commenced at 9:30 a.m.)

 2             THE COURT:  Good morning, everyone.

 3             ALL COUNSEL:  Good morning, your Honor.

 4             THE COURT:  We are together again in United States

 5   of America versus Robert Coyle, which is Criminal Number

 6   12-84, and representing the Government, as she has from the

 7   beginning of this, is Mary Kay Costello.

 8             MS. COSTELLO:  Good morning, your Honor.

 9             THE COURT:  Nice to see you again.  And the case

10   agent from the FBI is T. Sean Norman.

11             AGENT NORMAN:  Good morning, your Honor.

12             THE COURT:  Nice to see you.  And here from

13   Probation is Jacqueline Widmeier.  Nice to see you again.

14             PROBATION OFFICER WIDMEIER:  Good morning, your

15   Honor.

16             THE COURT:  And representing Mr. Coyle is Jeffrey

17   Miller.

18             MR. MILLER:  Good morning, your Honor.

19             THE COURT:  Welcome back to our courtroom.

20             MR. MILLER:  Thank you.

21             THE COURT:  And, Mr. Coyle, welcome.

22             THE DEFENDANT:  Good morning, your Honor.

23             THE COURT:  Our first order of business, of course,

24   is to canvass the presentence investigation report that Ms.

25   Widmeier has been hard at work on and, indeed, revised as
```

1  recently as yesterday, and when Ms. Widmeier dropped this off

2  yesterday in person, let the record show she reported that, as

3  revised, the Government had no objections to her report.  Is

4  that still the case?

5          MS. COSTELLO:  That is the case, your Honor.

6          THE COURT:  And it was also reported that the

7  defense has no objections to the report.  Is that still true?

8          MR. MILLER:  Correct, your Honor.

9          THE COURT:  Okay.  So, in light of that agreement,

10  and, of course, we've all been working hard on the elusive

11  question of loss and what the numbers should be for

12  restitution and Ms. Widmeier has revised her numbers

13  accordingly, I think, in each respect to the benefit of the

14  defendant -- correct?

15          PROBATION OFFICER WIDMEIER:  Yes, your Honor.

16          MR. MILLER:  That's correct.

17          THE COURT:  So I think I would hazard to say that we

18  at last have an agreement as to that; is that correct?

19          MS. COSTELLO:  That is correct, your Honor.

20          THE COURT:  Is that --

21          MR. MILLER:  We have an agreement on what I call the

22  hard numbers, your Honor.

23          THE COURT:  $6,480,302.65.

24          MR. MILLER:  That's correct.

25          THE COURT:  Okay.  So, mercifully, we have that

1  agreed which, of course, drives the sentencing calculus in Ms.

2  Widmeier's very thorough report, indeed.  So I've received

3  memoranda and supplemental memoranda and epistolary

4  submissions from the Government and Mr. Miller.  And, of

5  course, we've received and read a number of letters, most

6  recently, a letter dated May 16 from Jennifer Kates, Esquire,

7  who works with Councilwoman Maria Quiñones-Sánchez who is the

8  District Council person for the Seventh District here in

9  Philadelphia, and we're grateful for everyone who took the

10  trouble to write those letters.  And I take it, Mr. Miller,

11  you got a copy of Ms. Kates' letter?

12          MR. MILLER:  I did, your Honor.  I received it about

13  10 minutes ago.

14          THE COURT:  That's when I got it, too.

15          MR. MILLER:  Yes, I read it, your Honor.

16          THE COURT:  Okay.  So what would the Government like

17  to say about this?  And, of course, the Government has

18  interposed a motion for upward departure, which is something

19  of an antique these days, and more commonly a motion for

20  upward variance, which I'd like you to address, as well as the

21  3553(a) factors.  So won't you come forward.

22          MS. COSTELLO:  Certainly.  Good morning, your Honor.

23          THE COURT:  Good morning, Ms. Costello.

24          MS. COSTELLO:  And --

25          THE COURT:  We've been keeping you busy.

1          MS. COSTELLO:  Yes.  Definitely, your Honor.  Thank

2    you.  And you're correct, the Government filed its sentencing

3    memorandum and in there the Government did request a motion

4    for an upward departure and/or a motion for an upward variance

5    for a sentence above the Advisory Guideline range, which I

6    believe is --

7          THE COURT:  63 to 78 months.

8          MS. COSTELLO:  Correct, 63 to 78 months.  Your

9    Honor, the Government is requesting a sentence of imprisonment

10   four levels above the Advisory Guideline range, which would

11   result in an offense level of 30 and which would result in a

12   final Advisory Guideline range of 97 to 121 months, and the

13   Government is requesting a sentence at the high end of that

14   Advisory Guideline range.  And the reason, your Honor, is that

15   the Guidelines tend to focus exclusively on the financial loss

16   to the victim banks, which was great in this case, the banks

17   were put at great risk by Mr. Coyle's crimes, but there are

18   other victims, as well, that are not taken into consideration

19   in the Guideline calculation and those victims are what we

20   call the collateral victims, the people other than the bank.

21   Mostly Mr. Coyle's tenants.  And the most important ones that

22   come to mind are those who had --

23         THE COURT:  Well, the Landvest people that Ms. Kates

24   alludes to in her letter, those folks.

25         MS. COSTELLO:  Yes, your Honor, exactly.  They

1    believe they entered into some sort of agreement with Mr.

2    Coyle.   There were different agreements.   Some of them were

3    rent to own; some of them were installment sales agreements;

4    some of them were option to purchase agreements.   In one case,

5    we even had a house-for-house swap.

6            Mr. Coyle pledged those properties as collateral for

7    both the East River Bank loan and the Republic First Bank loan

8    without disclosing to either bank the interest that these

9    other people had in the properties and also without giving any

10   notice to the people who lived in them.   These people put

11   significant down payments down on those properties and they

12   also, believing that they were their properties or that they

13   were moving towards ownership, put significant amounts of

14   repairs into these properties, thousands of dollars, and then

15   Coyle pledged their properties without their knowledge as

16   collateral in a loan that, as we now know, was incredibly

17   risky because Mr. Coyle knew he couldn't afford either loan

18   because he lied about his cash flow.

19           So when Coyle eventually defaulted on the loan,

20   which shouldn't have been surprising, the bank moved to take

21   this collateral that was pledged, which it thought was

22   unencumbered collateral.   It started to foreclose on the

23   properties, it asked for sheriff's sales, and the people

24   living in these houses were taken completely by surprise.

25   They thought they owned them or were moving towards ownership,

1    they had at least an equitable interest in these properties,

2    and they were put at tremendous emotional trauma not knowing

3    what was going to happen with the place where they lived and,

4    also, financial loss as well, because here, especially with

5    the East River Bank victims, East River Bank pretty quickly

6    decided to try and make agreements with these people when East

7    River Bank realized what was going on.  So many of those

8    people were able to keep their homes, but at a financial loss,

9    because the new deal that they made with the bank was more

10   costly than the deal they originally had with Mr. Coyle.  So

11   they're out money -- which the Court has recognized that it's

12   part of the restitution award.

13            But, in addition, there were other ones like the

14   Republic First Bank.  Eventually, a deal was reached with some

15   of those people and they had to pay closing costs.  Most of

16   them aren't out money except for there was one victim that we

17   referred to as C.G. in our sentencing memorandum who did a

18   house-for-house swap.  He owned that house outright, but it

19   was pledged as collateral on the loan, and he was told he had

20   to move out and he was told he had to pay rent.  The people

21   thought he was renting it.  The banks thought he was renting

22   it.  He never paid rent.  He owned that house.  So he was out

23   closing costs of $2,550 that he shouldn't have had to pay

24   because he owned the house already.

25            So there's the financial loss.  But there's more the

```
1   emotional trauma, as well, because in a lot of cases, these
2   are low-income people.  They are generally not sophisticated.
3   Many of them --
4             THE COURT:  Some don't speak English.
5             MS. COSTELLO:  Exactly.  They don't speak English.
6             THE COURT:  In fact, the one, C.G., I think, is
7   illiterate.
8             MS. COSTELLO:  Correct, your Honor.
9             THE COURT:  As it's been represented to me.
10            MS. COSTELLO:  Yes, that is the case, your Honor.  I
11  know from experience and Agent Norman --
12            THE COURT:  What's the Government's response where
13  Mr. Miller in his letter suggests you might characterize it as
14  "a blame the victim approach" to Republic?  Do you want to
15  address that?
16            MS. COSTELLO:  Yes, your Honor, certainly.  I think
17  that nothing that Mr. Miller or the defense has raised with
18  respect to the Republic First Bank loan has anything to do
19  with the lies that he told the bank to get the loan in the
20  first place.  So, for example, I think one of the things he
21  talks about is that, well, Republic First Bank promised him
22  title business so he'd be able to afford the loan.  First of
23  all, that's not true.  We investigated that angle and it's not
24  how the deal went.  It's not a part of the loan deal.  But, in
25  any event, even if they had, it didn't excuse him lying to the
```

1    bank about his cash flow, about the nature of the collateral.

2    I mean, it's not a defense to what he did and I don't think

3    it's a mitigating factor in any way as to what kind of

4    sentence that he should receive.

5          I believe there was also some argument that Republic

6    First Bank wanted to get this loan, that they pushed Mr. Coyle

7    into this loan.  Again, that's not the case.  That's not what

8    we found from this.  Why would Republic First Bank want to

9    take on a bad loan, to remove a former bad loan?  I mean, it

10   doesn't make any sense and that's not what our investigation

11   found.  Our investigation found that they received the

12   information from Coyle about the rent rolls, the leases, the

13   letters that had the rent amounts in them.  They

14   cross-referenced them.  They did their due diligence.  What

15   Coyle told them led them to believe that they could safely

16   give him this loan, and as it turned out, he lied about his

17   cash flow, the rents, whether they were occupied or not.  The

18   collateral was not unencumbered as he represented.  So it has

19   absolutely nothing to do with his crime and it's not

20   mitigating in any way, your Honor.

21          THE COURT:  What about the contention that when

22   you're dealing with a lot of tenants, you're bound to have

23   some disgruntled folks?

24          MS. COSTELLO:  Well, I think that's probably true

25   that you are bound to have some disgruntled folks here and

1    there, but our experience in going through this investigation,

2    and Special Agent Norman spoke to numerous tenants, was that,

3    as a general rule, these properties were dilapidated, were

4    uninhabitable, and they were only made able to be inhabited by

5    people putting their own repairs into them.  We also know

6    that, for example, Mr. Coyle submitted numerous fake rental

7    licenses in support of these loans and they're licenses that

8    the L&I has to issue to say a property is able to be

9    inhabited.  He couldn't get those from L&I so what he had to

10   do was he actually printed them off of his printer in his

11   office.  So he faked them because he couldn't get them.

12          And our experience without question -- I mean, we've

13   seen it ourselves.  We also know about the appraisals.  For

14   example, when the appraisals were being done for these loans,

15   Coyle sent some of his workers out to his vacant properties

16   and had them dress them up.  That is to say, he had them put

17   curtains in the windows and paint the door; if there's windows

18   missing, put windows in so at the front it looked like it was

19   actually inhabited and that it was in decent condition.  In

20   reality, it was just a dress-up.  We heard that from some of

21   his contractors.

22          We know that Coyle didn't pay the water bills.  He

23   had his tenants pay him for the water and he wouldn't turn

24   around and pay the water company so the water company would

25   come out and turn off the water.  Coyle would send his workers

1    out to turn the water back on.  And there were numerous

2    incidences of where there was flooding because of the water

3    problems and C.G. talked in detail in the PSR about the

4    condition of the property that he had.  It was barely able to

5    be inhabited.  And, as I said, if not for the equity -- the

6    work that the tenants themselves put into it, there's no way

7    they could have lived in many of those properties, your Honor.

8              THE COURT:  Well, the defendant goes farther than

9    that.  I'm looking at page 12 of Ms. Widmeier's report and it

10   says that what we're really talking about here is 7 percent of

11   the universe of representations to First Republic Bank and the

12   question that raised in my mind -- and just wondering what the

13   Government's reaction is -- does the defendant really accept

14   responsibility?  That is, has he clearly established

15   responsibility for that count which is Count Three?  What's

16   the Government's view?

17             MS. COSTELLO:  It's a good question, your Honor,

18   because he did --

19             THE COURT:  The inference is that 93 percent of this

20   is fiction.

21             MS. COSTELLO:  Right.  And, first of all, your

22   Honor, let me address that.  It's incorrect.  He's only

23   talking about the falsehoods that are listed in the

24   Indictment, which is just a sampling of the lies that he told

25   the bank.  Special Agent Norman did an analysis of all the

```
 1    inflation.  So for the Republic First Bank loan, the actual

 2    rent collections indicated that Coyle overstated the rents by

 3    30 percent.  For the East River Bank loan, Coyle overstated

 4    the rents by 40 percent.  So it's not just a small amount.  I

 5    mean, this was a significant overstatement that he made to the

 6    banks, and even if it was just a small amount, it doesn't

 7    matter.  That small amount would be enough to throw the bank

 8    off.  I mean, they do like very meticulous calculations as to

 9    what they can afford, but you're right, your Honor, in

10    reading --

11              THE COURT:  Well, I'm sorry to press you on this,

12    but the defendant has the burden of showing that he's clearly

13    accepted responsibility and if he says, "As to 93 percent, I'm

14    not responsible," how is that clearly establishing his

15    acceptance of responsibility?  I'm sorry, I have to press you

16    on that.

17              MS. COSTELLO:  No, I understand, your Honor, and I

18    do appreciate it.  We're in a difficult position because in

19    our guilty plea agreement --

20              THE COURT:  It said, "As of the date of the

21    agreement."

22              MS. COSTELLO:  Yes, and he did by pleading guilty

23    and in a timely manner.  But I have the same issue, your

24    Honor.  In reading some of his submissions to the Probation

25    Office, I question whether he has truly accepted
```

1   responsibility or not, blaming the victim, minimizing what he

2   did, the crimes that he committed.

3          We are, I believe, your Honor -- I mean, we have to

4   abide by our stipulation in the plea agreement.

5          THE COURT:  But that's as to a date.  Mr. Miller's

6   submission to Ms. Widmeier was after that date; correct?

7          MS. COSTELLO:  Yes, your Honor.

8          THE COURT:  So am I imagining something or is this a

9   serious issue?

10         MS. COSTELLO:  It is a serious issue, your Honor.

11   You're not imagining anything.  And my position is I wanted to

12   hear what Mr. Coyle had to say today, what position was he

13   taking in court today, was he going to show any remorse,

14   because I've heard or seen no remorse from him whatsoever.

15   I've seen him blaming the victim, as you said.  I've seen him

16   minimizing the role that he played, ignoring the harm that he

17   caused not only to the bank, but to his tenants, as well.  And

18   it is an open question, your Honor, as I said, as to whether

19   he truly has.

20         THE COURT:  And so, of course, that would be three

21   offense levels if we were to hold that he has not carried his

22   burden.

23         MS. COSTELLO:  Well, I think that the -- I'm not

24   sure how that would work with the third point, your Honor,

25   because he did give us timely acceptance in that we did not

1    have to prepare for trial.

2            THE COURT:  Okay, two offense levels, giving him the

3    benefit of the doubt.

4            MS. COSTELLO:  I think that's at play at this point,

5    although the Government -- again, we stipulated to it at the

6    time of the plea agreement and I want to hear what Mr. Coyle

7    has to say for himself today before, you know, taking a strong

8    position on that.  It is an open question, but I would prefer

9    it that he abide by his stipulation, that he accept

10   responsibility, and we move forward as agreed in the plea

11   agreement, your Honor.

12           THE COURT:  Well, okay.  Anything else you'd like to

13   say on the subject of either your upward departure or

14   variance?  Why in the world would we go on a departure

15   route --

16           MS. COSTELLO:  I think --

17           THE COURT:  -- post-Booker?  Why would that make the

18   slightest bit of sense?

19           MS. COSTELLO:  Well, your Honor, obviously it's to

20   your discretion to determine how to approach it, but we're

21   just giving the Court options.  I think that it does make

22   sense to do it as an upward variance because we can consider

23   the 3553(a) factors and whether -- it covers all the bases,

24   your Honor, if it's approached as an upward variance.  It

25   could also be done as an upward departure, although I agree

```
 1   it's unnecessary under the circumstances post-Booker.  We're

 2   just covering our bases, your Honor.

 3            THE COURT:  Okay.  Anything else you'd like to say?

 4            MS. COSTELLO:  I believe that's it, your Honor.

 5   Thank you.

 6            THE COURT:  Okay.  So, Mr. Miller, let's first

 7   address the issue of acceptance of responsibility, just taking

 8   your words and imputing them to Mr. Coyle.  And I realize

 9   you're an advocate and you're doing your best job for your

10   client, and I obviously respect that, but if the fair

11   inference of what you wrote about the First Republic loan is

12   that 93 percent of the representations were not false and only

13   7 percent were false, how does that clearly establish

14   acceptance of responsibility for that count?

15            MR. MILLER:  Your Honor, if I can make it clear,

16   please, I have spent countless hours with Mr. Coyle on this

17   case.  There's no doubt in my mind that he fully accepts

18   responsibility for what he's charged with.  There's no doubt

19   about it.  He's been contrite.  He's been remorseful.  What

20   he's charged with is submitting false information to a bank --

21            THE COURT:  Right.  Oh, I agree.

22            MR. MILLER:  -- that was materially false

23   information, and that as a result of that, he received a loan.

24   It's sort of like, in a sense, a permutation of a false

25   statement, a false oral statement.  He made false written
```

1    statements.  The false statements, the documentation that went

2    from his office to the bank according to the Indictment,

3    according to Mr. Coyle, came in two formats:  One were rent

4    rolls.  The rent rolls were not accurate.  He admits that.

5    There's no question about that at all.  Some of the rent rolls

6    that were submitted to the bank were false because they

7    pertained to properties that weren't rented or the rents were

8    increased.  The second thing were some of the leases.  Some of

9    the leases that were submitted to the bank were fabricated or

10   false.  What we're saying is in the whole context of the mass

11   of material that was submitted, approximately 7, 8, 9 percent

12   of the rent rolls and the leases were fabricated and false.

13   He's not denying responsibility, but what he's trying to do --

14   rather than suggesting what the Government is saying that

15   everything Mr. Coyle does is illegal, he's a scam artist, he's

16   a fraud from A to Z, that's not true.  He's totally accepted

17   responsibility for what he's charged with.  He's not charged

18   with being a slumlord.  He's not charged with --

19            THE COURT:  No, look, you're preaching to the choir.

20   I know what he was charged with.  And I have great respect for

21   you, as you well know, as an advocate for your client, a

22   zealous advocate, but I just have a logical puzzle here and

23   the logical puzzle is taking what you wrote to Ms. Widmeier

24   that's quoted in the presentence report on page 12.  If

25   93 percent were not false, how, as a logical matter, could he

1    be held to clearly demonstrate acceptance of responsibility as

2    to First Republic -- what used to be called First Republic?

3          MR. MILLER:  What we're saying is simply that if he

4    submitted 100 leases, just using that as a hypothetical

5    figure, and 100 rent rolls, approximately 7 or 8 or 9 percent

6    of the rent rolls and 7 or 8 or 9 percent of the leases that

7    were submitted from the mass of submissions were fabricated or

8    falsely inflated.  We're only talking about degree.  We're not

9    questioning that there was a material misrepresentation by Mr.

10   Coyle and his company in connection with the acquisition of

11   the loan, but, in fact, the overwhelming -- it doesn't mean

12   he's not guilty.

13         THE COURT:  Well, I'm just thinking of Application

14   Note 1(A) of 3E1.1 which deals with denying relevant conduct

15   and that sort of thing as being inconsistent with acceptance

16   of responsibility.  And where you have that denial as to

17   93 percent of what's alleged here, it seems to me it comes

18   pretty close.  It's not even relevant conduct, it's the

19   offense of conviction.

20         MR. MILLER:  Well, your Honor, of the hundreds of

21   leases that were submitted, the Government claims that

22   approximately 9, 10 people that were contained within the

23   submitted leases, residents, renters, were harmed, which is

24   exactly consistent with our posture.  We're not denying

25   responsibility.  I don't think the Government is saying to

1    your Honor --

2              THE COURT:  Well, I pressed her on that point.

3              MR. MILLER:  Well, I don't think the Government is

4    saying to your Honor -- and I'm sure they haven't said it to

5    me nor has Ms. Jackie Widmeier.  Nobody is saying that

6    100 percent of the material that was submitted to the bank in

7    connection with the First Republic loan was false or

8    fabricated.  No one's saying that.  There is a percentage, no

9    question about it, that was false and misleading and it seems

10   to me -- and I may be wrong and I'm saying this

11   respectfully -- a side issue, so to speak, as to the

12   percentage.  Our calculation --

13             THE COURT:  Sir, I'm just taking your percentages.

14   That's all.

15             MR. MILLER:  Well, our percentage is based on our

16   own review.  Much of what the Government has told your Honor

17   today is hearsay, raw hearsay.  Almost everything the

18   Government has said, "Our investigation shows this, our

19   investigation shows that."  Well, our investigation shows it

20   was about 8 or 9 percent of the overall properties that were

21   pledged.  Subsumed within those 8 or 9 percent of properties

22   were false rentals, leases, and false rent rolls.  Maybe it

23   was 15 percent.  Maybe it was 20 percent.  I don't know, but

24   that's our estimate.

25             We also based the estimate on the Government's

1    contention as to the actual -- the victims that were renters

2    that were consequentially hurt from this loan.  They list

3    about 10.  If there were about 200 properties listed or

4    submitted, 200 leases submitted, they're talking about 10 out

5    of 200.  It's 5 percent.

6             What I'm suggesting to your Honor is that,

7    respectfully, he accepts responsibility.  There's no question

8    at all.  None whatsoever.  Our only contention was and

9    remains -- and it's mitigating.  It's in order to give your

10   Honor the picture.  I'm not trying to give you hearsay today.

11   We have witnesses who are going to testify to stuff.  I'm not

12   coming into this courtroom telling you, "Our investigation

13   shows this, our investigation shows that."  I have no quarrel

14   with the Government.  75 percent of the material that was told

15   to you today I heard for the first time seven minutes ago.

16   I'm not suggesting it's not accurate, but it's hearsay.

17            We have facts today to show what, in fact, occurred

18   with First Republic.  We have facts to show that the houses

19   were assiduously maintained.  We have the person who was in

20   charge for 18 years of maintenance.  And what I'm suggesting,

21   your Honor, there's not really a concrete issue, in my view,

22   on acceptance of responsibility.  He clearly accepts

23   responsibility and the fact that --

24            THE COURT:  Well, it's his burden to.

25            MR. MILLER:  The fact that he is taking the position

```
1    that we've taken from Day 1 that not 100 percent of the
2    material that was submitted to First Republic Bank, not
3    100 percent of it was fraudulent and misleading, it was a
4    different percentage -- and the Government would agree with
5    that.  Our percentage would be 8 or 9 percent.  But that's not
6    a -- that's not relevant, I think, or probative, respectfully,
7    to whether he accepts responsibility.  It just happens to be
8    the truth and the truth is borne out by our investigation,
9    and, more significantly, the itemization of the victims that
10   are consequentially allegedly damaged as a result of this loan
11   numbering the amount of 10 people.  So if he had submitted,
12   theoretically, 90 percent false leases, you'd have 140 alleged
13   victims who suffered as a result of this.  There was about 10.
14           But that is not any indication, I submit
15   respectfully, of a reflection of lack of acceptance of
16   responsibility.  He has accepted responsibility from Day 1
17   until today and will accept responsibility today.  The fact
18   that a smaller percentage of the material that was submitted,
19   we claim, was fraudulent than the Government contends is not
20   indicative of any kind of lack of acceptance of
21   responsibility.  He accepts responsibility for what he's
22   accused of unquestionably.  He's accused of submitting
23   materially false information, documentation to a bank, which,
24   in part, resulted in his acquisition of a major loan.
25           THE COURT:  Well, then give me an offer of proof.
```

1    You said you had some witnesses for us.  Give me an offer of

2    proof.

3              MR. MILLER:  Of what we intend to show today?

4              THE COURT:  Yes.

5              MR. MILLER:  Okay.  I think there's a number of

6    issues in this case that we've set forth in our sentencing

7    memorandum.  I think one critical question, which doesn't go

8    to guilt or innocence -- it doesn't -- it goes to what really

9    happened in this case.  We're not beating the victim over the

10   head, but, on the other hand, we're not giving the victim an

11   ice cream cone like the Government is either.  The victim,

12   First Republic Bank in this case, and I'll put a witness on or

13   two to testify to this, they were in a merger situation with

14   another bank.  They were desperate to project an inflated

15   artificial financial picture in order to merge and get

16   approval.

17             THE COURT:  So it is blaming the victim.

18             MR. MILLER:  It's not blaming the victim.  It's

19   explaining the circumstances.  There are circumstances here

20   that have not -- his Indictment, his charge, he's guilty of.

21   So if your Honor wants to look at the tip of the iceberg,

22   listen to what the Government says.  If you want to look at

23   the iceberg, listen to what we're going to present here today

24   because there's more to it.  There's more to the story.

25             THE COURT:  Mr. Miller, obviously we've done trials

1    together.  If Mr. Coyle stakes out this position, he didn't

2    have to plead guilty, but he did plead guilty.  He's a very

3    intelligent man.  There's no question about a knowing,

4    voluntary, and intelligent waiver of his rights.  But, for

5    heaven's sake, he could have contested the charges the way --

6              MR. MILLER:  He's not contesting the charges.  He's

7    not contesting guilt.  What we're trying to do is give your

8    Honor a full picture.  Rather than looking in a tunnel, we'd

9    like you to look at the horizon and the Government is

10   presenting the tunnel.  This particular bank wanted to merge

11   and what they wanted to do was project a financial picture

12   that was somewhat artificially inflated.  One of the things

13   they wanted to do was to get all their bad loans off their

14   books and they had, indeed, bad loans.  Some of them were with

15   Coyle's son.

16        So the bank contacted an attorney in Philadelphia

17   and suggested some kind of a gross loan with Bob Coyle which

18   would incorporate his son's loans.  Nothing wrong with that.

19   The bank wanted to move the bad loans off the books and show a

20   rosy picture.  Mr. Coyle already had financing and we'll put

21   evidence on today from Pennsylvania Bank where he was going to

22   refinance all his properties.  He didn't need this at all.  He

23   didn't need it at all.

24        They met.  Bruce Bryen, who is a CPA who's in the

25   courtroom, met with the bank.  Ed Fitzgerald met with the

1    bank -- Mr. Coyle's lawyer.  There was an agreement reached

2    that's set forth unquestionably in e-mails that we submitted

3    to your Honor and will be reinforced by testimony from Mr.

4    Bryen today.  A series of meetings occurred leading up to the

5    loan.  Mr. Coyle was not the moving force.  They wanted him to

6    take the loan.  They encouraged him.  The bank got appraisals,

7    their own appraisals.  The appraisals were too low.  The

8    appraisals were such that a normal bank would never grant such

9    a loan.  They basically threw the appraisals away and said,

10   "Let's get some more appraisals."  Coyle said, "Fine."

11          They got a little bit higher appraisals.  They still

12   weren't high enough.  The bank was troubled.  Those appraisals

13   were such that it would not normally warrant a bank in lending

14   him the money because the appraisals had to be approximately

15   75 percent of the value of the property that was going to be

16   collateralized.  So the bank said, "Well, what we'll do is

17   we'll give it to you anyway."  Coyle was fine with that.  This

18   is the crux of it.

19          Coyle made it abundantly clear at the time and he'll

20   testify today.  His accountant will testify today.  We have

21   documentation.  He made it abundantly clear, "I can't go into

22   this loan unless you give me title work for my title company.

23   I can't cover $32,000 a month payments."  So the agreement was

24   reached after a series of communications, many of which are

25   documented, many of which have been submitted to your Honor.

1    There was a series of written communications, meetings, oral

2    communications and e-mails, all of which we submitted and we

3    have in court today.

4              THE COURT:  But aren't you trying a substantive

5    case?

6              MR. MILLER:  No.

7              THE COURT:  I just don't get the fit of this to what

8    brings us together.

9              MR. MILLER:  Over here on the left, so to speak, on

10   third base, he's charged with submitting false information to

11   the bank.

12             THE COURT:  Right.

13             MR. MILLER:  And he pled guilty to that.

14             THE COURT:  And he claims that he's accepted

15   responsibility for that.

16             MR. MILLER:  Right.  And the normal consequence that

17   your Honor would believe is that he submitted false

18   information to the bank, which he did, and as a result of

19   that, the Government says -- and they're playing leap frog,

20   justifiably so -- that what happened next was the loan

21   imploded, which it did.  What happened next was, as a

22   consequence, individuals who had properties that were

23   collateralized were victimized.  That's all true if you

24   connect the dots.

25             The problem is there's more dots.  And I'll be

brief, but what I am saying is there was a clear

understanding.  He submitted false information to get this

loan.  There's no question about it.  But he made it

abundantly clear -- abundantly clear that "I, Bob Coyle, don't

want to go into this loan.  I can't pay this money.  I won't

be able to comply with it and this thing will fall apart and

collapse unless you give me title work."  The bank would have

told him anything.  What they did was they told him, "Sure,

we'll give you title work."  An arrangement was worked out

where they would give him 600 title closings a year which

would bring in $300,000 to Mr. Coyle's title company, which is

just about the $31,000 a month that he had responsibility on

this loan.  That was documented and that was agreed to.  That

was agreed to.

        And what happened is Mr. Coyle then signs on the

loan after telling them, "If you're not going to give it to

me, I'm not going to be able to pay this loan off."  He had

already submitted false information.  He did that.  That was

wrong.  That was a crime and he's 100 percent responsible for

that, but he may not be 100 -- he's 100 percent responsible

for what he was accused of and what he pled guilty to, but

he's not 100 percent responsible for the implosion of this

loan and the consequences that occurred to these folks.  What

happened --

            THE COURT:  But we know for sure that Republic went

1    under, didn't it?

2              MR. MILLER:  They did not go under.

3              THE COURT:  Well, they were taken out by another

4    bank; right?

5              MR. MILLER:  I think Republic's still in business.

6    They're still in business today, your Honor.  The merger --

7              THE COURT:  It was a merger.

8              MR. MILLER:  The merger was not approved by the

9    Government.

10             THE COURT:  Right.

11             MR. MILLER:  But -- and the merger failed and the

12   loan failed.  And the loan failed.  The reason this loan

13   imploded -- and I think that's relevant.  It may not be within

14   the nucleus of him pleading guilty to what he's charged with,

15   it isn't, but it's a tangential important issue.

16             THE COURT:  That's what my instinct is telling me.

17             MR. MILLER:  No.  No --

18             THE COURT:  Look, we have a lot of people here.  I

19   don't want to waste their time.  I mean, if you think it's

20   germane, I'll give you a limited amount of time, but we're not

21   going to try the whole case.

22             MR. MILLER:  Most of the people here are not going

23   to testify.  Most of the people here are character witnesses.

24   We only have really one witness, Bruce Bryen, who's a CPA, to

25   testify about the loan situation.

1          I'm only suggesting -- and I'll summarize and I'm

2     done.  I'm just suggesting to your Honor that the implosion of

3     this loan, which is a major calamity in many ways, having

4     nothing directly to do with his charges -- indirectly -- was

5     not the cause of Mr. Coyle -- Mr. Coyle didn't wake up one day

6     and say, "I'm going to defraud this bank, make a lot of money,

7     and run off with it."  He never dreamed that this loan would

8     fail.  He did submit false information.  That's what he's

9     charged with.  That's what he pled guilty to.

10          But he's not going to admit, respectfully, that he

11     is the direct cause of the implosion of this loan.  It was

12     misrepresented to him that he would get title insurance and

13     he'd be able to pay it.  He paid on this loan as the e-mails

14     indicate that we submitted to your Honor.  I think we

15     submitted D-1 to D-9.  He paid on this loan for 14 months.  He

16     paid approximately $350,000 on this loan, and during that 14

17     months, he and Bryen were begging and requesting and begging

18     for the title insurance that was promised.  That's all set

19     forth in the e-mails.

20          What finally happened is he defaulted on the loan

21     because he got virtually no title insurance.  When you default

22     on a loan, a receiver is appointed.  He was then out of the

23     picture.  Judge Bernstein appointed the receiver in the state

24     court.  People started to complain.  The houses weren't fixed

25     up.  The receiver begged Walter Weir, who's the bank's lawyer,

1    and I have a document to that, to maintain these houses.

2    Coyle had no more income.  The bank wrote all these people,

3    these 200 homeowners or whatever, "Don't send your rent to

4    Coyle, send it to us," which may or may not have been proper.

5    Probably was.  And then the bank refused to maintain the

6    homes.

7              So I can put on evidence.  I don't intend to be

8    lengthy.  I'm not retrying the case.  I'm just suggesting that

9    I think -- and I know your Honor well -- that your Honor wants

10   to see the whole picture.  But the whole picture, I can tell

11   you as an officer of the Court, is not a reflection or an

12   indication that this man denies in any way or recants

13   responsibility for what he's charged with.  He's not blaming

14   the victim.  But the victim, as the Government calls the bank,

15   ain't really a victim.  The victim is, in a sense, blameworthy

16   also.  We're not blaming them for this false submission and

17   what he's pled guilty to.  The Government could have charged

18   him with being a slumlord.  They could have charged him with

19   mail fraud or wire fraud, I presume.

20             THE COURT:  Which they didn't.

21             MR. MILLER:  They didn't.  What they charged him

22   with is what he pled guilty to.  What more can he do other

23   than come to this Court and say, "I am guilty.  I am

24   accountable for what I did.  I pleaded guilty to these

25   charges.  But I want my lawyer to let the Judge know the whole

1    story.  I didn't wake up one Saturday morning and go get a

2    hoagie and then decide I'm going to rob a bank or steal a lot

3    of money from a bank.  There's a lot more to it than that."

4              It's not going to be time consuming.  It's not

5    complex.

6              THE COURT:  All right, Mr. Miller, why don't you

7    proceed.

8              MR. MILLER:  Okay.  Mr. Bryen.

9              Your Honor, I also prepared a list for your Honor of

10   names of character witnesses who are here, most of whom will

11   not testify.

12             THE COURT:  Okay.

13             MR. MILLER:  May I hand it up to the Court?

14             THE COURT:  Yes.

15             MR. MILLER:  Most of these folks have submitted

16   character reference letters earlier.

17             Do you want Mr. Bryen here, your Honor, next to me?

18             THE COURT:  Yes, why don't you come up front.

19             THE DEPUTY CLERK:  Please remain standing, raise

20   your right hand, and place your left hand on the Bible.

21             BRUCE BRYEN, DEFENDANT'S WITNESS, SWORN.

22             THE DEPUTY CLERK:  Will you please have a seat and

23   speak into the microphone and state and spell your full name.

24             THE WITNESS:  Bruce --

25             THE COURT:  I'm sorry?

```
1              THE WITNESS:  Bruce Bryen.  B-R-U-C-E  B-R-Y-E-N.
2                        DIRECT EXAMINATION
3    BY MR. MILLER:
4    Q.   Mr. Bryen, I'm going to, if the Government doesn't
5    object, lead you initially so we can save some time.  This is
6    not a trial, it's a hearing, so I'm going to be brief.  What
7    is your occupation, sir?
8    A.   I'm a CPA.
9    Q.   Get a little closer to the mike, please.  How long have
10   you been a CPA?
11   A.   About 40 years.
12   Q.   Okay.  Do you know Bob Coyle?
13   A.   Yes.
14   Q.   Okay.  You were involved, were you not, in the early
15   stages of this particular First Republic loan; were you not?
16   A.   Yes.
17   Q.   And who contacted who to set this loan up?
18   A.   Ed Fitzgerald contacted Bob Coyle.
19   Q.   Ed Fitzgerald was his lawyer, correct, one of Bob's
20   attorneys or colleagues?
21   A.   Yes.  Yes.
22   Q.   And who contacted Ed Fitzgerald?
23   A.   It was either the President of the Bank or the Chairman
24   of the Bank.
25   Q.   Okay.  Now, at the time, wasn't there finance in place
```

1    for Bob to refinance all the properties that he had at that

2    time?

3    A.    Yes.

4    Q.    And that was with First Pennsylvania Bank; was it not?

5    A.    No, not First Pennsylvania.

6              THE COURT:  First Pennsylvania is defunct.

7    BY MR. MILLER:

8    Q.    It was in place with a local bank?

9    A.    A local bank, yes.  I don't remember the name.

10             THE COURT:  Royal Pennsylvania?

11             THE WITNESS:  I can't remember.

12   BY MR. MILLER:

13   Q.    Okay.

14   A.    A Philadelphia business bank, your Honor.

15   Q.    Now, did you attend a series of meetings and conferences

16   with people from the bank?

17   A.    Yes.

18   Q.    Okay.  And did the issue of title insurance, title work

19   for Bob's company come up?

20   A.    Yes.

21   Q.    And tell the Judge in summary fashion why -- if that was

22   critical or relevant, why?

23   A.    Well, it was relevant and very critical because the

24   amount of title work was going to be enough to almost amortize

25   the loan, the monthly payments.

1   Q.   Are you saying that the title work, had it been

2   forthcoming, would have been basically an amount equal

3   essentially to what the loan payments were?

4   A.   Yes.

5   Q.   Was the title work that was talked about important to Bob

6   Coyle?

7   A.   Yes.

8   Q.   Why?

9   A.   It would have guaranteed that the loan would be paid

10   while he used the money from the closings to fix up the

11   houses, get them in good shape to rent or to sell.

12   Q.   Okay.  Was that discussed with the bank in e-mails?

13   A.   In e-mails and in person.

14   Q.   Was it discussed when you were there?

15   A.   Yes.

16   Q.   Was it fair to say that there was a clear understanding

17   and agreement reached that in exchange for Bob signing for

18   this loan, that one of the things that he would get other than

19   the loan proceeds was title work from the bank?

20   A.   Yes.

21   Q.   And what was talked about was 600 -- discussed was 600

22   potential settlements a year?

23   A.   It was $25- to $30,000 a month.  I don't know what that

24   would equate to with numbers of titles.

25   Q.   And the $25- or $30,000 a month --

1    A.    Of premiums.

2    Q.    -- would have approximated his responsibility on that

3    loan?

4    A.    Not quite.

5              THE COURT:  How much in premiums, sir, per month?

6              THE WITNESS:  It was about $30,000 -- about $30,000

7    a month.  Enough to pay about 90 percent of the loan.

8              MR. MILLER:  Can I approach the witness, your Honor?

9              THE COURT:  Yes.

10             MR. MILLER:  I have what is marked -- I'm not going

11   to go through all of these, I can assure you.  They've been

12   submitted earlier to the Court and the Government in our

13   sentencing memorandum.  I have what I've marked as D-1 through

14   D-9 for identification purposes and I'm just going to just

15   very briefly touch on these.

16   BY MR. MILLER:

17   Q.    Do you have your set?

18   A.    Back where I was sitting.

19   Q.    Okay.

20             THE COURT:  Could you identify D-1 through 9, sir,

21   for the record?

22             THE WITNESS:  These are e-mails from -- some from

23   me, some from Mr. Coyle to the bank, the officers of the bank

24   about the titles that were expected.

25             MR. MILLER:  I have a set for the Court if it would

1   make it easier, your Honor.  May I hand it up?

2           THE COURT:  Yes.

3           MR. MILLER:  Thank you.

4   BY MR. MILLER:

5   Q.   These are a series of e-mails.  You've reviewed these;

6   correct?

7   A.   Yes.

8   Q.   These all pertain to the discussions, negotiations

9   regarding the promised title insurance?

10  A.   Yes.

11  Q.   And these e-mails and communications back and forth

12  generally are from you to other persons; correct?  Generally?

13  A.   Well, they're from me, from bank officers.

14  Q.   Back and forth.  Some to Bob Coyle?

15  A.   Yes.

16  Q.   And there's a reference there to Lou DeCesare.  Lou

17  DeCesare is in many of these e-mails and was the official

18  assigned to this loan from First Republic Bank?

19  A.   Well, he was the President of the Bank.

20  Q.   First Republic?

21  A.   Yes.

22  Q.   Now, take a look at D-1.  I'm not going to go through

23  each one in detail, but just take a look at D-1 at the bottom.

24  This is an e-mail from you to Lou DeCesare, to the President

25  of the Bank, and you're saying, "Good morning, Lou.  I just

1    spoke to Bob Coyle again about the title business promised."

2            What did you mean about "title business promised"?

3    A.   Well, at many of the meetings and on the phone, we

4    reiterated how critical the title work was to be able to help

5    amortize the loan.  Lou promised that Bob would get what we

6    had asked for, 25 --

7    Q.   The title insurance?

8    A.   Yes.

9    Q.   So you were sending this as a follow-up like what's going

10   on, more or less?

11   A.   Yes.

12   Q.   Okay.  And you say here, "Bob has done everything that he

13   said he would concerning the opening of accounts at your bank.

14   He is frustrated about hearing that he will receive title

15   business when he has done everything he promised and has

16   received only one little report in four and a half months from

17   the bank."

18           Okay, so this was an indication by you as to his

19   being upset and you being upset that the title insurance

20   wasn't forthcoming?

21   A.   It was just an incredible amount of time that was spent

22   with the bank to try to resolve all this and nothing had

23   happened.

24   Q.   Now, is it also true -- and I put this in the presentence

25   memorandum based on what I believe is correct -- that Bob had

1    told them over and over again before he signed, "If I don't

2    get title insurance, I won't be able to honor my commitment to

3    pay this off"?  Isn't that correct?

4    A.    Well, he told them that and I told them that, as well.

5    Q.    Okay.  Fine.  If you look at the next page of D-2, at the

6    bottom, it says here -- you say, "Where's the reciprocation to

7    Bob with the one point he has asked for, which is title

8    insurance, and has been promised since negotiations began for

9    the loan?  Is there anything that Bob can do with this

10   request?"  Here -- you saw that, sir?

11   A.    Yes.

12   Q.    Here you were again talking about where is the title

13   insurance; right?

14   A.    Yes.

15   Q.    And you were aware that Bob was paying approximately

16   $31,000 a month on this loan and he was hemorrhaging cash and

17   getting no title work?

18   A.    Yes.

19   Q.    Okay.  Please take a look at D-3.  D-3 is another e-mail

20   from the Executive Secretary and she says -- she's in the bank

21   and she's writing you and basically saying Lou and the lending

22   officers will meet basically for dinner and she'll let them

23   know about the title business.  And then you say, "I was

24   complaining to Lou that I was not getting the title business,

25   September 7th, 2007, settlement.  Set up a dinner meeting."

1              What was the purpose of setting up a dinner meeting

2    with the lenders at the bank at this point?  Was it to try and

3    move forward the title insurance expectation?

4    A.   Yes.

5    Q.   Okay.  Take a look at D-4, if you would.  At the top of

6    there, he talks about -- talked to Madonna about "Where's the

7    title work?  It's been 9 months now since 2007 without the

8    promised title work by Lou DeCesare."

9              So you wanted to set up a meeting with Harry

10   Madonna.  Who's Harry Madonna?

11   A.   He's the Chairman of the Bank.

12   Q.   Okay.  And when you talk about the promised title work,

13   we're talking about -- again, going back ab initio, so to

14   speak, to the first meeting -- we're talking about title work

15   that was promised to Bob in exchange for him taking out the

16   loan; correct?

17   A.   Yes.

18   Q.   Okay.  Please take a look at D-5.  Apparently, there was

19   some meeting with Harry Madonna.  He again promised that they

20   would give title work.  In the middle of that, it says, "Great

21   news.  It looks like Harry's a man of his word about getting

22   you title business."  This is from you to Bob Coyle.  "I am

23   glad I called him and did not call Lou" -- who's the

24   President -- "after we had the meeting in the lunch room.

25   Harry definitely has the power."

1          So this was as a result of after the discussion with

2    Harry where you were once again promised -- promised that

3    title work would be forthcoming?

4    A.    Yes.

5    Q.    Was it forthcoming?

6    A.    No.

7    Q.    Please take a look at D-6 at the top there.  There's

8    another e-mail.  "Hey, Bob, how's it going?  The remaining

9    balance on the line is $117,000."  Then it says, "I'm doing

10   everything in my power to get you title work.  As I previously

11   mentioned, I am working on several loans right now.  If they

12   are approved and accepted, I will send it your way."

13         This is from Ramzi Dagher who, again, was a title

14   guy that worked for First Republic Bank, correct, a loan

15   officer?

16   A.    He's a loan officer, yes.

17         THE COURT:  That's R-A-M-Z-I and last name is

18   D-A-G-H-E-R?

19         MR. MILLER:  I believe so, sir.

20         THE WITNESS:  Well, he was also Harry Madonna's

21   assistant, direct assistant.

22   BY MR. MILLER:

23   Q.    Okay, if you take a look at D-7, please, this is an

24   e-mail from Bob Coyle and it's obvious, if I can editorialize,

25   desperation.  He's referring back to the last meeting with

1   Ramzi Dagher and he says, "With respect to our last
2   meeting" -- Bruce, Mr. Dagher, and Harry -- "to discuss the
3   promised title work and the reason I cannot continue paying
4   the loan payment of $32,000 per month without the promised
5   title work," Coyle's saying, "It's been 14 months since the
6   settlement which I was promised title work to offset the
7   shortfall of income on my son's rental income.  My cash flow
8   is burning up."  Also, "Harry threatened to destroy my
9   business," and so on.
10          So this is, again, another e-mail where Coyle is
11  evidencing to you his desperation and frustration?
12  A.   Yes.
13  Q.   You were aware at the time, were you not, that he was
14  paying approximately $30,000 a month?
15  A.   Yes.
16  Q.   Okay.  We only have two more, sir.  If you take a look at
17  D-8, this is just another reference.  This is, I believe, from
18  you to DeCesare at the bank, carbon copy to Ed Fitzgerald,
19  where you talk in the middle there, it says, "Bob is
20  interested in referrals to his title agency and would
21  appreciate communication you have with any of the lenders of
22  your bank that result in business for savings aspect."
23          That's another plea, so to speak, for title work?
24  A.   That was before the closing.
25  Q.   Okay.

1    A.    Yes.

2    Q.    My final question to you is would it be fair to say that

3    in connection with this loan, a critical component of Bob

4    signing off on this loan was the bank's -- and I'll use the

5    word -- "promise" that he would receive title work?

6    A.    Yes.

7    Q.    Was it also clear from the vast communications -- and you

8    also had phone calls and meetings in addition to these

9    documents; did you not?

10    A.    Many.

11    Q.    Okay.  Was it also your testimony and belief that Bob

12    Coyle had advised the bank that -- and I'm now using my words

13    -- that this loan would collapse if he doesn't get the title

14    work?

15    A.    Yes.

16    Q.    Did he make it abundantly clear that he didn't have the

17    income stream to comply with this loan?

18    A.    Yes.

19    Q.    Any doubt at all that that occurred?

20    A.    No.

21    Q.    If they had -- I'm going to ask you a hypothetical, if I

22    can.  Do you believe, based on your background as a CPA and

23    your knowledge of the facts here, had the bank advised Mr.

24    Coyle early on before he signed off on the loan that "We're

25    not giving you title work, we can't give you any title work at

1    all" -- what would Coyle have done with respect to this loan?

2    A.   He wouldn't have taken the loan.

3    Q.   He would have walked?

4    A.   Yes.

5              MR. MILLER:  No further questions, your Honor.

6              THE COURT:  Cross-examination.

7              MS. COSTELLO:  Yes, please, your Honor.

8                        CROSS-EXAMINATION

9    BY MS. COSTELLO:

10   Q.   Are you familiar with the loan terms?

11   A.   I can't hear you.

12   Q.   I'm sorry.  Are you familiar with the loan terms?  Do you

13   think that played a vital role?

14   A.   I remember going through all that.  I don't remember what

15   they are now sitting here.

16   Q.   Okay.  Well, one of the terms was that Mr. Coyle walked

17   away with about $1.4 million in cash; isn't that right?

18   A.   Yes.

19   Q.   And if he had not taken that $1.4 million in cash, the

20   loan would have been more affordable, wouldn't it?

21   A.   It would be less than $30,000 a month.

22   Q.   Right.  Exactly.  So you've worked with Mr. Coyle a long

23   time; is that right?

24   A.   Yes.

25   Q.   You're his accountant for some time?

```
 1   A.    I was.

 2   Q.    I'm sorry, you were?

 3   A.    Yes.

 4   Q.    So you had knowledge of his financials?

 5   A.    Yes.

 6   Q.    Okay.  Now, did you know that he provided false

 7   information to Republic First Bank?

 8   A.    No.

 9   Q.    Did you -- also, your memories are about Republic First

10   Bank; right?  You don't know anything about East River Bank?

11   A.    Well, I know something about East River Bank.  I haven't

12   looked at this in years.  I haven't been Mr. Coyle's

13   accountant in years, but --

14   Q.    But your testimony today about this title business --

15   A.    Yes.

16   Q.    -- that has to do with Republic First Bank?

17   A.    Yes.

18   Q.    Okay, not having to do with East River Bank; is that

19   right?

20   A.    For today, yes.

21   Q.    Yes or no, sir.

22   A.    Yes.

23   Q.    Okay.  So let's assume for a minute that what you said is

24   true, that there was this promise that had to do with the loan

25   agreement.  You're not suggesting that that's an excuse for
```

1  the fake information that Mr. Coyle provided to the bank, are

2  you?

3  A.    No.

4  Q.    And it doesn't change the fact that he provided that

5  false information; is that right?

6  A.    No.  No.

7  Q.    And, in reality, there was no such agreement, was there?

8  A.    There was no written agreement.  There was a verbal

9  agreement.

10 Q.    Well, wasn't the verbal agreement, though, that if Coyle

11 moved his deposit accounts to Republic First Bank, that they

12 would put him on the list of title insurers that they gave out

13 to customers?  Wasn't that the deal?

14 A.    No.

15 Q.    Really?  Do you have D-2 in front of you?

16 A.    Yes, I do.

17 Q.    Okay.  Looking at D-2, which is part of the -- one of the

18 e-mails that Mr. Miller had spoken to you about, I believe

19 it's an e-mail from you to Mr. DeCesare, November 16th, 2007,

20 and if you go down to the second sentence from the bottom, you

21 write, "However, he feels" -- and I believe you're referring

22 to Mr. Coyle -- "that he has lived up to his word concerning

23 the deposits at your bank."  Do you see that?

24 A.    Yes.

25 Q.    So that was the deal, wasn't it?  He had to move his

1    deposits to the bank and then he would get put on their title

2    list?

3    A.    No, he was going to move the deposits there and they were

4    going to give him the title business.

5    Q.    Right.  It had nothing to do with the loan.

6    A.    It had everything to do with the loan because he wouldn't

7    have taken the loan without the promise of the title business.

8    Q.    Okay.  Well, most of these e-mails, by the way, are from

9    you or Mr. Coyle to the bank; right?

10   A.    Well, I guess about half of them, I guess.

11   Q.    Well, it's more than half, isn't it?

12   A.    Well, let me look at it.

13   Q.    Sure.

14   A.    There's five from Mr. Coyle or me to the bank.

15   Q.    And how many from the bank to you?  There's less than

16   five; right?  I'll make it easier for you.  Show me -- read to

17   me an e-mail from there -- in there from the bank to you or

18   Mr. Coyle where the bank promises Mr. Coyle title work in

19   exchange for taking the loan.

20   A.    I'm sure it's not in there.  It was at a meeting and they

21   said they couldn't put it in writing.

22            MS. COSTELLO:  Okay, may I approach the witness,

23   your Honor?

24            THE COURT:  I beg your pardon?

25            MS. COSTELLO:  May I approach the witness?

```
 1              THE COURT:  Sure.
 2    BY MS. COSTELLO:
 3    Q.   I'm handing you what has been marked as Government
 4    Exhibit 17, which just happens to be a number from -- I had
 5    this ready for trial, so ignore the number, but it is
 6    Government Exhibit Number 17.
 7    A.   I couldn't hear what you said when you were talking.
 8    Q.   I'm sorry, this is marked as Government Exhibit 17.
 9    A.   Yes.
10    Q.   And this is the loan agreement between Coyle's entities
11    and Republic First Bank; right?
12    A.   Yes.
13    Q.   Okay.  And so your testimony is that there's nowhere in
14    here of any promise of title insurance business to Mr. Coyle;
15    right?
16    A.   Well, I doubt it.  You just handed it to me.  I haven't
17    read it.
18    Q.   Well, you said it's never been put in writing; right?
19    A.   That's what I recall, yes.
20    Q.   So to you it was an oral understanding?
21    A.   Yes.
22    Q.   Could you please turn to page 35 of Government
23    Exhibit 17?
24    A.   I'm there.
25    Q.   And if you look at Section 13.24, that section is titled
```

1    "Entire Agreement"; correct?

2    A.    Yes.

3    Q.    And if you read along with me, it says, "This agreement

4    and the other loan documents embody the entire agreement and

5    understanding between the Lender and Borrower and supersede

6    all prior agreements and understandings between such parties

7    relating to the subject matter hereof and thereof."  Do you

8    see that?

9    A.    Yes, I do.

10   Q.    And if we continue on, "Accordingly, the loan documents

11   may not be contradicted by evidence of prior contemporaneous

12   or subsequent oral arguments of the parties."  And then most

13   importantly, it says, "There are no unwritten oral agreements

14   between the parties."  Do you see that?

15   A.    Yes.

16   Q.    And if you just flip to the end, this was signed by Mr.

17   Coyle; correct?  Pages 37 and 38?

18   A.    Yes.

19           MS. COSTELLO:  Thank you.  I have no further

20   questions, your Honor.

21           THE COURT:  Any redirect?

22           MR. MILLER:  No, your Honor.

23           THE COURT:  Thank you, Mr. Bryen.

24           THE WITNESS:  Shall I leave these here?

25           THE COURT:  Just leave them with my law clerk.

```
1              MR. MILLER:  May he be excused?

2              THE COURT:  I beg your pardon?

3              MR. MILLER:  May he be excused from the courtroom?

4              THE COURT:  Any objection?

5              MS. COSTELLO:  No, your Honor.

6              THE COURT:  Okay, by all means.

7              MR. MILLER:  He's indicated a desire -- he's got an

8    appointment.

9              THE COURT:  That's fine.  Thank you very much, sir.

10             MR. MILLER:  Your Honor, our next witness is Angel

11   Diaz who will testify briefly.

12             THE COURT:  Okay.

13             MR. MILLER:  Mr. Diaz.

14        May I preface to your Honor a proffer?  One of the

15   things that is sort of threaded through both the presentence

16   report as well as a main theory of the prosecution in their

17   submission is that Robert Coyle, I suppose, intentionally

18   decided not to maintain homes and a lot of people were, in

19   fact, victimized by his failure to repair homes.  The truth of

20   the matter or, I should say, the more accurate is that for

21   approximately 18 years prior to the implosion of this loan, he

22   had three crews; three crews of four or five men that worked

23   basically 40, 45, 50 hours a week.

24             THE COURT:  And Mr. Diaz is one of those people?

25             MR. MILLER:  This gentleman ran one of the three
```

1    crews for 18 years and will testify, and it's noteworthy, your

2    Honor, that when the problems started about the failure to

3    maintain and repair the homes, that's when Judge Bernstein

4    appointed a receiver and took the power, so to speak, and the

5    rents away from Mr. Coyle -- justifiably so because the

6    receiver was appointed at the request of First Republic Bank

7    -- and he appointed a company to manage the homes and the bank

8    then wrote the homeowners and told them, "Don't send any

9    money, any rents to Mr. Coyle."

10            Mr. Coyle, at that point, had no income.  At that

11   point, this is well into the guts of the loan implosion to

12   maintain the homes.  But our -- I want to diffuse any

13   suggestion that this man for years and years and years

14   neglected or was indifferent to the needs of the homeowners.

15   Again, I suggested to your Honor that there's probably

16   thousands of tenants that he's had.  He borrowed $30 million

17   over 18 years from different banks without any criminal

18   problems at all, none, and there's thousands of tenants.  And

19   there's always people who are disgruntled -- justifiably so,

20   many of them, I'm sure -- and there are probably situations

21   that Mr. Coyle's people didn't attend to it quickly enough or

22   even didn't attend to it, but it wasn't some systemic agenda.

23            THE COURT:  Let's hear from Mr. Diaz --

24            MR. MILLER:  Thank you.

25            THE COURT:  -- who's waiting patiently there.

1          MR. MILLER:  Do you want him here, your Honor?

2   (Indicating)

3          THE COURT:  No, there would be fine.  (Indicating)

4          MR. MILLER:  Nice and loud.

5          THE WITNESS:  Um-hum.

6          THE DEPUTY CLERK:  Please raise your right hand,

7   place your left hand on the Bible.

8          ANGEL DIAZ, DEFENDANT'S WITNESS, SWORN.

9          THE DEPUTY CLERK:  Thank you.  Please be seated and

10  state and spell your full name for the record.

11         THE WITNESS:  My name is Angel Diaz.

12         THE COURT:  Okay, proceed.

13                      DIRECT EXAMINATION

14  BY MR. MILLER:

15  Q.   Mr. Diaz, where do you reside?  What area?

16  A.   I live in Philadelphia.

17  Q.   Okay.  And were you employed by Mr. Coyle's real estate

18  company for a number of years?

19  A.   Yes, I did.

20  Q.   And you were employed by him for 18 years; were you not?

21  A.   18 years, yes.

22  Q.   And when, generally, did your employment start and when

23  did it terminate?

24  A.   I started working there in 1991 and it ended 2008.

25  Q.   It ended about the time that the bank took over these

1    homes, correct, and went into receivership?

2    A.    Yes.  Yes.

3    Q.    Okay.  During that period of time, you ran -- and I'm

4    going to try to be brief.  There were a number of crews,

5    groups of men, women, whatever, who would repair and maintain

6    the Coyle properties that were rented; is that correct?

7    A.    Yes.  Yes, there was.

8    Q.    How many crews were there?

9    A.    There were like four crews --

10   Q.    Okay.

11   A.    -- that had like four men in each group.

12   Q.    So there was approximately 16 individuals that worked?

13   A.    Yes.

14   Q.    And they worked a minimum of 40 hours a week and a

15   maximum usually of some 60 hours a week; did they not?

16   A.    Yes.

17   Q.    Many of the jobs that you had to encounter and the things

18   you had to do were what we would call emergencies?

19   A.    It was -- yeah, it was a lot of work and emergencies.

20   Q.    Okay.  Now, what was your work?  What did you do for 18

21   years?  What was your --

22   A.    Well, we had the work that I get.  It was like we get a

23   work order every day.  I have like four guys on me --

24   Q.    Well, you were in maintenance and repair; correct?

25   A.    Yes.  Yes.

1    Q.    You didn't rent houses?

2    A.    No.

3    Q.    Okay, you were maintenance and repair?

4    A.    Just in the field.

5    Q.    Okay.  In a very broad way, briefly tell the Court what

6    you did.

7    A.    What we did -- what we did, all the repairs inside and

8    outside.  We did like floors, doors, windows, carpet,

9    painting, plumbing, heating.  We did a lot of heating, too.

10   Q.    Isn't it true that Mr. Coyle would furnish you over this

11   18-year period with an American Express or other credit card?

12   A.    Yes.  Every day I would buy materials to fix the homes.

13   Q.    And was there ever a time when Mr. Coyle would say,

14   "Don't fix this house or don't fix that one," some kind of a

15   plan not to repair it?

16   A.    Oh, no, no, no.  He wanted the houses done.  He wanted

17   the houses fixed.

18   Q.    What was his attitude about trying to comply with tenant

19   problems?

20   A.    He always wanted to keep everybody like happy.  He wanted

21   to help everybody in the community is the way I see it.

22   Q.    Okay.  And we spoke yesterday for the first time; right?

23   A.    Um-hum.

24   Q.    And you told me that many of the problems that you would

25   encounter are what you would call emergency situations?

1   A.   Yes.  Sometimes, even when on the weekends, he would call

2   me up, "Angel, if you can go and fix this heater up," and I

3   would go.

4   Q.   You would go at nights?

5   A.   Yes, I would.

6   Q.   In snowstorms?

7   A.   Yeah.  Whenever he called me, I had to go.

8   Q.   And I asked you yesterday what kinds of problems and you

9   said there were many, many, but lots were things like clogged

10  toilets?

11  A.   Oh, yes, there were.

12  Q.   No water?

13  A.   Right.

14  Q.   Lots of vandalism?

15  A.   Um-hum.

16  Q.   Broken windows?

17  A.   A lot.  Lots of them.

18  Q.   Poles or trees falling on houses?

19  A.   Yes.

20  Q.   Roofs leaking?

21  A.   Yes.

22  Q.   And you said you were an expert in boilers.  You had a

23  lot of problems with boilers?

24  A.   Yes, I did.  Yeah.

25  Q.   Okay.  And isn't it a fact -- I believe you told me

1   yesterday that sometimes you would have this credit card that

2   Coyle would give you and sometimes you would spend, I think

3   you said, $10,000 a week on materials?

4   A.   Yes, something like that.  Because it depends.  Sometimes

5   we have to fix the house all completely inside because some

6   houses needed a lot of work.  So we did spend -- like

7   sometimes I remember we'd spend like $1,500 a day.

8   Q.   A day?

9   A.   A day.

10   Q.   And were the four crews generally all out at the same

11   time?

12   A.   Yes.

13   Q.   Okay.  And you ran one?

14   A.   Yes.

15   Q.   Did you actually yourself do hands-on work?  In other

16   words, were you in these houses doing the work?

17   A.   Oh, yes.  Yes, I do.  I love it.

18   Q.   Were the houses occupied or not occupied or both?

19   A.   Both.  Some of them were not occupied and some of them

20   were occupied.

21   Q.   Now, generally speaking, the people that you

22   encountered -- you didn't encounter all his tenants -- did

23   they seem generally pleased with the fact you were trying to

24   repair the houses?

25   A.   Yeah, they seemed happy.

```
 1   Q.   My last question to you is, sir, how would you describe
 2   in your own words Mr. Coyle's disposition or attitude toward
 3   trying to maintain and fix up these homes that people were
 4   either going to rent or were living in?
 5   A.   He always -- he always wanted to like help everybody.
 6   Even help me.  When I, you know, started in 1991, I had went
 7   looking for a job there and he told me -- I had even worked
 8   with my wife.  That's how I know he's got a good heart.  He
 9   wants to help everybody.
10   Q.   And, again, your role or contribution to fixing these
11   things up was about at the same time that the houses went into
12   receivership; is that correct?
13   A.   Um-hum.
14   Q.   In 2008?
15   A.   Um-hum.
16        MR. MILLER:  Okay.  No further questions, your
17   Honor.
18        THE COURT:  Cross-examination.
19        MS. COSTELLO:  Yes, your Honor.
20                   CROSS-EXAMINATION
21   BY MS. COSTELLO:
22   Q.   Hi, Mr. Diaz.
23   A.   Hi.  How are you?
24   Q.   I'm fine, thank you.  So it sounds like you were pretty
25   busy?
```

1   A.    Yes.

2   Q.    Did you live in any of Mr. Coyle's houses?

3   A.    No.  No, I didn't.

4   Q.    No, you didn't?

5   A.    No.

6   Q.    No, okay.  Did you ever go around to the houses and turn

7   the water back on?

8   A.    Yes, I did.

9   Q.    You don't work for the water company, though; right?

10  A.    No.

11  Q.    Okay.  And weren't you involved in dressing up some of

12  the vacant properties before the appraisal?

13  A.    Yes, I did.

14  Q.    That entailed what, making it look nice, like putting up

15  curtains in the empty windows?  Right?

16  A.    Yes.

17  Q.    And painting the doors?

18  A.    Um-hum.

19  Q.    And who told you to do that?

20  A.    Mr. Coyle.

21  Q.    Mr. Coyle.

22          MS. COSTELLO:  Thank you.  Nothing else, your Honor.

23          THE COURT:  Any follow-up?

24          MR. MILLER:  I have no follow-up questions, your

25  Honor.  I would like to submit what is marked as D-10 for

1    identification purposes, a letter that is in conjunction with

2    the same issue he's talking about.  This is a -- it's actually

3    an e-mail from Walter Weir, who's First Republic Bank's

4    lawyer, and it was sent to Sherman C. Toppin.  Sherman C.

5    Toppin was from Coyle Toppin.  Coyle Toppin had been appointed

6    by Judge Bernstein as the receiver.  This letter is in

7    response to the receiver's plea to Walter Weir to have the

8    bank fix up these homes since the bank was now receiving the

9    rentals.  It was in receivership.  Mr. Coyle didn't really

10   have any hands-on ability with respect to these homes anymore

11   and what happened is Coyle went to Coyle Toppin -- I'm sorry,

12   went to the receiver and basically said, "Please get the bank

13   to fix these houses up.  People are living in them."

14          That's indeed what happened.  And Walter Weir's

15   response, which I'm going to give to you, it's from Walter

16   Weir, Jr., Esquire, Weir & Partners, who's a well-known lawyer

17   in the banking industry community, his answer in rejecting the

18   request from the receiver that the bank spend money in fixing

19   these places up was -- he said, quote, in part, "While the

20   Bank does not object to the court-appointed receiver making

21   repairs in some cases, the Bank is not prepared to accept any

22   responsibility for the maintenance, care, or protection of the

23   real estate.  The Bank has studiously avoided putting itself

24   in the position so that someone might claim that it's a

25   mortgagee in possession.  Our bank is not in the business of

1    maintaining or operating real estate and we have no interest
2    in taking any action with respect to these properties which
3    might impose the duties of mortgagee in possession.  While we
4    understand your desire to maximize the value of the real
5    estate, the Bank's interest in your appointment extends no
6    further than that of a rent receiver."
7             I would like to submit this for consideration.
8             THE COURT:  Any objection?
9             MS. COSTELLO:  No, your Honor.
10            MR. MILLER:  This is relevant on two issues, your
11   Honor.
12            MS. COSTELLO:  Is Mr. Diaz needed for this?
13            THE COURT:  Are we done with Mr. Diaz?
14            MR. MILLER:  Yes.
15            THE COURT:  Thank you, Mr. Diaz.
16            MR. MILLER:  It's relevant on two issues:  One, to
17   show -- which happens to be, again, the true picture, an
18   accurate picture -- that when the receiver stepped in and the
19   money was then sent to the bank as a result of the bank's
20   letters, indeed Mr. Coyle's maintenance stopped and the bank
21   refused to do it.
22            The second issue that it touches on, which is a
23   later issue that's also relevant, is the loss figure.  I'm not
24   going to get into it right now, but we have submitted to the
25   Court that the loss in this particular case -- again, we're

```
 1   not blaming the victim, but the facts are that the hard
 2   numbers of the loss could have been ameliorated by the bank
 3   had the bank not let these properties deteriorate.  And this
 4   is a clear indication.  He said, "We have no interest in
 5   maintaining the properties at all."
 6           What the bank did is they had a value, according to
 7   their appraisers, of $7.5 million, approximately.  By letting
 8   the properties deteriorate over three years -- unquestionably,
 9   they did.  There's no question about it.  I don't think
10   there's a dispute and the letter certainly proves that the
11   properties fell in value to approximately $3.4 million.  A
12   loss around $4 million in value.
13           So when you compute the loss in this case for
14   Guideline purposes, you're talking about a substantial loss.
15   Had the banks been even moderately proactive in maintaining
16   these properties at all, number one, it would have been a lot
17   better for the tenants.  They can all blame Mr. Coyle for that
18   if they want to, but the bank has a part in that.  I'm not
19   beating the victim up.  And, second of all, it impacts
20   directly on the consequential computations regarding the
21   Guidelines.  That's why we say the Guidelines overstate the
22   seriousness of the offense.  With respect to the loss, we've
23   agreed on the hard numbers.
24           We also submitted to your Honor some information
25   from Ricardo Zayas.  We incorporated his report in our
```

1    presentence submission.  Mr. Zayas is a CPA.  Former IRS

2    agent.  He is hired frequently by the prosecution.  I had a

3    first degree murder case, Craig Rabinowitz, where he was the

4    prosecutor's accountant.  I had a case, Vincent Marchese, in

5    front of Judge Padova where he was the U.S. Attorney's

6    accountant in determining loss.  His opinion is, consistent

7    with my suggestion to your Honor, that had the bank been

8    proactive in even mildly, mildly preserving these houses, the

9    loss would have been far different.

10            THE COURT:  So has Mr. Coyle sued Weir & Partners or

11   the receiver?

12            MR. MILLER:  Mr. Coyle has no lawsuit against the

13   receiver, your Honor.  He's not sued Weir & Partners.  Mr.

14   Coyle, at this point, is insolvent.  I can assure you.

15            THE COURT:  No, but if what you're saying is true,

16   it seems to me he's entitled to contribution or indemnity.

17            MR. MILLER:  He may very well be.  His civil counsel

18   is here.

19            THE COURT:  There's nothing that would stop him from

20   filing such a claim as long as it's within the statute of

21   limitations.

22            MR. MILLER:  His civil counsel is here and is our

23   next very brief witness.

24            THE COURT:  Okay, let's hear that then.

25            MR. MILLER:  And he can address -- I don't know.  I

1    don't know whether he intends to do it.  I think Mr. Coyle has

2    had enough litigation in his life right now, and, frankly, to

3    answer your Honor's question, I think he's a lot more

4    interested in his grandchildren than litigation at this point.

5    He's kind of had it.  And part of this, a great deal of this

6    he's brought down on himself, I'm not suggesting he hasn't,

7    but I think it's wearing on him substantially.

8                THE COURT:  Okay.

9                MR. MILLER:  But could I call Kyle Kulzer briefly?

10               THE COURT:  Briefly.

11               MR. MILLER:  And then we have two or three character

12   witnesses and then we're done.

13               THE DEPUTY CLERK:  Please raise your right hand.

14               THE WITNESS:  Sure.

15               KYLE KULZER, DEFENDANT'S WITNESS, SWORN.

16               THE DEPUTY CLERK:  Thank you.  Please state and

17   spell your full name.

18               THE WITNESS:  Sure.  My name is Kyle Kulzer.

19   K-Y-L-E  K-U-L-Z-E-R.

20               THE COURT:  K-Y-L-E  K-U-L --

21               THE WITNESS:  K-U-L-Z-E-R.

22               THE COURT:  K-U-L --

23               THE WITNESS:  -- Z-E-R.

24               THE COURT:  Okay.  Proceed.

25                         DIRECT EXAMINATION

1    BY MR. MILLER:

2    Q.    Mr. Kulzer, briefly, you're a member of the Bar?

3    A.    Correct.  Pennsylvania and New Jersey.

4    Q.    Okay.  And you have, at times, represented Mr. Coyle?

5    A.    Correct.

6    Q.    You're a civil attorney and do civil work?

7    A.    Civil, specializing in securities and banking law.

8    Q.    I have very few questions for you.  The first one is --

9    and you can answer it, please, in a narrative.  Did you

10   resolve the outstanding dispute or skirmish with respect to

11   East River Bank, which is one of the two victim banks in this

12   case?

13   A.    Yes, we did.  We were able to enter into a settlement

14   agreement with the bank shortly after they initiated

15   litigation which released Mr. Coyle from liability, assuming

16   that the properties were disposed of.

17   Q.    Okay.  Thank you.  The second question is -- and I don't

18   want to get into percentages, because I think it's a fruitless

19   endeavor, but you heard the earlier discussion about the

20   submission of false documentation to the bank.  We're talking

21   about particularly First Republic.

22   A.    Correct.

23   Q.    There's no doubt in your mind from reviewing this case

24   and being involved as Coyle's lawyer that there was certainly

25   false information with respect to some rent rolls and some

1    leases submitted?

2    A.    Um --

3    Q.    As far as you know.

4    A.    As far as I know, correct.

5    Q.    Okay.  Is it also true that it certainly is not anywhere

6    approaching 100 percent of that?

7    A.    No -- yes, in my opinion, it's not approaching anywhere

8    near 100 percent.

9    Q.    What was your estimate of the approximate percentage?

10   A.    Well, if you look at --

11            MS. COSTELLO:  Objection, your Honor.

12            THE COURT:  Sustained.  Objection sustained.

13   BY MR. MILLER:

14   Q.    I'll ask it a different way if I can.  Did you arrive at

15   some kind of an estimate based on your own due diligence and

16   work?

17            MS. COSTELLO:  Objection, your Honor.

18            MR. MILLER:  I'm just asking --

19            THE COURT:  Sustained.

20   BY MR. MILLER:

21   Q.    Do you know how many houses were pledged?

22   A.    For both banks?

23   Q.    Yes.  Let's take First Republic.

24   A.    I believe First Republic was approximately 117

25   properties, give or take.

1    Q.    Now, you yourself handled some of the tenant disputes

2    with people that were so-called victimized by this loan;

3    correct?

4    A.    Correct.  What essentially happened, once the banks

5    initiated litigation, certain tenants stepped forward and made

6    claims of ownership or lease purchase.  Now, how we handled

7    that, and it was a very small percentage so --

8              MS. COSTELLO:  Your Honor, I'm going to object to

9    this.  I don't see the relevance.

10              THE COURT:  Yes.

11              MR. MILLER:  I'll ask you one question, if I may,

12    sir.

13              THE COURT:  Go ahead.

14    BY MR. MILLER:

15    Q.    How many people stepped forward and how many litigations

16    were there?

17    A.    I believe with Republic Bank, maybe six or seven, and

18    with East River Bank, maybe five or six.  But my recollection

19    was that it was a small amount compared to the overall amount

20    of properties.

21              MR. MILLER:  Thank you.

22              THE COURT:  Cross-examination.

23              MS. COSTELLO:  Yes, your Honor, very briefly.

24              THE COURT:  Sure.

25                        CROSS-EXAMINATION

1    BY MS. COSTELLO:

2    Q.   So you're referring to the rent to own?

3    A.   I'm referring to any tenant who came forward and filed a

4    lawsuit.

5    Q.   Okay.  So you don't even know the whole universe of

6    rent-to-own agreements that were out there, do you?

7    A.   I do not.  All I know is what the lawsuits which were

8    filed --

9    Q.   Right.

10   A.   I would assume that anyone that had a claim would have

11   come forward and made it.

12   Q.   Well, that's just an assumption, though.  Just answer my

13   question yes or no.

14   A.   Okay.

15   Q.   Do you know the entire universe of rent-to-own agreements

16   that Mr. Coyle entered into for collateral property?

17   A.   No.

18   Q.   Okay.  And you talk about people who came forward.  Well,

19   are you aware that part of the misrepresentations that Mr.

20   Coyle made was that he warranted and represented that people

21   were renting properties that were vacant?

22   A.   I'm sorry, could you repeat the question?  Are you asking

23   me if I was aware?  At what time?

24   Q.   Yes.  At any time.

25   A.   Well, I'm aware of what was alleged in the Indictment,

1    correct.

2    Q.    Right.  So, obviously, if nobody's living in those

3    properties, they can't come forward; isn't that right?

4    A.    Right.

5    Q.    So you're not including those people in your very

6    unprofessional calculation; is that correct?  Unprofessional

7    in that you're not an accountant.

8    A.    I'm not an accountant or expert.

9    Q.    But you're not taking that into consideration; right?

10   A.    Correct.

11   Q.    And you're not taking into consideration all of the

12   people who rented whose rent was inflated on the rent rolls

13   that Mr. Coyle submitted to the banks; is that right?

14   A.    What I'm taking into consideration are people who came

15   forward and filed the lawsuit.

16   Q.    Right.

17   A.    That was the question that was asked of me.

18   Q.    Right.  And are you aware that once the receivers took

19   over the properties, many of the tenants stopped paying rent

20   at that time?

21   A.    Yes.

22   Q.    And --

23   A.    That was a major issue.

24   Q.    Exactly.  It was a major issue making repairs difficult,

25   didn't it?

1    A.    Well --

2    Q.    Yes or no.

3    A.    Yes.

4          MR. MILLER:  Your Honor, he doesn't have to answer

5    yes or no.  I think he has a right to answer it.

6          THE COURT:  He has a right to answer her question.

7          MR. MILLER:  Thank you.

8    BY MS. COSTELLO:

9    Q.    Yes or no, and then you can explain.

10   A.    Can you repeat the question?

11   Q.    Yes.  It was that it made making repairs on those

12   properties difficult, didn't it?

13   A.    It did.  And I would like to add that once the receivers

14   got appointed, Mr. Coyle had no control over the properties.

15   It was in the bank's hands and the receiver's hand.  Mr. Coyle

16   consented both in East River and ultimately with Republic to

17   allow the banks to have receivers that would manage the

18   properties.  So what the receivers did after they were

19   appointed --

20   Q.    I mean, we're getting like way over it.

21         THE COURT:  I think we are, too.

22         MS. COSTELLO:  Thank you.

23         THE WITNESS:  Okay.

24         THE COURT:  Any follow-up, Mr. Miller?

25         MR. MILLER:  No, your Honor.

1          THE COURT:  Thank you, sir.  You may step down.

2          You said you had some other people who would like to

3    come forward?

4          MR. MILLER:  Just character.  Your Honor, we've

5    submitted a number of character reference letters in

6    connection with this to your Clerk earlier.

7          THE COURT:  Yes.

8          MR. MILLER:  And I do not intend to call all these

9    character witnesses.  I intend to call two or three only.  But

10   I would ask, if the Court has no objection, if I could just

11   have them rise in the courtroom so you can take judicial

12   notice of the fact that they're here on his behalf?

13         THE COURT:  Sure.

14         MR. MILLER:  Okay.  Would all the character

15   witnesses here for Mr. Coyle please rise.

16         (Witnesses rise.)

17         MR. MILLER:  There's approximately 10 people here,

18   your Honor.  I would like to just call --

19         THE COURT:  I'm sorry, sir?

20         MR. MILLER:  I would just like to call two or three

21   for less than a minute each.

22         THE COURT:  Okay.

23         MR. MILLER:  Sir, please, step up here, please.

24   (Indicating)

25         THE DEPUTY CLERK:  Will you please raise your right

1    hand.

2                JOHN BAUMBACH, DEFENDANT'S WITNESS, SWORN.

3                THE DEPUTY CLERK:  Please state and spell your name.

4                THE WITNESS:  John Baumbach, B-A-U-M-B-A-C-H.

5                THE COURT:  Okay, and you've known Mr. Coyle for 55

6    years?

7                THE WITNESS:  Exactly, your Honor.

8                THE COURT:  And what would you like to say, sir?

9                THE WITNESS:  That he was always a good person.

10   I've never seen him hurt anybody.  On one occasion, talking

11   about how he treated his tenants, I was in the office.  He

12   asked me to take a ride with him.  He went to one of his

13   tenants.  The woman had three kids, no food, a couple of pets.

14   As we left the property, he gave me money to take back so the

15   woman could buy food for her kids.  This is true.  I've never

16   seen him tell anybody to get out of his office for not paying

17   rent or anything.  He always tried to work with them.  And I

18   spent a lot of time in there.  I know him as well as his wife.

19   BY MR. MILLER:

20   Q.   Do you know other people in the community that know him,

21   other folks that know him?

22   A.   Oh, other than his family, yeah.  Yeah, one or two.  My

23   brother.

24   Q.   Is it your opinion that he has a good reputation in the

25   general family community as to being a good and honest person?

1    A.    Yeah.  It's -- you know, I don't know how he was around

2    people when I wasn't with him, but when he was around me -- I

3    mean, we grew up together.  I was 12 years old when I met him.

4    Q.    Thank you.

5    A.    He's helped me several times, too.

6              MR. MILLER:  Thank you.

7              THE COURT:  Any questions from the Government?

8              MS. COSTELLO:  No.  Thank you, your Honor.

9              MR. MILLER:  I have one more witness.

10             THE COURT:  Thank you, Mr. Baumbach.

11             MR. MILLER:  Who would like to testify?  One more.

12   I'm just going to call one more character witness.

13             THE COURT:  Okay.

14             MR. MILLER:  Your Honor, I would proffer that I have

15   interviewed every one of these individuals directly or

16   indirectly, either by telephone or today or before, and if I

17   called all of these folks that are here, they would all give

18   testimony that was almost similar, if not identical, to the

19   last character witness.

20             THE COURT:  Okay.

21             MR. MILLER:  And many of them have submitted

22   character reference letters --

23             THE COURT:  Yes.

24             MR. MILLER:  -- including his wife who's here in

25   court.

```
1              THE COURT:  Yes.

2              MR. MILLER:  Can you step up, please?

3              THE COURT:  Sir, can you come forward.

4              THE DEPUTY CLERK:  Please raise your right hand.

5              THOMAS JESSE MOORE, DEFENDANT'S WITNESS, SWORN.

6              THE COURT:  Your name, sir?

7              THE WITNESS:  Thomas Jesse Moore.

8              THE COURT:  Okay, Mr. Moore, you are Mr. Coyle's

9      brother?

10             THE WITNESS:  That is correct.  He's my biological

11     half brother.  We share the same birth mother.

12             THE COURT:  Okay.  What would you like to say, sir?

13             THE WITNESS:  I want to thank the Court for a moment

14     for the privilege of coming here this morning.  I'm very proud

15     of my brother.  My brother chose to work in a neighborhood

16     that's very underserved.  He chose to work in one of the

17     toughest neighborhoods in our nation and that's a difficult

18     thing to do.  I mean, I think the Court needs to take that

19     into consideration.

20             I've seen him personally have numerous success

21     stories.  We've heard today in court some terrible tragedies,

22     but if we're going to put the light on the tragedies, we also

23     need to put the same light on those successes, and I've seen

24     him personally lobby and advocate for so many people in the

25     community.  He was personally responsible for helping people
```

1   obtain loans where it was impossible to achieve.  He sat back

2   in situations working through our local community

3   organizations to fight redlining and discrimination.

4          Working in the area in which he's working, he could

5   have chose to work anywhere, but he chose to work in an area

6   to give back to others, to make a difference in people's lives

7   so that others wouldn't have to experience the poverty that he

8   went through.  I think he was successful in that and I'm very

9   proud of that.

10          MR. MILLER:  Thank you.

11          THE COURT:  Thank you very much, sir.

12          Any questions from the Government?

13          MS. COSTELLO:  No.  Thank you, your Honor.

14          MR. MILLER:  I have no additional witnesses, your

15   Honor, or any documentary evidence.

16          THE COURT:  Okay.

17          MR. MILLER:  Thank you.

18          THE COURT:  Well, I take it there's no objection

19   from the Government or Mr. Miller for my simply including in

20   the record the Defense Exhibits and the Government's Exhibits?

21          MS. COSTELLO:  No objection.

22          MR. MILLER:  No objection, your Honor.

23          THE COURT:  Okay, so they'll be admitted into the

24   record of this sentencing hearing.

25          Mr. Coyle, you have a right to address the Court and

```
1   it's a right that I always welcome defendants exercising, but
2   I also understand that this is a rather difficult context and
3   so you might feel shy about coming forward, but if you'd like
4   to say something, this would be the time to do it.  Would you
5   like to say something?
6                   THE DEFENDANT:  Yes, your Honor.
7                   THE COURT:  Won't you come forward.
8                   THE DEPUTY CLERK:  Please raise your right hand.
9                   ROBERT COYLE, DEFENDANT, SWORN.
10                  THE COURT:  Yes, Mr. Coyle, what would you like to
11  say, sir?  Speak into the microphone because all these good
12  people want to hear what you have to say.
13                  THE DEFENDANT:  First of all, your Honor, I do
14  accept responsibility for what has happened.  I'm very sorry
15  that any tenant has been hurt by my default on these loans.  I
16  did submit documentations that were not true, but in reality,
17  I never thought that this loan would go bad.
18                  THE COURT:  I'm sorry, sir?
19                  THE DEFENDANT:  I never thought this loan would go
20  bad.  My intention was not to hurt anybody.  I'd like to
21  address the issue of me being a slum landlord.
22                  THE COURT:  Of what, sir?
23                  THE DEFENDANT:  I'm sorry --
24                  MR. MILLER:  He said he would like to address the
25  issue of him being a slum landlord.
```

1          THE COURT:  Oh, okay.

2          THE DEFENDANT:  I'm not a slum landlord, your Honor.

3   Excuse me, your Honor.

4          THE COURT:  That's okay.  I understand this is very

5   difficult to do.

6          MR. MILLER:  Maybe I can help him a little, your

7   Honor.

8          THE DEFENDANT:  No, let me go.

9          MR. MILLER:  Okay, then.

10          THE DEFENDANT:  I know what a slum landlord is.  As

11   a young boy growing up in North Philadelphia, my father was an

12   alcoholic and deserted the family.  My mother was the only

13   provider.  We lived in slum landlords for 10, 15 years of my

14   life.  All right, my mother worked in the sweatshops when we

15   were young children trying to provide a good living for us,

16   which she couldn't.  There was many times that we moved from

17   house to house, I would say at least 10, 15 times, because we

18   couldn't pay the rent.

19          I went to eight different schools and two different

20   high schools.  I did whatever I could do to support the

21   family.  I went to Thomas Edison High School and I left there

22   12 noon to work in a paper factory 8 hours a day to help

23   support the family.  So that's what I'd like to address.  I'm

24   not a slum landlord.  I would never have anybody go through

25   what I went through.  I would never hurt any tenant.  My

```
 1    intention was never to hurt any tenant.

 2            Just for the record, your Honor, I started my real

 3    estate career in 1986.  I sold real estate in the tough areas

 4    of Philadelphia, North Philadelphia, West Kensington,

 5    Kensington.  These areas were bad.  The housing was decaying.

 6    Low-income buyers could not get mortgages.  The banks were

 7    redlining.  I formed a nonprofit organization, which was

 8    called the Affordable Housing Coalition, that was made up of

 9    America Street Business Card, the local politicians, State

10    Representative Ralph Costa, many of the black clergies.  Sam

11    Evans, he was a very powerful African-American leader, was

12    part of it.  The purpose was to bring the lenders to know that

13    they have to stop redlining against the community, especially

14    the poor areas of Philadelphia specifically where I worked.

15            I opened a real estate office in North Philadelphia.

16    I found it very difficult to get mortgages for people so we

17    formed an organization and then we brought the banks and the

18    private insurance companies to come to our meetings and we

19    presented evidence to them through a HMDA report, which is

20    called Home Mortgage Disclosure, which every bank and lender

21    has to provide to the Government.  We found out that most of

22    the banks were redlining the area that I worked, especially

23    the Hispanic community, the African-American community.

24            We were able to convince Mellon Bank and Congress

25    Bank, which was two of the banks that were redlining, which we
```

```
 1   proved though our evidence of the Mortgage Disclosure Act --

 2   we were able to get a $30 million mortgage and business

 3   commitment from these banks.  That enabled me to sell the

 4   homes and to get mortgages.  I would say 95 percent of the

 5   people that I helped -- not to say I didn't make any money.  I

 6   was very successful, but I worked for it, your Honor.  I was

 7   able to get mortgages for people that were on welfare, people

 8   who were on Social Security.  I sold over a thousand houses

 9   that way.  I bought a thousand houses.  I've repaired a

10   thousand houses.

11          I committed -- I borrowed and committed over

12   $25 million to the community in the bad areas of Philadelphia.

13   I bought homes that were on blocks that were 50 to 60 percent

14   boarded up and I fixed three or four of those homes and I was

15   able to sell those homes.  I had over 500 properties at one

16   time that I rented out to low-income people.  Most of my

17   clients were African-American, Spanish people.  They were

18   poor.

19          So I stand here today to address this Court that I'm

20   not a slum landlord.  The newspaper has printed me as a slum

21   landlord.  There's people in this community that have judged

22   me according to that newspaper.  I never responded to it.  I

23   didn't want to dignify that.  But here today, I will tell your

24   Honor I'm not a slum landlord.  I did everything that I

25   possibly could to help those people.
```

1          For the record, First Republic Bank, it's not the

2     first time I had a loan with them, your Honor.  In 2001, I

3     borrowed $4.5 million from them and I paid them back.  I

4     refi'd six or seven times in my career for millions of

5     dollars.  I could have took that money and ran.  I didn't do

6     that.  I took that money and I invested in the community and I

7     paid all my loans on time.  Never had a problem until I had a

8     problem with First Republic Bank.  The market was bad.  Most

9     of my tenants were laid off because of the economy.  They

10    couldn't pay.  I never removed any tenant from a property that

11    came in and tried to work things out.  There were tenants that

12    were six months, seven months behind.  I never removed them.

13    I said, "When you get back on your feet, come in and pay."

14    Yes, there were some tenants that were hurt, and I'm sorry for

15    that, but I didn't intentionally hurt anyone.  And I did

16    things that were wrong in regards to what I did to the banks,

17    but as a whole, your Honor, I'm not a bad man.

18         So for the record, your Honor, that is the whole

19    story and I do accept responsibility.  I know your Honor has a

20    hard time with that trying to figure out, well, if 90 percent

21    of the loans were good, why are you accepting responsibility?

22    Because I want to get it over with.  It's been very difficult

23    not only physically, but emotionally.  I have my whole family.

24    And I apologize for that.  That's why I pleaded out.  I just

25    -- I don't have any more money.  I paid lawyers' fees,

1  hundreds of thousands of dollars, to defend myself against

2  these false accusations of Republic Bank.  I must have paid

3  over a half a million dollars, your Honor, in just legal fees

4  trying to defend myself.  I'm broke.  I've had it.  So I'm

5  leaving it up to your Honor to decide the sentence.  Thank

6  you.

7         THE COURT:  You're welcome.  If you could remain

8  standing there and, Mr. Miller, I'm sure you would like to

9  come forward and support your client.

10        As I said to you when we were together the last time

11 to talk about the guilty plea, I explained to you in detail

12 how complicated federal sentencing is.  This case is a perfect

13 instance of what I was talking about.  It's very complex, very

14 difficult, but one thing we know for sure is that the counts

15 of conviction that you pled guilty to are serious matters

16 indeed.  And whatever the exact details of the consequences of

17 these loans going bad, this was very serious business that had

18 a very serious consequence on you to be sure, but on the

19 community, as well.

20        But with all deference to the Government's arguments

21 and those who have written to me about you both pro and con,

22 it seems to me that the Guidelines in your case do capture the

23 consequences and the culpability associated with this.  I am

24 not going to grant the Government's motion either for an

25 upward departure or an upward variance because I believe that

1    the Guidelines capture the heartland of crimes of this nature

2    and that the circumstances that the Government believes would

3    justify an upward variance, it seems to me Mr. Miller has

4    shown beyond any doubt it's much more complicated than might

5    appear and there's a lot of blame to go around.  So I am going

6    to stay within the Sentencing Guidelines, but this is serious

7    business and the consequences were serious and grave to many

8    people and it just shows an economic crime like loan fraud is

9    very serious and that the criminalization of it, as Congress

10   did in 18 U.S.C. § 1014, is entirely warranted.

11          So I'm going to sentence you to 72 months in custody

12   and that will be followed by 5 years of supervised release,

13   during which time the defendant will be subject to the usual

14   conditions, and, of course, most important here is the

15   restitution which, at last we've agreed, is $6,480,302.65.

16   Obviously, Mr. Coyle can't possibly pay that back given his

17   limited resources now, but at a minimum we're not going to

18   impose a fine because of that prodigious restitution number

19   and the victim's losses that add up to the $6,480,302.65

20   beginning with East River Bank and $693,111 and so forth and

21   down to the $50 to the Philadelphia Corporation for Aging and

22   $2500 to the Philadelphia VIP, Inc. Obviously, under the law,

23   the individual victims should be paid back first.

24          Now, while he's in custody, Mr. Coyle clearly cannot

25   make any significant money, but there is the Inmate Financial

1    Responsibility Program that we will hope that Mr. Coyle avails

2    himself of to pay back a modest amount in accordance with that

3    program.  While he's on supervised release, he will supply his

4    probation officer with any financial information that the

5    probation officer reasonably asks of him.  Because of the

6    restitution obligation, I think that in the first year of

7    supervised release, Mr. Coyle could pay $250 a month toward

8    restitution, and the second year, he could pay $300, and we'll

9    keep it at that for the duration.  We'll waive interest

10   because of inability to pay.  The special assessment of $200

11   is due immediately, which brings us to the issue of surrender.

12           I take it the Government has no objection to our

13   giving Mr. Coyle a reasonable surrender time?

14           MS. COSTELLO:  Correct, your Honor.

15           MR. MILLER:  May I be heard on that, your Honor?

16           THE COURT:  Yes, sir.

17           MR. MILLER:  I was going to request the following:

18           Number one, that Mr. Coyle be able to self-report.

19           Number two, that your Honor make a specific

20   recommendation that he be designated for Fairton Camp.  It's

21   certainly a camp sentence and he lives in New Jersey.  It's in

22   Vineland, New Jersey.  It's a federal prison camp, Fairton

23   Camp.

24           Third of all, that he be permitted to surrender on

25   July 8th, which is a Monday.  It takes approximately 30 to 40

1    days or so for the U.S. Bureau of Prisons.

2            THE COURT:  I take it the Government has no problem

3    with that?

4            MS. COSTELLO:  No objection, your Honor.

5            THE COURT:  Okay.

6            MR. MILLER:  And that he could pay the statutory

7    assessment by Monday at 3 p.m.

8            THE COURT:  Monday, the --

9            MR. MILLER:  This coming Monday.

10           THE COURT:  Oh, that's fine.

11           MR. MILLER:  Thank you.

12           THE COURT:  I'll say July 8th, 2013.

13           MR. MILLER:  Perhaps at 2 p.m., your Honor.

14           THE COURT:  That's what it says, 2 p.m.

15           MR. MILLER:  Okay.

16           THE COURT:  And we will make that recommendation to

17   the Bureau of Prisons that you've sought, but bear in mind,

18   Mr. Coyle, I can't create a bed where none exists, but I will

19   certainly say if it's not the Fairton Camp, that it will be as

20   close to Vineland?

21           MR. MILLER:  That's correct, your Honor.

22           THE COURT:  As close to Glassboro, New Jersey, as

23   possible.

24           MR. MILLER:  That is the closest.  Probably the

25   second is Fort Dix, but Fairton Camp is --

1          THE COURT:  Okay, we'll recommend the camp at

2    Fairton and, in any event, as close to Glassboro, New Jersey,

3    as possible, okay?

4          MR. MILLER:  Right.  Thank you, your Honor.

5          THE COURT:  You're welcome.

6          Now, Mr. Coyle, because we're trusting you like

7    this, it will definitely improve the quality of life going

8    forward when you're in the custody of the Bureau of Prisons,

9    and I say this not by way of saber rattling, but you have to

10   show up at the time that I've set for your surrender.

11   Understand, sir?

12         THE DEFENDANT:  I understand that completely, your

13   Honor.

14         THE COURT:  Okay, and the failure to do so would be

15   a separate new federal offense punishable by some serious jail

16   time and a big fine.  Understand?

17         THE DEFENDANT:  I understand, your Honor.

18         THE COURT:  Okay.  And, also, I want to point out to

19   you that although your plea agreement limits your rights of

20   appeal, if you believe, consistent with your plea agreement,

21   that you want to appeal the sentence that I've imposed, you

22   have 14 days from today to do so.  Understand, sir?

23         THE DEFENDANT:  Yes, your Honor.

24         THE COURT:  And Mr. Miller knows how to do that if

25   he believes it's consistent with the plea agreement and Mrs.

1    Adler could do it for the asking, but the main thing is you

2    have the 14 days.

3              I take it the Government has a motion with respect

4    to Counts Two and Four?

5              MS. COSTELLO:  Yes, your Honor.  The Government

6    moves to dismiss Counts Two and Four.

7              THE COURT:  Motion granted.  I'll do a written order

8    to that effect.

9              MS. COSTELLO:  Thank you, your Honor.

10             THE COURT:  Anything else from the Government?

11             MS. COSTELLO:  Yes, one other thing, your Honor.

12   The Government just requests that the Court make forfeiture --

13   to orally pronounce forfeiture in the amount of $10,106,200

14   and that that be made part of the judgment.

15             MR. MILLER:  No objection.

16             MS. COSTELLO:  There is a preliminary order of

17   forfeiture --

18             THE COURT:  Do you have an order for me?

19             MS. COSTELLO:  I do not yet have a final order, your

20   Honor, but you did sign the preliminary --

21             THE COURT:  Okay, if you have the number, we'll put

22   it in the judgment.  Give it to Mrs. Adler, okay?

23             MR. MILLER:  I have no objection.

24             THE COURT:  No objection, okay.

25             MS. COSTELLO:  Thank you, your Honor.

1            THE COURT:  All right, anything else from you, Mr.

2    Miller?

3            MR. MILLER:  No, your Honor.  Thank you for giving

4    us ample time.

5            THE COURT:  Good luck to you, Mr. Coyle.

6            (Proceedings concluded at 11:18 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I   N   D   E   X

2

3    DEFENDANT'S WITNESSES              DIRECT      CROSS

4    Bruce Bryen                         30          42

5    Angel Diaz                          50          55

6    Kyle Kulzer                         61          65

7    John Baumbach                       69

8    Thomas Jessie Moore                 71

9    Robert Coyle                        73

10

11

12

13

14

15                   C E R T I F I C A T E

16

17       I certify that the foregoing is a correct transcript

18    from the record of the proceedings in the above-entitled

19    matter.

20

21

22                        _____

23                        Kathleen Feldman, CSR, CRR, RPR, CM
                          Official Court Reporter

24

25    Date: _____

**$**

**$1,500** [1] - 54:7
**$10,000** [1] - 54:3
**$10,106,200** [1] - 83:13
**$117,000** [1] - 39:9
**$2,550** [1] - 8:23
**$200** [1] - 80:10
**$25** [3] - 33:23, 33:25, 76:12
**$250** [1] - 84:7
**$2500** [1] - 79:22
**$30** [2] - 49:16, 76:2
**$30,000** [6] - 33:23, 33:25, 34:6, 40:14, 42:21
**$300** [1] - 80:8
**$300,000** [1] - 26:11
**$31,000** [2] - 26:12, 37:16
**$32,000** [2] - 24:23, 40:4
**$350,000** [1] - 28:16
**$50** [1] - 79:21
**$6,480,302.65** [3] - 4:23, 79:15, 79:19
**$693,111** [1] - 79:20

**1**

**1** [2] - 21:1, 21:16
**1(A** [1] - 18:14
**1.4** [2] - 42:17, 42:19
**10** [9] - 5:13, 18:22, 20:3, 20:4, 21:11, 21:13, 68:17, 74:13, 74:17
**100** [11] - 18:4, 18:5, 19:6, 21:1, 21:3, 26:19, 26:20, 26:22, 63:6, 63:8
**1014** [1] - 79:10
**1064** [1] - 1:19
**117** [1] - 63:24
**11:18** [1] - 84:6
**12** [4] - 12:9, 17:24, 70:3, 74:22
**12-84** [2] - 1:6, 3:6
**121** [1] - 6:12
**1234** [1] - 1:23
**1250** [1] - 1:16
**13.24** [1] - 46:25
**14** [5] - 28:15, 28:16, 40:5, 82:22, 83:2
**140** [1] - 21:12
**15** [3] - 19:23, 74:13, 74:17

**150** [1] - 1:19
**16** [3] - 1:8, 5:6, 51:12
**16th** [1] - 44:19
**17** [4] - 46:4, 46:6, 46:8, 46:23
**18** [8] - 20:20, 48:21, 49:1, 49:17, 50:20, 50:21, 51:20, 79:10
**18-year** [1] - 52:11
**19106** [3] - 1:16, 1:20, 1:24
**1986** [1] - 75:3
**1991** [1] - 50:24, 55:6

**2**

**2** [2] - 81:13, 81:14
**20** [1] - 19:23
**200** [4] - 20:3, 20:4, 20:5, 29:3
**2001** [1] - 77:2
**2007** [3] - 37:25, 38:7, 44:19
**2008** [2] - 50:24, 55:14
**2013** [2] - 1:8, 81:12
**215** [1] - 1:24
**25** [1] - 36:6

**3**

**3** [1] - 81:7
**3.4** [1] - 59:11
**30** [4] - 6:11, 13:3, 80:25, 85:4
**35** [1] - 46:22
**3553(a** [2] - 5:21, 15:23
**37** [1] - 47:17
**38** [1] - 47:17
**3E1.1** [1] - 18:14

**4**

**4** [1] - 59:12
**4.5** [1] - 77:3
**40** [5] - 13:4, 31:11, 48:23, 51:14, 80:25
**42** [1] - 85:4
**45** [1] - 48:23

**5**

**5** [2] - 20:5, 79:12
**50** [3] - 48:23, 76:13, 85:5

**500** [1] - 76:15
**55** [2] - 69:5, 85:5

**6**

**60** [2] - 51:15, 76:13
**600** [3] - 26:10, 33:21
**601** [1] - 1:23
**61** [1] - 85:6
**615** [1] - 1:16
**63** [2] - 6:7, 6:8
**65** [1] - 85:6
**69** [1] - 85:7

**7**

**7** [5] - 12:10, 16:13, 17:11, 18:5, 18:6
**7.5** [1] - 59:7
**71** [1] - 85:8
**72** [1] - 79:11
**73** [1] - 85:9
**75** [2] - 20:14, 24:15
**779-5578** [1] - 1:24
**78** [2] - 6:7, 6:8
**7th** [1] - 37:25

**8**

**8** [7] - 17:11, 18:5, 18:6, 19:20, 19:21, 21:5, 74:22
**8th** [2] - 80:25, 81:12

**9**

**9** [9] - 17:11, 18:5, 18:6, 18:22, 19:20, 19:21, 21:5, 34:20, 38:7
**90** [3] - 21:12, 34:7, 77:20
**93** [5] - 12:19, 13:13, 16:12, 17:25, 18:17
**95** [1] - 76:4
**97** [1] - 6:12
**9:30** [1] - 3:1

**A**

**a.m** [2] - 3:1, 84:6
**ab** [1] - 38:13
**abide** [2] - 14:4, 15:9
**ability** [1] - 57:10
**able** [16] - 8:8, 9:22, 11:4, 11:8, 12:4, 26:6,

26:17, 28:13, 36:4, 37:2, 62:13, 75:24, 76:2, 76:7, 76:15, 80:18
**above-entitled** [1] - 85:18
**absolutely** [1] - 10:19
**abundantly** [5] - 24:19, 24:21, 26:4, 41:16
**accept** [6] - 12:13, 15:9, 21:17, 57:21, 73:14, 77:19
**acceptance** [9] - 13:15, 14:25, 16:7, 16:14, 18:1, 18:15, 20:22, 21:15, 21:20
**accepted** [5] - 13:13, 13:25, 17:16, 21:16, 25:14, 39:12
**accepting** [1] - 77:21
**accepts** [5] - 16:17, 20:7, 20:22, 21:7, 21:21
**accordance** [1] - 80:2
**according** [4] - 17:2, 17:3, 59:6, 76:22
**Accordingly** [1] - 47:10
**accordingly** [1] - 4:13
**accountable** [1] - 29:24
**accountant** [7] - 24:20, 42:25, 43:13, 60:4, 66:6, 66:7, 66:8
**accounts** [2] - 36:13, 44:11
**accurate** [4] - 17:4, 20:16, 48:20, 58:18
**accusations** [1] - 78:2
**accused** [3] - 21:22, 26:21
**achieve** [1] - 72:1
**acquisition** [2] - 18:10, 21:24
**Act** [1] - 76:1
**ACTION** [1] - 1:4
**action** [1] - 58:2
**actual** [2] - 13:1, 20:1
**add** [2] - 67:13, 79:19
**addition** [2] - 8:13, 41:8
**additional** [1] - 72:14
**address** [10] - 5:20,

9:15, 12:22, 16:7, 60:25, 72:25, 73:21, 73:24, 74:23, 76:19
**Adler** [2] - 83:1, 83:22
**admit** [1] - 28:10
**admits** [1] - 17:4
**admitted** [2] - 41:12, 41:23
**Advisory** [4] - 6:5, 6:10, 6:12, 6:14
**advocate** [4] - 16:9, 17:21, 17:22, 71:24
**afford** [3] - 7:17, 9:22, 13:9
**Affordable** [1] - 75:8
**affordable** [1] - 42:20
**African** [3] - 75:11, 75:23, 76:17
**African-American** [3] - 75:11, 75:23, 76:17
**agency** [1] - 40:20
**agenda** [1] - 49:22
**agent** [2] - 3:10, 60:2
**Agent** [3] - 9:11, 11:2, 12:25
**AGENT** [1] - 3:11
**Aging** [1] - 79:21
**ago** [2] - 5:13, 20:15
**agree** [3] - 15:25, 16:21, 21:4
**agreed** [6] - 5:1, 15:10, 26:13, 26:14, 59:23, 79:15
**Agreement** [1] - 47:1
**agreement** [24] - 4:9, 4:18, 4:21, 7:1, 13:19, 13:21, 14:4, 15:6, 15:11, 24:1, 24:23, 33:17, 43:25, 44:7, 44:8, 44:9, 44:10, 46:10, 47:3, 47:4, 62:14, 82:19, 82:20, 82:25
**agreements** [8] - 7:2, 7:3, 7:4, 8:6, 47:6, 47:13, 65:6, 65:15
**ahead** [1] - 64:13
**ain't** [1] - 29:15
**alcoholic** [1] - 74:12
**ALL** [1] - 3:3
**alleged** [3] - 18:17, 21:12, 65:25
**allegedly** [1] - 21:10
**allow** [1] - 67:17
**alludes** [1] - 6:24
**almost** [3] - 19:17,

32:24, 70:18
**ameliorated** [1] - 59:2
**America** [2] - 3:5, 75:9
**AMERICA** [1] - 1:4
**American** [4] - 52:11, 75:11, 75:23, 76:17
**amortize** [2] - 32:24, 36:5
**amount** [12] - 13:4, 13:6, 13:7, 21:11, 27:20, 32:24, 33:2, 36:21, 64:19, 80:2, 83:13
**amounts** [2] - 7:13, 10:13
**ample** [1] - 84:4
**analysis** [1] - 12:25
**Angel** [4] - 48:10, 50:11, 53:2, 85:5
**ANGEL** [1] - 50:8
**angle** [1] - 9:23
**answer** [7] - 57:17, 61:3, 62:9, 65:12, 67:4, 67:5, 67:6
**antique** [1] - 5:19
**anyway** [1] - 24:17
**apart** [1] - 26:6
**apologize** [1] - 77:24
**appeal** [2] - 82:20, 82:21
**appear** [1] - 79:5
**APPEARANCES** [1] - 1:13
**Application** [1] - 18:13
**appointed** [9] - 28:22, 28:23, 49:4, 49:6, 49:7, 57:5, 57:20, 67:14, 67:19
**appointment** [2] - 48:8, 58:5
**appraisal** [1] - 56:12
**appraisals** [11] - 11:13, 11:14, 24:6, 24:7, 24:8, 24:9, 24:10, 24:11, 24:12, 24:14
**appraisers** [1] - 59:7
**appreciate** [2] - 13:18, 40:21
**approach** [5] - 9:14, 15:20, 34:8, 45:22, 45:25
**approached** [1] - 15:24
**approaching** [2] - 63:6, 63:7
**approval** [1] - 22:16

**approved** [2] - 27:8, 39:12
**approximate** [1] - 63:9
**approximated** [1] - 34:2
**area** [4] - 50:15, 72:4, 72:5, 75:22
**areas** [4] - 75:3, 75:5, 75:14, 76:12
**argument** [1] - 10:5
**arguments** [2] - 47:12, 78:20
**arrangement** [1] - 26:9
**arrive** [1] - 63:14
**artificial** [1] - 22:15
**artificially** [1] - 23:12
**artist** [1] - 17:15
**aspect** [1] - 40:22
**assessment** [2] - 80:10, 81:7
**assiduously** [1] - 10:19
**assigned** [1] - 35:18
**assistant** [3] - 1:15, 39:21
**associated** [1] - 78:23
**assume** [2] - 43:23, 65:10
**assuming** [1] - 62:15
**assumption** [1] - 65:12
**assure** [2] - 34:11, 60:14
**attend** [3] - 32:15, 49:21, 49:22
**ATTENDANCE** [1] - 2:1
**attitude** [1] - 52:18, 55:2
**attorney** [2] - 23:16, 62:6
**ATTORNEY** [1] - 1:14
**Attorney** [1] - 1:15
**Attorney's** [1] - 60:5
**attorneys** [1] - 31:20
**avails** [1] - 80:1
**avoided** [1] - 57:23
**award** [1] - 8:12
**aware** [6] - 37:15, 40:13, 65:19, 65:23, 65:25, 66:18

## B

**B-A-U-M-B-A-C-H** [1]

- 69:4
**B-R-Y-E-N** [1] - 31:1
**background** [1] - 41:22
**bad** [12] - 10:9, 23:13, 23:14, 23:19, 73:17, 73:20, 75:5, 76:12, 77:8, 77:17, 78:17
**balance** [1] - 39:9
**bank** [79] - 6:20, 7:8, 7:20, 8:9, 9:19, 10:1, 12:25, 13:7, 14:17, 16:20, 17:2, 17:6, 17:9, 19:6, 21:23, 22:14, 23:10, 23:16, 23:19, 23:25, 24:1, 24:6, 24:8, 24:12, 24:13, 24:16, 25:11, 25:18, 26:7, 27:4, 28:6, 29:2, 29:5, 29:14, 30:2, 30:3, 32:8, 32:9, 32:14, 32:16, 33:12, 33:19, 34:23, 35:13, 36:13, 36:17, 36:22, 37:20, 38:2, 40:18, 40:22, 41:12, 41:23, 44:1, 44:23, 45:1, 45:9, 45:14, 45:15, 45:17, 45:18, 49:7, 50:25, 57:8, 57:12, 57:18, 57:25, 58:19, 58:20, 59:2, 59:3, 59:6, 59:18, 60:7, 62:14, 62:20, 75:20
**Bank** [45] - 7:7, 8:5, 8:7, 8:14, 9:18, 9:21, 10:6, 10:8, 12:11, 13:1, 13:3, 21:2, 22:12, 23:21, 31:23, 31:24, 32:4, 35:18, 35:19, 35:25, 38:11, 39:14, 43:7, 43:10, 43:11, 43:16, 43:18, 44:11, 46:11, 49:6, 57:20, 57:21, 57:23, 62:11, 64:17, 64:18, 75:24, 75:25, 77:1, 77:8, 78:2, 79:20
**bank's** [4] - 28:25, 41:4, 58:19, 67:15
**Bank's** [2] - 57:3, 58:5
**banking** [2] - 57:17, 62:7
**banks** [17] - 6:16, 8:21, 13:6, 49:17, 59:15, 62:11, 63:22, 64:4, 66:13, 67:17,

75:6, 75:17, 75:22, 75:25, 76:3, 77:16
**Bar** [1] - 62:2
**barely** [1] - 12:4
**base** [1] - 25:10
**based** [5] - 19:15, 19:25, 36:25, 41:22, 63:15
**bases** [2] - 15:23, 16:2
**BAUMBACH** [1] - 69:2
**Baumbach** [3] - 69:4, 70:10, 85:7
**bear** [1] - 81:17
**beating** [2] - 22:9, 59:19
**bed** [1] - 81:18
**BEFORE** [1] - 1:10
**beg** [1] - 45:24, 48:2
**began** [1] - 37:8
**begged** [1] - 28:25
**begging** [2] - 28:17
**beginning** [2] - 3:7, 79:20
**behalf** [1] - 68:12
**behind** [1] - 77:12
**belief** [1] - 41:11
**believes** [2] - 79:2, 82:25
**benefit** [2] - 4:13, 15:3
**Bernstein** [3] - 28:23, 49:3, 57:6
**best** [1] - 16:9
**better** [1] - 59:17
**between** [4] - 46:10, 47:5, 47:6, 47:14
**beyond** [1] - 79:4
**Bible** [2] - 30:20, 50:7
**big** [1] - 82:16
**bills** [1] - 11:22
**biological** [1] - 71:10
**birth** [1] - 71:11
**bit** [2] - 15:18, 24:11
**black** [1] - 75:10
**blame** [3] - 9:14, 59:17, 79:5
**blameworthy** [1] - 29:15
**blaming** [7] - 14:1, 14:15, 22:17, 22:18, 29:13, 29:16, 59:1
**blocks** [1] - 76:13
**boarded** [1] - 76:14
**Bob** [22] - 23:17, 26:4, 31:12, 31:18, 32:1, 33:5, 33:17, 35:14, 36:1, 36:5,

36:12, 36:25, 37:7, 37:9, 37:15, 38:15, 38:22, 39:8, 39:24, 40:19, 41:3, 41:11
**Bob's** [2] - 31:19, 32:19
**boilers** [2] - 53:22, 53:23
**Booker** [2] - 15:17, 16:1
**books** [2] - 23:14, 23:19
**borne** [1] - 21:8
**borrowed** [3] - 49:16, 76:11, 77:3
**Borrower** [1] - 47:5
**bottom** [3] - 35:23, 37:6, 44:20
**bought** [2] - 76:9, 76:13
**bound** [2] - 10:22, 10:25
**boy** [1] - 74:11
**brief** [4] - 26:1, 31:6, 51:4, 60:23
**briefly** [7] - 34:15, 48:11, 52:5, 61:9, 61:10, 62:2, 64:23
**bring** [2] - 26:11, 75:12
**brings** [2] - 25:8, 80:11
**broad** [1] - 52:5
**broke** [1] - 78:4
**broken** [1] - 53:16
**brother** [5] - 69:23, 71:9, 71:11, 71:15
**brought** [2] - 61:6, 75:17
**Bruce** [5] - 23:24, 27:24, 31:1, 40:2, 85:4
**BRUCE** [2] - 30:21, 31:1
**bruce** [1] - 30:24
**Bryen** [20] - 23:24, 24:4, 27:24, 28:17, 30:8, 30:17, 31:1, 31:4, 47:23, 85:4
**BRYEN** [1] - 30:21
**Building** [1] - 1:19
**burden** [3] - 13:12, 14:22, 20:24
**Bureau** [4] - 2:2, 81:1, 81:17, 82:8
**burning** [1] - 40:8
**business** [21] - 3:23, 9:22, 27:5, 27:6, 32:14, 36:1, 36:2, 36:15, 37:23, 37:24,

38:22, 40:9, 40:22,
43:14, 45:4, 45:7,
46:14, 57:25, 76:2,
78:17, 79:7
   **Business** [1] - 75:9
   **busy** [2] - 5:25,
55:25
   **buy** [2] - 52:12,
69:15
   **buyers** [1] - 75:6
   **BY** [17] - 1:18, 31:3,
32:7, 32:12, 35:4,
39:22, 42:9, 46:2,
50:14, 55:21, 62:1,
63:13, 63:20, 64:14,
65:1, 67:8, 69:19

## C

   **C.A.T** [1] - 1:25
   **C.G** [3] - 8:17, 9:6,
12:3
   **calamity** [1] - 28:3
   **calculation** [3] -
6:19, 19:12, 66:6
   **calculations** [1] -
13:8
   **calculus** [1] - 5:1
   **Camp** [4] - 80:20,
80:23, 81:19, 81:25
   **camp** [3] - 80:21,
80:22, 82:1
   **cannot** [2] - 40:3,
79:24
   **canvass** [1] - 3:24
   **capture** [2] - 78:22,
79:1
   **carbon** [1] - 40:18
   **Card** [1] - 75:9
   **card** [2] - 52:11, 54:1
   **care** [1] - 57:22
   **career** [2] - 75:3,
77:4
   **carpet** [1] - 52:8
   **carried** [1] - 14:21
   **case** [22] - 3:9, 4:4,
4:5, 6:16, 7:4, 9:10,
10:7, 16:17, 22:6,
22:9, 22:12, 25:5,
27:21, 29:8, 58:25,
59:13, 60:3, 60:4,
62:12, 62:23, 78:12,
78:22
   **cases** [2] - 9:1, 57:21
   **cash** [7] - 7:18, 10:1,
10:17, 37:16, 40:7,
42:17, 42:19
   **caused** [1] - 14:17
   **certain** [1] - 64:5

   **certainly** [7] - 5:22,
9:16, 59:10, 62:24,
63:5, 80:21, 81:19
   **certify** [1] - 85:17
   **Chairman** [2] -
31:23, 38:11
   **change** [1] - 44:4
   **character** [11] -
27:23, 30:10, 30:16,
61:11, 68:4, 68:5,
68:9, 68:14, 70:12,
70:19, 70:22
   **characterize** [1] -
9:13
   **charge** [2] - 20:20,
22:20
   **charged** [13] - 16:18,
16:20, 17:17, 17:18,
17:20, 25:10, 27:14,
28:9, 29:13, 29:17,
29:18, 29:21
   **charges** [4] - 23:5,
23:6, 28:4, 29:25
   **Chestnut** [1] - 1:16
   **children** [1] - 74:15
   **choir** [1] - 17:19
   **chose** [4] - 71:15,
71:16, 72:5
   **circumstances** [4] -
16:1, 22:19, 79:2
   **civil** [5] - 60:17,
60:22, 62:6, 62:7
   **claim** [4] - 21:19,
57:24, 60:20, 65:10
   **claims** [3] - 18:21,
25:14, 64:6
   **clear** [10] - 16:15,
24:19, 24:21, 26:1,
26:4, 33:16, 41:7,
41:16, 59:4
   **clearly** [7] - 12:14,
13:12, 13:14, 16:13,
18:1, 20:22, 79:24
   **clergies** [1] - 75:10
   **CLERK** [10] - 30:19,
30:22, 50:6, 50:9,
61:13, 61:16, 68:25,
69:3, 71:4, 73:8
   **Clerk** [1] - 68:6
   **clerk** [1] - 47:25
   **client** [3] - 16:10,
17:21, 78:9
   **clients** [1] - 76:17
   **clogged** [1] - 53:9
   **close** [4] - 18:18,
81:20, 81:22, 82:2
   **closer** [1] - 31:9
   **closest** [1] - 81:24
   **closing** [3] - 8:15,
8:23, 40:24

   **closings** [2] - 26:10,
33:10
   **CM** [2] - 1:22, 85:23
   **Coalition** [1] - 75:8
   **collapse** [2] - 26:7,
41:13
   **collateral** [9] - 6:20,
7:6, 7:16, 7:21, 7:22,
8:19, 10:1, 10:18,
65:16
   **collateralized** [2] -
24:16, 25:23
   **colleagues** [1] -
31:20
   **collections** [1] - 13:2
   **coming** [4] - 20:12,
71:14, 73:3, 81:9
   **commenced** [1] - 3:1
   **commitment** [2] -
37:2, 76:3
   **committed** [1] - 14:2,
76:11
   **commonly** [1] - 5:19
   **communication** [1] -
40:21
   **communications** [5]
- 24:24, 25:1, 25:2,
35:11, 41:7
   **community** [1] -
52:21, 57:17, 69:20,
69:25, 71:25, 72:2,
75:13, 75:23, 76:12,
76:21, 77:6, 78:19
   **companies** [1] -
75:18
   **company** [9] - 11:24,
18:10, 24:22, 26:11,
32:19, 49:7, 50:18,
56:9
   **compared** [1] - 64:19
   **complain** [1] - 28:24
   **complaining** [1] -
37:24
   **completely** [3] -
7:24, 54:5, 82:12
   **complex** [2] - 30:5,
78:13
   **complicated** [2] -
78:12, 79:4
   **comply** [3] - 26:6,
41:17, 52:18
   **component** [1] -
41:3
   **computations** [1] -
59:20
   **compute** [1] - 59:13
   **con** [1] - 78:21
   **concerning** [2] -
36:13, 44:22
   **concluded** [1] - 84:6

   **concrete** [1] - 20:21
   **condition** [2] - 11:19,
12:4
   **conditions** [1] -
79:14
   **conduct** [2] - 18:14,
18:18
   **cone** [1] - 22:11
   **conferences** [1] -
32:15
   **Congress** [2] -
75:24, 79:9
   **conjunction** [1] -
57:1
   **connect** [1] - 25:24
   **connection** [4] -
48:10, 19:7, 41:3,
68:6
   **consented** [1] -
67:16
   **consequence** [3] -
25:16, 25:22, 78:18
   **consequences** [4] -
26:23, 78:16, 78:23,
79:7
   **consequential** [1] -
59:20
   **consequentially** [2] -
20:2, 21:10
   **consider** [1] - 15:22
   **consideration** [6] -
6:18, 58:7, 66:9,
66:11, 66:14, 71:19
   **consistent** [4] -
18:24, 60:6, 82:20,
82:25
   **consuming** [1] - 30:4
   **contacted** [4] -
23:16, 31:17, 31:18,
31:22
   **contained** [1] - 18:22
   **contemporaneous**
[1] - 47:11
   **contends** [1] - 21:19
   **contention** [3] -
10:21, 20:1, 20:8
   **contested** [1] - 23:5
   **contesting** [2] - 23:6,
23:7
   **context** [2] - 17:10,
73:2
   **continue** [2] - 40:3,
47:10
   **contractors** [1] -
11:21
   **contradicted** [1] -
47:11
   **contribution** [2] -
55:10, 60:16
   **contrite** [1] - 16:19

   **control** [1] - 67:14
   **conviction** [2] -
18:19, 78:15
   **convince** [1] - 75:24
   **copy** [2] - 5:11,
40:18
   **Corporation** [1] -
79:21
   **correct** [36] - 4:8,
4:14, 4:16, 4:18, 4:19,
4:24, 6:2, 6:8, 9:8,
14:6, 31:19, 35:6,
35:12, 36:25, 37:3,
38:16, 39:14, 47:1,
47:17, 51:1, 51:6,
51:24, 55:12, 62:3,
62:5, 62:22, 63:4,
64:3, 64:4, 66:1, 66:6,
66:10, 71:10, 80:14,
81:21, 85:17
   **Costa** [1] - 75:10
   **Costello** [2] - 3:7,
5:23
   **COSTELLO** [55] -
1:14, 3:8, 4:5, 4:19,
5:22, 5:24, 6:1, 6:8,
6:25, 9:5, 9:8, 9:10,
9:16, 10:24, 12:17,
12:21, 13:17, 13:22,
14:7, 14:10, 14:23,
15:4, 15:16, 15:19,
16:4, 42:7, 42:9,
45:22, 45:25, 46:2,
47:19, 48:5, 55:19,
55:21, 56:22, 58:9,
58:12, 63:11, 63:17,
64:8, 64:23, 65:1,
67:8, 67:22, 70:8,
72:13, 72:21, 80:14,
81:4, 83:5, 83:9,
83:11, 83:16, 83:19,
83:25
   **costly** [1] - 8:10
   **costs** [2] - 8:15, 8:23
   **Council** [1] - 5:8
   **Councilwoman** [1] -
5:7
   **Counsel** [2] - 1:17,
1:20
   **counsel** [2] - 60:17,
60:22
   **COUNSEL** [1] - 3:3
   **count** [2] - 12:15,
16:14
   **Count** [1] - 12:15
   **countless** [1] - 16:16
   **Counts** [2] - 83:4,
83:6
   **counts** [1] - 78:14
   **couple** [1] - 69:13

**course** [7] - 3:23, 4:10, 5:1, 5:5, 5:17, 14:20, 79:14

**Court** [17] - 1:22, 8:11, 15:21, 29:11, 29:23, 30:13, 34:12, 34:25, 52:5, 58:25, 68:10, 71:13, 71:18, 72:25, 76:19, 83:12, 85:23

**COURT** [159] - 1:1, 3:2, 3:4, 3:9, 3:12, 3:16, 3:19, 3:21, 3:23, 4:6, 4:9, 4:17, 4:20, 4:23, 4:25, 5:14, 5:16, 5:23, 5:25, 6:7, 6:23, 9:4, 9:6, 9:9, 9:12, 10:21, 12:8, 12:19, 13:11, 13:20, 14:5, 14:8, 14:20, 15:2, 15:12, 15:17, 16:3, 16:6, 16:21, 17:19, 18:13, 19:2, 19:13, 20:24, 21:25, 22:4, 22:17, 22:25, 25:4, 25:7, 25:12, 25:14, 26:25, 27:3, 27:7, 27:10, 27:16, 27:18, 29:20, 30:6, 30:12, 30:14, 30:18, 30:25, 32:6, 32:10, 34:5, 34:9, 34:20, 35:2, 39:17, 42:6, 45:24, 46:1, 47:21, 47:23, 47:25, 48:2, 48:4, 48:6, 48:9, 48:12, 48:24, 49:23, 49:25, 50:3, 50:12, 55:18, 56:23, 58:8, 58:13, 58:15, 60:10, 60:15, 60:19, 60:24, 61:8, 61:10, 61:20, 61:22, 61:24, 63:12, 63:19, 64:10, 64:13, 64:22, 64:24, 67:6, 67:21, 67:24, 68:1, 68:7, 68:13, 68:19, 68:22, 69:5, 69:8, 70:7, 70:10, 70:13, 70:20, 70:23, 71:1, 71:3, 71:6, 71:8, 71:12, 72:11, 72:16, 72:18, 72:23, 73:7, 73:10, 73:18, 73:22, 74:1, 74:4, 78:7, 80:16, 81:2, 81:5, 81:8, 81:10, 81:12, 81:14, 81:16, 81:22, 82:1, 82:5, 82:14, 82:18, 82:24, 83:7, 83:10, 83:18, 83:21, 83:24,

84:1, 84:5

**court** [6] - 14:13, 25:3, 28:24, 57:20, 70:25, 71:21

**court-appointed** [1] - 57:20

**Courthouse** [1] - 1:23

**courtroom** [5] - 3:19, 20:12, 23:25, 48:3, 68:11

**cover** [1] - 24:23

**covering** [1] - 16:2

**covers** [1] - 15:23

**Coyle** [102] - 3:5, 3:16, 3:21, 7:2, 7:6, 7:15, 7:17, 7:19, 8:10, 10:6, 10:12, 10:15, 11:6, 11:15, 11:22, 11:25, 13:2, 13:3, 14:12, 15:6, 16:8, 16:16, 17:3, 17:15, 18:10, 23:1, 23:17, 23:20, 24:5, 24:10, 24:17, 24:19, 26:4, 26:15, 28:5, 29:2, 29:4, 31:12, 31:18, 33:6, 34:23, 35:14, 36:1, 38:22, 39:24, 40:10, 41:12, 41:24, 42:1, 42:16, 42:22, 44:1, 44:10, 44:22, 45:9, 45:14, 45:18, 46:14, 47:17, 48:17, 49:5, 49:9, 49:10, 51:6, 52:10, 52:13, 54:2, 56:20, 56:21, 57:5, 57:9, 57:11, 59:17, 60:10, 60:12, 60:14, 61:1, 62:4, 62:15, 65:16, 65:20, 66:13, 67:14, 67:15, 68:15, 69:5, 72:25, 73:10, 79:16, 79:24, 80:1, 80:7, 80:13, 80:18, 81:18, 82:6, 84:5, 85:9

**COYLE** [2] - 1:6, 73:9

**Coyle's** [15] - 6:17, 6:21, 23:15, 24:1, 26:11, 40:5, 43:12, 46:10, 49:21, 50:17, 55:2, 56:2, 58:20, 62:24, 71:8

**CPA** [6] - 23:24, 27:24, 31:8, 31:10, 41:22, 60:1

**Craig** [1] - 60:3

**cream** [1] - 22:11

**create** [1] - 81:18

**credit** [2] - 52:11, 54:1

**crews** [7] - 48:22, 49:1, 51:4, 51:8, 51:9, 54:10

**crime** [3] - 10:19, 26:19, 79:8

**crimes** [3] - 6:17, 14:2, 79:1

**Criminal** [1] - 3:5

**criminal** [1] - 49:17

**CRIMINAL** [1] - 1:4

**criminalization** [1] - 79:9

**critical** [3] - 22:7, 32:22, 32:23, 36:4, 41:3

**CROSS** [3] - 55:20, 64:25, 85:3

**cross** [5] - 10:14, 42:6, 42:8, 55:18, 64:22

**cross-examination** [4] - 42:6, 42:8, 55:18, 64:22

**CROSS-EXAMINATION** [2] - 55:20, 64:25

**cross-referenced** [1] - 10:14

**CRR** [2] - 1:22, 85:23

**crux** [1] - 24:18

**CSR** [2] - 1:22, 85:23

**culpability** [1] - 78:23

**curtains** [1] - 11:17, 56:15

**custody** [3] - 79:11, 79:24, 82:8

**customers** [1] - 44:13

# D

**D-1** [5] - 28:15, 34:13, 34:20, 35:22, 35:23

**D-10** [1] - 56:25

**D-2** [3] - 37:5, 44:15, 44:17

**D-3** [2] - 37:19

**D-4** [1] - 38:5

**D-5** [1] - 38:18

**D-6** [1] - 39:7

**D-7** [1] - 39:23

**D-8** [1] - 40:17

**D-9** [2] - 28:15, 34:14

**Dagher** [3] - 39:13,

40:1, 40:2

**DAGHER** [1] - 39:18

**DALZELL** [1] - 1:10

**damaged** [1] - 21:10

**date** [3] - 13:20, 14:5, 14:6

**Date** [1] - 85:25

**dated** [1] - 5:6

**days** [4] - 5:19, 81:1, 82:22, 83:2

**deal** [8] - 8:9, 8:10, 8:14, 9:24, 44:13, 44:25, 61:5

**dealing** [1] - 10:22

**deals** [1] - 18:14

**decaying** [1] - 75:5

**decent** [1] - 11:19

**DeCesare** [6] - 35:16, 35:17, 35:24, 38:8, 40:18, 44:19

**decide** [2] - 30:2, 78:5

**decided** [2] - 8:6, 48:18

**default** [2] - 28:21, 73:15

**defaulted** [2] - 7:19, 28:20

**defend** [2] - 78:1, 78:4

**DEFENDANT** [12] - 3:22, 73:6, 73:9, 73:13, 73:19, 73:23, 74:2, 74:8, 74:10, 82:12, 82:17, 82:23

**Defendant** [1] - 1:20

**defendant** [5] - 4:14, 12:8, 12:13, 13:12, 79:13

**DEFENDANT'S** [6] - 30:21, 50:8, 61:15, 69:2, 71:5, 85:3

**defendants** [1] - 73:1

**defense** [3] - 4:7, 9:17, 10:2

**Defense** [1] - 72:20

**deference** [1] - 78:20

**definitely** [3] - 6:1, 38:25, 82:7

**defraud** [1] - 28:6

**defunct** [1] - 32:6

**degree** [2] - 18:8, 60:3

**demonstrate** [1] - 18:1

**denial** [1] - 18:16

**denies** [1] - 29:12

**denying** [3] - 17:13, 18:14, 18:24

**departure** [6] - 5:18,

6:4, 15:13, 15:14, 15:25, 78:25

**deposit** [1] - 44:11

**deposits** [3] - 44:23, 45:1, 45:3

**DEPUTY** [10] - 30:19, 30:22, 50:6, 50:9, 61:13, 61:16, 68:25, 69:3, 71:4, 73:8

**describe** [1] - 55:1

**deserted** [1] - 74:12

**designated** [1] - 80:20

**desire** [2] - 48:7, 58:4

**desperate** [1] - 22:14

**desperation** [2] - 39:25, 40:11

**destroy** [1] - 40:8

**detail** [3] - 12:3, 35:23, 78:11

**details** [1] - 78:16

**deteriorate** [2] - 59:3, 59:8

**determine** [1] - 15:20

**determining** [1] - 60:6

**DIAZ** [1] - 50:8

**Diaz** [11] - 48:11, 48:13, 48:24, 49:23, 50:11, 50:15, 55:22, 58:12, 58:13, 58:15, 85:5

**difference** [1] - 72:6

**different** [7] - 7:2, 21:4, 49:17, 60:9, 63:14, 74:19

**difficult** [9] - 13:18, 66:24, 67:12, 71:17, 73:2, 74:5, 75:16, 77:22, 78:14

**diffuse** [1] - 49:12

**dignify** [1] - 76:23

**dilapidated** [1] - 11:3

**diligence** [2] - 10:14, 63:15

**dinner** [3] - 37:22, 37:25, 38:1

**DIRECT** [2] - 61:25, 85:3

**direct** [4] - 28:11, 31:2, 39:21, 50:13

**directly** [3] - 28:4, 59:20, 70:15

**disclosing** [1] - 7:8

**Disclosure** [2] - 75:20, 76:1

**discretion** [1] - 15:20

**discrimination** [1] - 72:3

**discuss** [1] - 40:2
**discussed** [3] - 33:12, 33:14, 33:21
**discussion** [2] - 39:1, 62:19
**discussions** [1] - 35:8
**disgruntled** [3] - 10:23, 10:25, 49:19
**dismiss** [1] - 83:6
**disposed** [1] - 62:16
**disposition** [1] - 55:2
**dispute** [2] - 59:10, 62:10
**disputes** [1] - 64:1
**DISTRICT** [2] - 1:1, 1:2
**District** [3] - 1:15, 5:8
**Dix** [1] - 81:25
**document** [1] - 29:1
**documentary** [1] - 72:15
**documentation** [4] - 17:1, 21:23, 24:21, 62:20
**documentations** [1] - 73:16
**documented** [2] - 24:25, 26:13
**documents** [3] - 41:9, 47:4, 47:10
**dollars** [4] - 7:14, 77:5, 78:1, 78:3
**done** [10] - 11:14, 15:25, 22:25, 28:2, 36:12, 36:15, 42:1, 52:16, 58:13, 61:12
**door** [1] - 11:17
**doors** [2] - 52:8, 56:17
**dots** [2] - 25:24, 25:25
**doubt** [7] - 15:3, 16:17, 16:18, 41:19, 46:16, 62:23, 79:4
**down** [6] - 7:11, 44:20, 61:6, 68:1, 79:21
**dreamed** [1] - 28:7
**dress** [2] - 11:16, 11:20
**dress-up** [1] - 11:20
**dressing** [1] - 56:11
**drives** [1] - 5:1
**dropped** [1] - 4:1
**due** [3] - 10:14, 63:15, 80:11
**duration** [1] - 80:9
**during** [3] - 28:16,

51:3, 79:13
**duties** [1] - 58:3

# E

**e-mail** [8] - 35:24, 37:19, 39:8, 39:24, 40:10, 44:19, 45:17, 57:3
**e-mails** [12] - 24:2, 25:2, 28:13, 28:19, 33:12, 33:13, 34:22, 35:5, 35:11, 35:17, 44:18, 45:8
**early** [2] - 31:14, 41:24
**easier** [2] - 35:1, 45:16
**East** [12] - 7:7, 8:5, 8:6, 13:3, 43:10, 43:11, 43:18, 62:11, 64:18, 67:16, 79:20
**EASTERN** [1] - 1:2
**Eastern** [1] - 1:15
**economic** [1] - 79:8
**economy** [1] - 77:9
**Ed** [5] - 23:25, 31:18, 31:19, 31:22, 40:18
**Edison** [1] - 74:21
**editorialize** [1] - 39:24
**effect** [1] - 83:8
**eight** [1] - 74:19
**either** [8] - 7:8, 7:17, 15:13, 22:11, 31:23, 55:4, 70:16, 78:24
**elusive** [1] - 4:10
**embody** [1] - 47:4
**emergencies** [2] - 51:18, 51:19
**emergency** [1] - 52:25
**emotional** [2] - 8:2, 9:1
**emotionally** [1] - 77:23
**employed** [2] - 50:17, 50:20
**employment** [1] - 50:22
**empty** [1] - 56:15
**enabled** [1] - 76:3
**encounter** [2] - 51:17, 52:25, 54:22
**encountered** [1] - 54:22
**encouraged** [1] - 24:6
**end** [2] - 6:13, 47:16

**endeavor** [1] - 62:19
**ended** [2] - 50:24, 50:25
**English** [2] - 9:4, 9:5
**entailed** [1] - 56:14
**enter** [1] - 62:13
**entered** [2] - 7:1, 65:16
**entire** [2] - 47:4, 65:15
**Entire** [1] - 47:1
**entirely** [1] - 79:10
**entities** [1] - 46:10
**entitled** [2] - 60:16, 85:18
**epistolary** [1] - 5:3
**equal** [1] - 33:2
**equate** [1] - 33:24
**equitable** [1] - 8:1
**equity** [1] - 12:5
**especially** [2] - 8:4, 75:13, 75:22
**Esquire** [2] - 5:6, 57:16
**ESQUIRE** [2] - 1:14, 1:18
**essentially** [2] - 33:3, 64:4
**establish** [1] - 16:13
**established** [1] - 12:14
**establishing** [1] - 13:14
**estate** [7] - 50:17, 57:23, 58:1, 58:5, 75:3, 75:15
**estimate** [1] - 19:24, 19:25, 63:9, 63:15
**Evans** [1] - 75:11
**event** [2] - 9:25, 82:2
**eventually** [2] - 7:19, 8:14
**evidence** [6] - 23:21, 29:7, 47:11, 72:15, 75:19, 76:1
**evidencing** [1] - 40:11
**exact** [1] - 78:16
**exactly** [6] - 6:25, 9:5, 18:24, 42:22, 66:24, 69:7
**EXAMINATION** [6] - 31:2, 42:8, 50:13, 55:20, 61:25, 64:25
**examination** [3] - 42:6, 55:18, 64:22
**example** [3] - 9:20, 11:6, 11:14
**except** [1] - 8:16
**exchange** [3] -

33:17, 38:15, 45:19
**exclusively** [1] - 6:15
**excuse** [3] - 9:25, 43:25, 74:3
**excused** [2] - 48:1, 48:3
**Executive** [1] - 37:20
**exercising** [1] - 73:1
**Exhibit** [4] - 46:4, 46:6, 46:8, 46:23
**Exhibits** [2] - 72:20
**exists** [1] - 81:18
**expectation** [1] - 38:3
**expected** [1] - 34:24
**experience** [4] - 9:11, 11:1, 11:12, 72:7
**expert** [2] - 53:22, 66:8
**explain** [1] - 67:9
**explained** [1] - 78:11
**explaining** [1] - 22:19
**Express** [1] - 52:11
**extends** [1] - 58:5

# F

**fabricated** [4] - 17:9, 17:12, 18:7, 19:8
**fact** [11] - 9:6, 18:11, 20:17, 20:23, 20:25, 21:17, 44:4, 48:19, 53:25, 54:23, 68:12
**factor** [1] - 10:3
**factors** [2] - 5:21, 15:23
**factory** [1] - 74:22
**facts** [4] - 20:17, 20:18, 41:23, 59:1
**fail** [1] - 28:8
**failed** [3] - 27:11, 27:12
**failure** [3] - 48:19, 49:2, 82:14
**fair** [3] - 16:10, 33:16, 41:2
**Fairton** [5] - 80:20, 80:22, 81:19, 81:25, 82:2
**fake** [2] - 11:6, 44:1
**faked** [1] - 11:11
**fall** [1] - 26:6
**falling** [1] - 53:18
**false** [29] - 16:12, 16:13, 16:20, 16:22, 16:24, 16:25, 17:1, 17:6, 17:10, 17:12,

17:25, 19:7, 19:9, 19:22, 21:12, 21:23, 25:10, 25:17, 26:2, 26:18, 28:8, 29:16, 43:6, 44:5, 62:20, 62:25, 78:2
**falsehoods** [1] - 12:23
**falsely** [1] - 18:8
**familiar** [2] - 42:10, 42:12
**family** [6] - 69:22, 69:25, 74:12, 74:21, 74:23, 77:23
**far** [3] - 60:9, 63:3, 63:4
**fashion** [1] - 32:21
**father** [1] - 74:11
**FBI** [1] - 3:10
**federal** [4] - 2:2, 78:12, 80:22, 82:15
**fees** [2] - 77:25, 78:3
**feet** [1] - 77:13
**Feldman** [1] - 85:23
**FELDMAN** [1] - 1:22
**fell** [1] - 59:11
**few** [1] - 62:8
**fiction** [1] - 12:20
**field** [1] - 52:4
**fight** [1] - 72:3
**figure** [3] - 18:5, 58:23, 77:20
**filed** [4] - 6:2, 65:3, 65:8, 66:15
**filing** [1] - 60:20
**final** [3] - 6:12, 41:2, 83:19
**finally** [1] - 28:20
**finance** [1] - 31:25
**financial** [7] - 6:15, 8:4, 8:8, 8:25, 22:15, 23:11, 80:4
**Financial** [1] - 79:20
**financials** [1] - 43:4
**financing** [1] - 23:20
**Fine** [1] - 24:10
**fine** [8] - 24:17, 37:5, 48:9, 50:3, 55:24, 79:18, 81:10, 82:16
**First** [33] - 7:7, 8:14, 9:18, 9:21, 10:6, 10:8, 12:11, 13:1, 16:11, 18:2, 19:7, 20:18, 21:2, 22:12, 31:15, 32:4, 32:5, 35:18, 35:20, 39:14, 43:7, 43:9, 43:16, 44:11, 46:11, 49:6, 57:3, 62:21, 63:23, 63:24, 77:1, 77:8

**first** [15] - 3:23, 9:20, 9:22, 12:21, 16:6, 20:15, 32:6, 38:14, 52:22, 60:3, 62:8, 73:13, 77:2, 79:23, 80:6

**fit** [1] - 25:7

**Fitzgerald** [5] - 23:25, 31:18, 31:19, 31:22, 40:18

**five** [4] - 45:14, 45:16, 48:22, 64:18

**fix** [9] - 33:10, 52:12, 52:14, 53:2, 54:5, 55:3, 57:8, 57:13

**fixed** [3] - 28:24, 52:17, 76:14

**fixing** [1] - 55:10, 57:18

**flip** [1] - 47:16

**flooding** [1] - 12:2

**floors** [1] - 52:8

**flow** [4] - 7:18, 10:1, 10:17, 40:7

**focus** [1] - 6:15

**folks** [7] - 6:24, 10:23, 10:25, 26:23, 30:15, 69:21, 70:17

**follow** [4] - 36:9, 56:23, 56:24, 67:24

**follow-up** [4] - 36:9, 56:23, 56:24, 67:24

**followed** [1] - 79:12

**following** [1] - 80:17

**food** [2] - 69:13, 69:15

**FOR** [1] - 1:2

**force** [1] - 24:5

**foreclose** [1] - 7:22

**foregoing** [1] - 85:17

**forfeiture** [2] - 83:12, 83:13, 83:17

**formats** [1] - 17:3

**formed** [2] - 75:7, 75:17

**former** [2] - 10:9, 60:1

**Fort** [1] - 81:25

**forth** [6] - 22:6, 24:2, 28:19, 35:11, 35:14, 79:20

**forthcoming** [4] - 33:2, 36:20, 39:3, 39:5

**forward** [16] - 5:21, 15:10, 38:3, 64:5, 64:15, 65:3, 65:11, 65:18, 66:3, 66:15, 68:3, 71:3, 73:3, 73:7, 78:9, 82:8

**Four** [2] - 83:4, 83:6

**four** [8] - 6:10, 36:16, 48:22, 51:9, 51:11, 51:23, 54:10, 76:14

**frankly** [1] - 61:2

**fraud** [4] - 17:16, 29:19, 79:8

**fraudulent** [2] - 21:3, 21:19

**frequently** [1] - 60:2

**frog** [1] - 25:19

**front** [1] - 11:18, 30:18, 44:15, 60:5

**fruitless** [1] - 62:18

**frustrated** [1] - 36:14

**frustration** [1] - 40:11

**full** [4] - 23:8, 30:23, 50:10, 61:17

**fully** [1] - 16:17

**furnish** [1] - 52:10

## G

**general** [2] - 11:3, 69:25

**generally** [7] - 9:2, 35:12, 50:22, 54:10, 54:21, 54:23

**gentleman** [1] - 48:25

**germane** [1] - 27:20

**given** [1] - 79:16

**glad** [1] - 38:23

**Glassboro** [2] - 81:22, 82:2

**Government** [44] - 1:17, 3:6, 4:3, 5:4, 5:16, 5:17, 6:2, 6:3, 6:9, 6:13, 15:5, 17:14, 18:21, 18:25, 19:3, 19:16, 19:18, 20:14, 21:4, 21:19, 22:11, 22:22, 23:9, 25:19, 27:9, 29:14, 29:17, 31:4, 34:12, 46:3, 46:6, 46:8, 46:22, 70:7, 72:12, 72:19, 75:21, 79:2, 80:12, 81:2, 83:3, 83:5, 83:10, 83:12

**Government's** [7] - 9:12, 12:13, 12:16, 19:25, 72:20, 78:20, 78:24

**grandchildren** [1] - 61:4

**grant** [2] - 24:8, 78:24

**granted** [1] - 83:7

**grateful** [1] - 5:9

**grave** [1] - 79:7

**Great** [1] - 38:20

**great** [4] - 6:16, 6:17, 17:20, 61:5

**grew** [1] - 70:3

**gross** [1] - 23:17

**group** [1] - 51:11

**groups** [1] - 51:5

**growing** [1] - 74:11

**guaranteed** [1] - 33:9

**guess** [2] - 45:10

**Guideline** [6] - 6:5, 6:10, 6:12, 6:14, 6:19, 59:14

**Guidelines** [6] - 6:15, 59:21, 78:22, 79:1, 79:6

**guilt** [2] - 22:8, 23:7

**guilty** [16] - 13:19, 13:22, 18:12, 22:20, 23:2, 25:13, 26:21, 27:14, 28:9, 29:17, 29:22, 29:23, 29:24, 78:11, 78:15

**guts** [1] - 49:11

**guy** [1] - 39:14

**guys** [1] - 51:23

## H

**half** [5] - 36:16, 45:10, 45:11, 71:11, 78:3

**hand** [12] - 22:10, 30:13, 30:20, 35:1, 50:6, 50:7, 61:13, 67:15, 69:1, 71:4, 73:8

**handed** [1] - 46:16

**handing** [1] - 46:3

**handled** [2] - 64:1, 64:6

**hands** [3] - 54:15, 57:10, 67:15

**hands-on** [2] - 54:15, 57:10

**happy** [2] - 52:20, 54:25

**hard** [6] - 3:25, 4:10, 4:22, 59:1, 59:23, 77:20

**harm** [1] - 14:16

**harmed** [1] - 18:23

**Harry** [8] - 38:9, 38:10, 38:19, 38:25, 39:2, 39:20, 40:2,

40:8

**Harry's** [1] - 38:21

**hazard** [1] - 4:17

**head** [1] - 22:10

**hear** [7] - 14:12, 15:6, 42:11, 46:7, 49:23, 60:24, 73:12

**heard** [6] - 11:20, 14:14, 20:15, 62:19, 71:21, 80:15

**hearing** [1] - 31:6, 36:14, 72:24

**hearsay** [1] - 19:17, 20:10, 20:16

**heart** [1] - 55:8

**heartland** [1] - 79:1

**heater** [1] - 53:2

**heating** [1] - 52:9

**heaven's** [1] - 23:5

**held** [1] - 18:1

**help** [8] - 36:4, 52:21, 55:5, 55:6, 55:9, 74:6, 74:22, 76:25

**helped** [1] - 70:5, 76:5

**helping** [1] - 71:25

**hemorrhaging** [1] - 37:16

**hereof** [1] - 47:7

**hi** [2] - 55:22, 55:23

**high** [5] - 6:13, 24:12, 74:20

**High** [1] - 74:21

**higher** [1] - 24:11

**himself** [3] - 15:7, 61:6, 80:2

**hired** [1] - 60:2

**Hispanic** [1] - 75:23

**HMDA** [1] - 75:19

**hoagie** [1] - 30:2

**hold** [1] - 14:21

**Home** [1] - 75:20

**homeowners** [3] - 29:3, 49:8, 49:14

**homes** [16] - 8:8, 29:6, 48:18, 48:19, 49:3, 49:7, 49:12, 51:1, 52:12, 55:3, 57:8, 57:10, 76:4, 76:13, 76:14, 76:15

**honest** [1] - 69:25

**honor** [1] - 37:2

**Honor** [126] - 3:3, 3:8, 3:11, 3:15, 3:18, 3:22, 4:5, 4:8, 4:15, 4:19, 4:22, 5:12, 5:15, 5:22, 6:1, 6:9, 6:14, 6:25, 9:8, 9:10, 9:16, 10:20, 12:7, 12:17,

12:22, 13:9, 13:17, 13:24, 14:3, 14:7, 14:10, 14:18, 14:24, 15:11, 15:19, 15:24, 16:2, 16:4, 16:15, 18:20, 19:1, 19:4, 19:16, 20:6, 20:10, 20:21, 22:21, 23:8, 24:3, 24:25, 25:17, 27:6, 28:2, 28:14, 29:9, 30:9, 30:17, 32:14, 34:8, 35:1, 42:5, 42:7, 45:23, 47:20, 47:22, 48:5, 48:10, 48:14, 49:2, 49:15, 50:1, 55:17, 55:19, 56:22, 56:25, 58:9, 58:11, 59:24, 60:7, 60:13, 63:11, 63:17, 64:8, 64:23, 67:4, 67:25, 68:4, 68:18, 69:7, 70:8, 70:14, 72:13, 72:15, 72:22, 73:6, 73:13, 74:2, 74:3, 74:7, 75:2, 76:6, 76:24, 77:2, 77:17, 77:18, 77:19, 78:3, 78:5, 80:14, 80:15, 80:19, 81:4, 81:13, 81:21, 82:4, 82:13, 82:17, 82:23, 83:5, 83:9, 83:11, 83:20, 83:25, 84:3

**Honor's** [1] - 61:3

**HONORABLE** [1] - 1:10

**hope** [1] - 80:1

**horizon** [1] - 23:9

**hours** [5] - 16:16, 48:23, 51:14, 51:15, 74:22

**house** [11] - 7:5, 8:18, 8:22, 8:24, 52:14, 54:5, 74:17

**house-for-house** [2] - 7:5, 8:18

**houses** [22] - 7:24, 20:18, 28:24, 29:1, 33:11, 52:1, 52:16, 52:17, 53:18, 54:6, 54:16, 54:18, 54:24, 55:11, 56:2, 56:6, 57:13, 60:8, 63:21, 76:8, 76:9, 76:10

**housing** [1] - 75:5

**Housing** [1] - 75:8

**hum** [6] - 50:5, 52:23, 53:15, 55:13, 55:15, 56:18

**hundreds** [2] -

18:20, 78:1
**hurt** [8] - 20:2, 69:10, 73:15, 73:20, 74:25, 75:1, 77:14, 77:15
**hypothetical** [2] - 18:4, 41:21

**I**

**ice** [1] - 22:11
**iceberg** [2] - 22:21, 22:23
**identical** [1] - 70:18
**identification** [2] - 34:14, 57:1
**identify** [1] - 34:20
**ignore** [1] - 46:5
**ignoring** [1] - 14:16
**illegal** [1] - 17:15
**illiterate** [1] - 9:7
**imagining** [2] - 14:8, 14:11
**immediately** [1] - 80:11
**impacts** [1] - 59:19
**imploded** [2] - 25:21, 27:13
**implosion** [5] - 26:22, 28:2, 28:11, 48:21, 49:11
**important** [4] - 6:21, 27:15, 33:5, 79:14
**importantly** [1] - 47:13
**impose** [2] - 58:3, 79:18
**imposed** [1] - 82:21
**impossible** [1] - 72:1
**imprisonment** [1] - 6:9
**improve** [1] - 82:7
**imputing** [1] - 16:8
**IN** [1] - 1:1
**inability** [1] - 80:10
**Inc** [1] - 79:22
**incidences** [1] - 12:2
**including** [3] - 66:5, 70:24, 72:19
**income** [8] - 9:2, 29:2, 40:7, 41:17, 49:10, 75:6, 76:16
**inconsistent** [1] - 18:15
**incorporate** [1] - 23:18
**incorporated** [1] - 59:25
**incorrect** [1] - 12:22
**increased** [1] - 17:8

**incredible** [1] - 36:21
**incredibly** [1] - 7:16
**indeed** [6] - 3:25, 5:2, 23:14, 57:14, 58:20, 78:16
**indemnity** [1] - 60:16
**Independence** [1] - 1:19
**indicate** [1] - 28:14
**indicated** [2] - 13:2, 48:7
**Indicating** [3] - 50:2, 50:3, 68:24
**indication** [4] - 21:14, 29:12, 36:18, 59:4
**indicative** [1] - 21:20
**Indictment** [4] - 12:24, 17:2, 22:20, 65:25
**indifferent** [1] - 49:14
**indirectly** [2] - 28:4, 70:16
**individual** [1] - 79:23
**individuals** [3] - 25:22, 51:12, 70:15
**industry** [1] - 57:17
**inference** [2] - 12:19, 16:11
**inflated** [4] - 18:8, 22:14, 23:12, 66:12
**inflation** [1] - 13:1
**information** [15] - 10:12, 16:20, 16:23, 21:23, 25:10, 25:18, 26:2, 26:18, 28:8, 43:7, 44:1, 44:5, 59:24, 62:25, 80:4
**inhabited** [4] - 11:4, 11:9, 11:19, 12:5
**initiated** [2] - 62:14, 64:5
**initio** [1] - 38:13
**Inmate** [1] - 79:25
**innocence** [1] - 22:8
**inside** [2] - 52:7, 54:5
**insolvent** [1] - 60:14
**installment** [1] - 7:3
**instance** [1] - 78:13
**instinct** [1] - 27:16
**insurance** [11] - 28:12, 28:18, 28:21, 32:18, 35:9, 36:7, 36:19, 37:2, 37:8, 37:13, 38:3, 46:14, 75:18
**insurers** [1] - 44:12
**intelligent** [2] - 23:3,

23:4
**intend** [4] - 22:3, 29:7, 68:8, 68:9
**intends** [1] - 61:1
**intention** [2] - 73:20, 75:1
**intentionally** [2] - 48:17, 77:15
**interest** [6] - 7:8, 8:1, 58:1, 58:5, 59:4, 80:9
**interested** [2] - 40:20, 61:4
**interposed** [1] - 5:18
**interviewed** [1] - 70:15
**invested** [1] - 77:6
**investigated** [1] - 9:23
**Investigation** [1] - 2:2
**investigation** [10] - 3:24, 10:10, 10:11, 11:1, 19:18, 19:19, 20:12, 20:13, 21:8
**involved** [3] - 31:14, 56:11, 62:24
**IRS** [1] - 60:1
**issue** [17] - 11:8, 13:23, 14:9, 14:10, 16:7, 19:11, 20:21, 27:15, 32:18, 57:2, 58:22, 58:23, 66:23, 66:24, 73:21, 73:25, 80:11
**issues** [3] - 22:6, 58:10, 58:16
**itemization** [1] - 21:9
**itself** [1] - 57:23

**J**

**Jackie** [1] - 19:5
**Jacqueline** [2] - 2:3, 3:13
**jail** [1] - 82:15
**JEFFREY** [1] - 1:18
**Jeffrey** [1] - 3:16
**Jennifer** [1] - 5:6
**Jersey** [5] - 62:3, 80:21, 80:22, 81:22, 82:2
**JESSE** [1] - 71:5
**Jesse** [1] - 71:7
**Jessie** [1] - 85:8
**job** [2] - 16:9, 55:7
**jobs** [1] - 51:17
**JOHN** [1] - 69:2
**John** [2] - 69:4, 85:7
**Jr** [1] - 57:16

**Judge** [6] - 28:23, 29:25, 32:21, 49:3, 57:6, 60:5
**judged** [1] - 76:21
**judgment** [2] - 83:14, 83:22
**judicial** [1] - 68:11
**July** [2] - 80:25, 81:12
**justifiably** [3] - 25:20, 49:5, 49:19
**justify** [1] - 79:3

**K**

**K-U-L-Z-E-R** [2] - 61:19, 61:21
**Kates** [2] - 5:6, 6:23
**Kates'** [1] - 5:11
**KATHLEEN** [1] - 1:22
**Kathleen** [1] - 85:23
**KAY** [1] - 1:14
**Kay** [1] - 3:7
**keep** [3] - 8:8, 52:20, 80:9
**keeping** [1] - 5:25
**Kensington** [2] - 75:4, 75:5
**kids** [2] - 69:13, 69:15
**kind** [6] - 10:3, 21:20, 23:17, 52:14, 61:5, 63:15
**kinds** [1] - 53:8
**knowing** [2] - 8:2, 23:3
**knowledge** [3] - 7:15, 41:23, 43:4
**known** [2] - 57:16, 69:5
**knows** [1] - 82:24
**KUL** [2] - 61:20, 61:22
**Kulzer** [3] - 61:9, 61:18, 62:2, 85:6
**KULZER** [1] - 61:15
**Kyle** [3] - 61:9, 61:18, 85:6
**KYLE** [1] - 61:15, 61:19, 61:20

**L**

**L&I** [2] - 11:8, 11:9
**lack** [2] - 21:15, 21:20
**laid** [1] - 77:9

**landlord** [8] - 73:21, 73:25, 74:2, 74:10, 74:24, 76:20, 76:21, 76:24
**landlords** [1] - 74:13
**Landvest** [1] - 6:23
**last** [8] - 4:18, 39:17, 39:25, 40:1, 55:1, 70:19, 78:10, 79:15
**law** [3] - 47:25, 62:7, 79:22
**lawsuit** [3] - 60:12, 65:4, 66:15
**lawsuits** [1] - 65:7
**lawyer** [7] - 24:1, 28:25, 29:25, 31:19, 57:4, 57:16, 62:24
**lawyers'** [1] - 77:25
**lead** [1] - 31:5
**leader** [1] - 75:11
**leading** [1] - 24:4
**leaking** [1] - 53:20
**leap** [1] - 25:19
**lease** [1] - 64:6
**leases** [12] - 10:12, 17:8, 17:9, 17:12, 18:4, 18:6, 18:21, 18:23, 19:22, 20:4, 21:12, 63:1
**least** [2] - 8:1, 74:17
**leave** [2] - 47:24, 47:25
**leaving** [1] - 78:5
**led** [1] - 10:15
**Ledger** [1] - 1:19
**left** [5] - 25:9, 30:20, 50:7, 69:14, 74:21
**legal** [1] - 78:3
**lender** [1] - 75:20
**Lender** [1] - 47:5
**lenders** [3] - 38:2, 40:21, 75:12
**lending** [2] - 24:13, 37:21
**lengthy** [1] - 29:8
**less** [4] - 36:10, 42:21, 45:15, 68:21
**letter** [7] - 5:6, 5:11, 6:24, 9:13, 57:1, 57:6, 59:10
**letters** [7] - 5:5, 5:10, 10:13, 30:16, 58:20, 68:5, 70:22
**letting** [1] - 59:7
**level** [1] - 6:11
**levels** [3] - 6:10, 14:21, 15:2
**liability** [1] - 62:15
**licenses** [2] - 11:7
**lied** [2] - 7:18, 10:16

**lies** [2] - 9:19, 12:24
**life** [3] - 61:2, 74:14, 82:7
**light** [3] - 4:9, 71:22, 71:23
**limitations** [1] - 60:21
**limited** [2] - 27:20, 79:17
**limits** [1] - 82:19
**line** [1] - 39:9
**list** [4] - 20:2, 30:9, 44:12, 45:2
**listed** [2] - 12:23, 20:3
**listen** [2] - 22:22, 22:23
**litigation** [4] - 61:2, 61:4, 62:15, 64:5
**litigations** [1] - 64:15
**live** [2] - 50:16, 56:2
**lived** [5] - 7:10, 8:3, 12:7, 44:22, 74:13
**lives** [2] - 72:6, 80:21
**living** [5] - 7:24, 55:4, 57:13, 66:2, 74:15
**loan** [90] - 7:7, 7:16, 7:17, 7:19, 8:19, 9:18, 9:19, 9:22, 9:24, 10:6, 10:7, 10:9, 10:16, 13:1, 13:3, 16:11, 16:23, 18:11, 19:7, 20:2, 21:10, 21:24, 23:17, 24:5, 24:6, 24:9, 24:22, 25:20, 26:3, 26:5, 26:13, 26:16, 26:17, 26:23, 27:12, 27:25, 28:3, 28:7, 28:11, 28:13, 28:15, 28:16, 28:20, 28:22, 31:15, 31:17, 32:25, 33:3, 33:9, 33:18, 33:19, 34:3, 34:7, 35:18, 36:5, 37:9, 37:16, 38:16, 39:14, 39:16, 40:4, 41:3, 41:4, 41:13, 41:17, 41:24, 42:1, 42:2, 42:10, 42:12, 42:20, 43:24, 45:5, 45:6, 45:7, 45:19, 46:10, 47:4, 47:10, 48:21, 49:11, 64:2, 73:17, 73:19, 77:2, 79:8
**loans** [12] - 11:7, 11:14, 23:13, 23:14, 23:18, 23:19, 39:11, 72:1, 73:15, 77:7,

77:21, 78:17
**lobby** [1] - 71:24
**local** [4] - 32:8, 32:9, 72:2, 75:9
**logical** [3] - 17:22, 17:23, 17:25
**look** [18] - 17:19, 22:21, 22:22, 23:9, 27:18, 35:22, 35:23, 37:5, 37:19, 38:5, 38:18, 39:7, 39:23, 40:16, 45:12, 46:25, 56:14, 63:10
**looked** [2] - 11:18, 43:12
**looking** [4] - 12:9, 23:8, 44:17, 55:7
**looks** [1] - 38:21
**loss** [14] - 4:11, 6:15, 8:4, 8:8, 8:25, 58:23, 58:25, 59:2, 59:12, 59:13, 59:14, 59:22, 60:6, 60:9
**losses** [1] - 79:19
**Lou** [1] - 35:16, 35:24, 35:25, 36:5, 37:21, 37:24, 38:8, 38:23
**loud** [1] - 50:4
**love** [1] - 54:17
**low** [4] - 9:2, 24:7, 75:6, 76:16
**low-income** [3] - 9:2, 75:6, 76:16
**luck** [1] - 84:5
**lunch** [1] - 38:24
**lying** [1] - 9:25

## M

**machine** [1] - 1:25
**Madonna** [4] - 38:6, 38:10, 38:19
**Madonna's** [1] - 39:20
**mail** [9] - 29:19, 35:24, 37:19, 39:8, 39:24, 40:10, 44:19, 45:17, 57:3
**mails** [12] - 24:2, 25:2, 28:13, 28:19, 33:12, 33:13, 34:22, 35:5, 35:11, 35:17, 44:18, 45:8
**main** [2] - 48:16, 83:1
**maintain** [1] - 29:1, 29:5, 48:18, 49:3, 49:12, 51:5, 55:3

**maintained** [1] - 20:19
**maintaining** [3] - 58:1, 59:5, 59:15
**maintenance** [5] - 20:20, 51:24, 52:3, 57:22, 58:20
**major** [4] - 21:24, 28:3, 66:23, 66:24
**Mall** [1] - 1:19
**man** [5] - 23:3, 29:12, 38:21, 49:13, 77:17
**manage** [2] - 49:7, 67:17
**manner** [1] - 13:23
**Marchese** [1] - 60:4
**Maria** [1] - 5:7
**marked** [5] - 34:10, 34:13, 46:3, 46:8, 56:25
**market** [1] - 77:8
**Market** [1] - 1:23
**mARY** [1] - 1:14
**Mary** [1] - 3:7
**mass** [2] - 17:10, 18:7
**material** [4] - 17:11, 18:9, 19:6, 20:14, 21:2, 21:18
**materially** [2] - 16:22, 21:23
**materials** [2] - 52:12, 54:3
**matter** [5] - 13:7, 17:25, 47:7, 48:20, 85:19
**matters** [1] - 78:15
**maximize** [1] - 58:4
**maximum** [1] - 51:15
**MAY** [1] - 1:8
**mean** [12] - 10:2, 10:9, 11:12, 13:5, 13:8, 14:3, 18:11, 27:19, 36:2, 67:20, 70:3, 71:18
**means** [1] - 48:6
**meet** [1] - 37:22
**meeting** [9] - 37:25, 38:1, 38:9, 38:14, 38:19, 38:24, 39:25, 40:2, 45:20
**meetings** [6] - 24:4, 25:1, 32:15, 36:3, 41:8, 75:18
**Mellon** [1] - 75:24
**member** [1] - 62:2
**memoranda** [2] - 5:3
**memorandum** [1] - 6:3, 8:17, 22:7, 34:13,

36:25
**memories** [1] - 43:9
**men** [3] - 48:22, 51:5, 51:11
**mentioned** [1] - 39:11
**mercifully** [1] - 4:25
**merge** [2] - 22:15, 23:10
**merger** [5] - 22:13, 27:6, 27:7, 27:8, 27:11
**met** [4] - 23:24, 23:25, 70:3
**meticulous** [1] - 13:8
**microphone** [2] - 30:23, 73:11
**middle** [2] - 38:20, 40:19
**might** [5] - 9:13, 57:24, 58:3, 73:3, 79:4
**mike** [1] - 31:9
**mildly** [2] - 60:8
**MILLER** [113] - 1:18, 1:18, 3:18, 3:20, 4:8, 4:16, 4:21, 4:24, 5:12, 5:15, 16:15, 16:22, 18:3, 18:20, 19:3, 19:15, 20:25, 22:3, 22:5, 22:18, 23:6, 25:6, 25:9, 25:13, 25:16, 27:2, 27:5, 27:8, 27:11, 27:17, 27:22, 29:21, 30:8, 30:13, 30:15, 31:3, 32:7, 32:12, 34:8, 34:10, 34:16, 34:25, 35:3, 35:4, 39:19, 39:22, 42:5, 47:22, 48:1, 48:3, 48:7, 48:10, 48:13, 48:25, 49:24, 50:1, 50:4, 50:14, 55:16, 56:24, 58:10, 58:14, 58:16, 60:12, 60:17, 60:22, 60:25, 61:9, 61:11, 62:1, 63:13, 63:18, 63:20, 64:11, 64:14, 64:21, 67:4, 67:7, 67:25, 68:4, 68:8, 68:14, 68:17, 68:20, 68:23, 69:19, 70:6, 70:9, 70:11, 70:14, 70:21, 70:24, 71:2, 72:10, 72:14, 72:17, 72:22, 73:24, 74:6, 74:9, 80:15, 80:17, 81:6, 81:9, 81:11, 81:13, 81:15, 81:21,

81:24, 82:4, 83:15, 83:23, 84:3
**Miller** [15] - 3:17, 5:4, 5:10, 9:13, 9:17, 16:6, 22:25, 30:6, 44:18, 67:24, 72:19, 78:8, 79:3, 82:24, 84:2
**Miller's** [1] - 14:5
**million** [10] - 42:17, 42:19, 49:16, 59:7, 59:11, 59:12, 76:2, 76:12, 77:3, 78:3
**millions** [1] - 77:4
**mind** [5] - 6:22, 12:12, 16:17, 62:23, 81:17
**minimizing** [2] - 14:1, 14:16
**minimum** [2] - 51:14, 79:17
**minute** [2] - 43:23, 68:21
**minutes** [2] - 5:13, 20:15
**misleading** [2] - 19:9, 21:3
**misrepresentation** [1] - 18:9
**misrepresentations** [1] - 65:19
**misrepresented** [1] - 28:12
**missing** [1] - 11:18
**mitigating** [3] - 10:3, 10:20, 20:9
**moderately** [1] - 59:15
**modest** [1] - 80:2
**moment** [1] - 71:13
**Monday** [4] - 80:25, 81:7, 81:8, 81:9
**money** [16] - 8:11, 8:16, 24:14, 26:5, 28:6, 30:3, 33:10, 49:9, 57:18, 58:19, 69:14, 76:5, 77:5, 77:6, 77:25, 79:25
**month** [14] - 24:23, 26:12, 33:23, 33:25, 34:5, 34:7, 37:16, 40:4, 40:14, 42:21, 80:7
**monthly** [1] - 32:25
**months** [11] - 6:7, 6:8, 6:12, 28:15, 28:17, 36:16, 38:7, 40:5, 77:12, 79:11
**MOORE** [1] - 71:5
**Moore** [3] - 71:7, 71:8, 85:8

**morning** [12] - 3:2, 3:3, 3:8, 3:11, 3:14, 3:18, 3:22, 5:22, 5:23, 30:1, 35:25, 71:14
**Mortgage** [2] - 75:20, 76:1
**mortgage** [1] - 76:2
**mortgagee** [2] - 57:25, 58:3
**mortgages** [4] - 75:6, 75:16, 76:4, 76:7
**most** [13] - 5:5, 6:21, 8:15, 27:22, 27:23, 30:10, 30:15, 45:8, 47:12, 75:21, 76:16, 77:8, 79:14
**mostly** [1] - 6:21
**mother** [3] - 71:11, 74:12, 74:14
**motion** [7] - 5:18, 5:19, 6:3, 6:4, 78:24, 83:3, 83:7
**move** [6] - 8:20, 15:10, 23:19, 38:3, 44:25, 45:3
**moved** [3] - 7:20, 44:11, 74:16
**moves** [1] - 83:6
**moving** [3] - 7:13, 7:25, 24:5
**MR** [111] - 3:18, 3:20, 4:8, 4:16, 4:21, 4:24, 5:12, 5:15, 16:15, 16:22, 18:3, 18:20, 19:3, 19:15, 20:25, 22:3, 22:5, 22:18, 23:6, 25:6, 25:9, 25:13, 25:16, 27:2, 27:5, 27:8, 27:11, 27:17, 27:22, 29:21, 30:8, 30:13, 30:15, 31:3, 32:7, 32:12, 34:8, 34:10, 34:16, 34:25, 35:3, 35:4, 39:19, 39:22, 42:5, 47:22, 48:1, 48:3, 48:7, 48:10, 48:13, 48:25, 49:24, 50:1, 50:4, 50:14, 55:16, 56:24, 58:10, 58:14, 58:16, 60:12, 60:17, 60:22, 60:25, 61:9, 61:11, 62:1, 63:13, 63:18, 63:20, 64:11, 64:14, 64:21, 67:4, 67:7, 67:25, 68:4, 68:8, 68:14, 68:17, 68:20, 68:23, 69:19, 70:6, 70:9, 70:11,

70:14, 70:21, 70:24, 71:2, 72:10, 72:14, 72:17, 72:22, 73:24, 74:6, 74:9, 80:15, 80:17, 81:6, 81:9, 81:11, 81:13, 81:15, 81:21, 81:24, 82:4, 83:15, 83:23, 84:3
**MS** [53] - 3:8, 4:5, 4:19, 5:22, 5:24, 6:1, 6:8, 6:25, 9:5, 9:8, 9:10, 9:16, 10:24, 12:17, 12:21, 13:17, 13:22, 14:7, 14:10, 14:23, 15:4, 15:16, 15:19, 16:4, 42:7, 42:9, 45:22, 45:25, 46:2, 47:19, 48:5, 55:19, 55:21, 58:9, 58:12, 63:11, 63:17, 64:8, 64:23, 65:1, 67:8, 67:22, 70:8, 72:13, 72:21, 80:14, 81:4, 83:5, 83:9, 83:11, 83:16, 83:19, 83:25
**murder** [1] - 60:3
**must** [1] - 78:2

## N

**name** [9] - 30:23, 32:9, 39:17, 50:10, 50:11, 61:17, 61:18, 69:3, 71:6
**names** [1] - 30:10
**narrative** [1] - 62:9
**NASUTI** [1] - 1:18
**nation** [1] - 71:17
**nature** [2] - 10:1, 79:1
**near** [1] - 63:8
**need** [3] - 23:22, 23:23, 71:23
**needed** [2] - 54:6, 58:12
**needs** [2] - 49:14, 71:18
**neglected** [1] - 49:14
**negotiations** [2] - 35:8, 37:8
**neighborhood** [1] - 71:15
**neighborhoods** [1] - 71:17
**never** [15] - 8:22, 24:8, 28:7, 46:18, 69:10, 69:15, 73:17, 73:19, 74:24, 74:25,

75:1, 76:22, 77:7, 77:10, 77:12
**New** [5] - 62:3, 80:21, 80:22, 81:22, 82:2
**new** [2] - 8:9, 82:15
**news** [1] - 38:21
**newspaper** [2] - 76:20, 76:22
**next** [6] - 25:20, 25:21, 30:17, 37:5, 48:10, 60:23
**nice** [5] - 3:9, 3:12, 3:13, 50:4, 56:14
**nights** [1] - 53:4
**NO** [1] - 1:6
**nobody** [1] - 19:5
**nobody's** [1] - 66:2
**none** [2] - 20:8, 49:18, 81:18
**nonprofit** [1] - 75:7
**noon** [1] - 74:22
**normal** [2] - 24:8, 25:16
**normally** [1] - 24:13
**Norman** [5] - 2:2, 3:10, 9:11, 11:2, 12:25
**NORMAN** [1] - 3:11
**North** [3] - 74:11, 75:4, 75:15
**Note** [1] - 18:14
**noteworthy** [1] - 49:1
**nothing** [8] - 9:17, 10:19, 23:18, 28:4, 36:22, 45:5, 56:22, 60:19
**notice** [2] - 7:10, 68:12
**November** [1] - 44:19
**nowhere** [1] - 46:13
**nucleus** [1] - 27:14
**Number** [2] - 3:5, 46:6
**number** [12] - 5:5, 22:5, 46:4, 46:5, 50:18, 51:4, 59:16, 68:5, 79:18, 80:18, 80:19, 83:21
**numbering** [1] - 21:11
**numbers** [6] - 4:11, 4:12, 4:22, 33:24, 59:2, 59:23
**numerous** [4] - 11:2, 11:6, 12:1, 71:20

## O

**object** [3] - 31:5, 57:20, 64:8
**objection** [14] - 48:4, 58:8, 63:11, 63:12, 63:17, 68:10, 72:18, 72:21, 72:22, 80:12, 81:4, 83:15, 83:23, 83:24
**objections** [2] - 4:3, 4:7
**obligation** [1] - 80:6
**obtain** [1] - 72:1
**obvious** [1] - 39:24
**obviously** [6] - 15:19, 16:10, 22:25, 66:2, 79:16, 79:22
**occasion** [1] - 69:10
**occupation** [1] - 31:7
**occupied** [5] - 10:17, 54:18, 54:19, 54:20
**occurred** [4] - 20:17, 24:4, 26:23, 41:19
**OF** [3] - 1:2, 1:4, 1:14
**offense** [6] - 6:11, 14:21, 15:2, 18:19, 59:22, 82:15
**offer** [2] - 21:25, 22:1
**office** [5] - 11:11, 17:2, 69:11, 69:16, 75:15
**OFFICE** [1] - 1:14
**Office** [2] - 2:4, 13:25
**officer** [2] - 29:11, 39:15, 39:16, 80:4, 80:5
**OFFICER** [2] - 3:14, 4:15
**officers** [3] - 34:23, 35:13, 37:22
**Official** [2] - 1:22, 85:23
**official** [1] - 35:17
**offset** [1] - 40:6
**old** [1] - 70:3
**once** [4] - 39:2, 64:4, 66:18, 67:13
**one** [39] - 7:4, 8:16, 9:6, 9:20, 17:3, 22:7, 23:12, 27:24, 28:5, 30:1, 31:19, 33:18, 35:23, 36:16, 37:7, 42:16, 44:17, 48:14, 48:24, 48:25, 52:14, 54:13, 58:16, 59:16, 62:8, 62:11, 64:11, 69:10, 69:12, 69:22, 70:9, 70:11, 70:12,

70:15, 71:16, 76:15, 78:14, 80:18, 83:11
**one's** [1] - 19:8
**ones** [2] - 6:21, 8:13
**open** [2] - 14:18, 15:8
**opened** [1] - 75:15
**opening** [1] - 36:13
**operating** [1] - 58:1
**opinion** [3] - 60:6, 63:7, 69:24
**option** [1] - 7:4
**options** [1] - 15:21
**oral** [5] - 16:25, 25:1, 46:20, 47:12, 47:13
**orally** [1] - 83:13
**order** [8] - 3:23, 20:9, 22:15, 51:23, 83:7, 83:16, 83:18, 83:19
**organization** [2] - 75:7, 75:17
**organizations** [1] - 72:3
**originally** [1] - 8:10
**ourselves** [1] - 11:13
**outright** [1] - 8:18
**outside** [1] - 52:8
**outstanding** [1] - 62:10
**overall** [2] - 19:20, 64:19
**overstate** [1] - 59:21
**overstated** [2] - 13:2, 13:3
**overstatement** [1] - 13:5
**overwhelming** [1] - 18:11
**own** [9] - 7:3, 11:5, 19:16, 24:7, 55:2, 63:15, 65:2, 65:6, 65:15
**owned** [4] - 7:25, 8:18, 8:22, 8:24
**ownership** [3] - 7:13, 7:25, 64:6

## P

**p.m** [3] - 81:7, 81:13, 81:14
**PA** [3] - 1:16, 1:20, 1:24
**Padova** [1] - 60:5
**page** [4] - 12:9, 17:24, 37:5, 46:22
**pages** [1] - 47:17
**paid** [10] - 8:22, 28:13, 28:15, 28:16,

33:9, 77:3, 77:7,
77:25, 78:2, 79:23
**paint** [1] - 11:17
**painting** [2] - 52:9,
56:17
**paper** [1] - 74:22
**pardon** [2] - 45:24,
48:2
**part** [10] - 8:12, 9:24,
21:24, 44:17, 57:19,
59:18, 61:5, 65:19,
75:12, 83:14
**particular** [3] -
23:10, 31:15, 58:25
**particularly** [1] -
62:21
**parties** [3] - 47:6,
47:12, 47:14
**Partners** [3] - 57:16,
60:10, 60:13
**patiently** [1] - 49:25
**pay** [20] - 8:15, 8:20,
8:23, 11:22, 11:23,
11:24, 26:5, 26:17,
28:13, 34:7, 37:3,
74:18, 77:10, 77:13,
79:16, 80:2, 80:7,
80:8, 80:10, 81:6
**paying** [5] - 37:15,
40:3, 40:14, 66:19,
69:16
**payment** [1] - 40:4
**payments** [4] - 7:11,
24:23, 32:25, 33:3
**PENNSYLVANIA** [2]
- 1:2, 1:7
**Pennsylvania** [7] -
1:15, 23:21, 32:4,
32:5, 32:6, 32:10,
62:3
**people** [50] - 6:20,
6:23, 7:9, 7:10, 7:23,
8:6, 8:8, 8:15, 8:20,
9:2, 11:5, 18:22,
21:11, 27:18, 27:22,
27:23, 28:24, 29:2,
32:16, 48:18, 48:24,
49:19, 49:21, 54:21,
55:3, 57:13, 64:2,
64:15, 65:18, 65:20,
66:5, 66:12, 66:14,
68:2, 68:17, 69:20,
70:2, 71:24, 71:25,
73:12, 75:16, 76:5,
76:7, 76:16, 76:17,
76:21, 76:25, 79:8
**people's** [1] - 72:6
**per** [2] - 34:5, 40:4
**percent** [33] - 12:10,
12:19, 13:3, 13:4,

13:13, 16:12, 16:13,
17:11, 17:25, 18:5,
18:6, 18:17, 19:6,
19:20, 19:21, 19:23,
20:5, 20:14, 21:1,
21:3, 21:5, 21:12,
24:15, 26:19, 26:20,
26:22, 34:7, 63:6,
63:8, 76:4, 76:13,
77:20
**percentage** [8] -
19:8, 19:12, 19:15,
21:4, 21:5, 21:18,
63:9, 64:7
**percentages** [2] -
19:13, 62:18
**perfect** [1] - 78:12
**perhaps** [1] - 81:13
**period** [2] - 51:3,
52:11
**permitted** [1] - 80:24
**permutation** [1] -
16:24
**person** [6] - 4:2, 5:8,
20:19, 33:13, 69:9,
69:25
**personally** [3] -
71:20, 71:24, 71:25
**persons** [1] - 35:12
**pertain** [1] - 35:8
**pertained** [1] - 17:7
**pets** [1] - 69:13
**PHILADELPHIA** [1] -
1:7
**Philadelphia** [15] -
1:16, 1:20, 1:24, 5:9,
23:16, 32:14, 50:16,
74:11, 75:4, 75:14,
75:15, 76:12, 79:21,
79:22
**phone** [2] - 36:3,
41:8
**physically** [1] - 77:23
**picture** [10] - 20:10,
22:15, 23:8, 23:11,
23:20, 28:23, 29:10,
58:17, 58:18
**place** [6] - 8:3, 9:20,
30:20, 31:25, 32:8,
50:7
**places** [1] - 57:19
**plan** [1] - 52:15
**play** [1] - 15:4
**played** [2] - 14:16,
42:13
**playing** [1] - 25:19
**plea** [10] - 13:19,
14:4, 15:6, 15:10,
40:23, 57:7, 78:11,
82:19, 82:20, 82:25

**plead** [2] - 23:2
**pleaded** [2] - 29:24,
77:24
**pleading** [2] - 13:22,
27:14
**pleased** [1] - 54:23
**pled** [6] - 25:13,
26:21, 28:9, 29:17,
29:22, 78:15
**pledged** [6] - 7:6,
7:15, 7:21, 8:19,
19:21, 63:21
**plumbing** [1] - 52:9
**point** [10] - 14:24,
15:4, 19:2, 37:7, 38:2,
49:10, 49:11, 60:14,
61:4, 82:18
**poles** [1] - 53:18
**politicians** [1] - 75:9
**poor** [2] - 75:14,
76:18
**position** [7] - 13:18,
14:11, 14:12, 15:8,
20:25, 23:1, 57:24
**possession** [2] -
57:25, 58:3
**possible** [2] - 81:23,
82:3
**possibly** [2] - 76:25,
79:16
**post** [2] - 15:17, 16:1
**post-Booker** [2] -
15:17, 16:1
**posture** [1] - 18:24
**potential** [1] - 33:22
**poverty** [1] - 72:7
**power** [3] - 38:25,
39:10, 49:4
**powerful** [1] - 75:11
**preaching** [1] - 17:19
**preface** [1] - 48:14
**prefer** [1] - 15:8
**preliminary** [2] -
83:16, 83:20
**premiums** [2] - 34:1,
34:5
**prepare** [1] - 15:1
**prepared** [2] - 30:9,
57:21
**present** [1] - 22:23
**presented** [1] - 75:19
**presentence** [5] -
3:24, 17:24, 36:24,
48:15, 60:1
**presenting** [1] -
23:10
**preserving** [1] - 60:8
**President** [4] -
31:23, 35:19, 35:24,
38:24

**press** [2] - 13:11,
13:15
**pressed** [1] - 19:2
**presume** [2] - 29:19
**pretty** [3] - 8:5,
18:18, 55:24
**previously** [1] -
39:10
**printed** [2] - 11:10,
76:20
**printer** [1] - 11:10
**prison** [1] - 80:22
**Prisons** [3] - 81:1,
81:17, 82:8
**private** [1] - 75:18
**privilege** [1] - 71:14
**pro** [1] - 78:21
**proactive** [2] - 59:15,
60:8
**Probation** [3] - 2:4,
3:13, 13:24
**probation** [2] - 80:4,
80:5
**PROBATION** [2] -
3:14, 4:15
**probative** [1] - 21:6
**problem** [4] - 25:25,
77:7, 77:8, 81:2
**problems** [7] - 12:3,
49:2, 49:18, 52:19,
52:24, 53:8, 53:23
**proceed** [3] - 30:7,
50:12, 61:24
**Proceedings** [1] -
3:1
**proceedings** [2] -
84:6, 85:18
**proceeds** [1] - 33:19
**prodigious** [1] -
79:18
**produced** [1] - 1:25
**proffer** [2] - 48:14,
70:14
**Program** [1] - 80:1
**program** [1] - 80:3
**project** [2] - 22:14,
23:11
**promise** [4] - 41:5,
43:24, 45:7, 46:14
**promised** [17] - 9:21,
28:18, 35:9, 36:1,
36:2, 36:5, 36:15,
37:8, 38:8, 38:12,
38:15, 38:19, 39:2,
40:3, 40:4, 40:6
**promises** [1] - 45:18
**pronounce** [1] -
83:13
**proof** [2] - 21:25,
22:2

**proper** [1] - 29:4
**properties** [36] - 7:6,
7:9, 7:11, 7:12, 7:14,
7:15, 7:23, 8:1, 11:3,
11:15, 12:7, 17:7,
19:20, 19:21, 20:3,
23:22, 25:22, 32:1,
51:6, 56:12, 58:2,
59:3, 59:5, 59:8,
59:11, 59:16, 62:16,
63:25, 64:20, 65:21,
66:3, 66:19, 67:12,
67:14, 67:18, 76:15
**property** [6] - 11:8,
12:4, 24:15, 65:16,
69:14, 77:10
**prosecution** [2] -
48:16, 60:2
**prosecutor's** [1] -
60:4
**protection** [1] -
57:22
**proud** [2] - 71:14,
72:9
**proved** [1] - 76:1
**proves** [1] - 59:10
**provide** [2] - 74:15,
75:21
**provided** [3] - 43:6,
44:1, 44:4
**provider** [1] - 74:13
**PSR** [1] - 12:3
**Public** [1] - 1:19
**punishable** [1] -
82:15
**purchase** [2] - 7:4,
64:6
**purpose** [2] - 38:1,
75:12
**purposes** [3] - 34:14,
57:1, 59:14
**pushed** [1] - 10:6
**put** [18] - 6:17, 7:10,
7:13, 8:2, 11:16,
11:18, 12:6, 22:12,
23:20, 29:7, 36:24,
44:12, 45:1, 45:21,
46:18, 71:22, 71:23,
83:21
**putting** [3] - 11:5,
56:14, 57:23
**puzzle** [2] - 17:22,
17:23

## Q

**quality** [1] - 82:7
**quarrel** [1] - 20:13
**questioning** [1] -

18:9
   **questions** [7] - 42:5,
47:20, 55:16, 56:24,
62:8, 70:7, 72:12
   **quickly** [2] - 8:5,
49:21
   **quite** [1] - 34:4
   **Quiñones** [1] - 5:7
   **Quiñones-Sánchez**
[1] - 5:7
   **quote** [1] - 57:19
   **quoted** [1] - 17:24

## R

   **Rabinowitz** [1] - 60:3
   **raise** [6] - 30:19,
50:6, 61:13, 68:25,
71:4, 73:8
   **raised** [2] - 9:17,
12:12
   **Ralph** [1] - 75:10
   **Ramzi** [2] - 39:13,
40:1
   **RAMZI** [1] - 39:17
   **ran** [4] - 48:25, 51:3,
54:13, 77:5
   **range** [4] - 6:5, 6:10,
6:12, 6:14
   **rather** [3] - 17:14,
23:8, 73:2
   **rattling** [1] - 82:9
   **raw** [1] - 19:17
   **reached** [4] - 8:14,
24:1, 24:24, 33:17
   **reaction** [1] - 12:13
   **read** [5] - 5:5, 5:15,
45:16, 46:17, 47:3
   **reading** [2] - 13:10,
13:24
   **ready** [1] - 46:5
   **real** [7] - 50:17,
57:23, 58:1, 58:4,
75:2, 75:3, 75:15
   **reality** [3] - 11:20,
44:7, 73:16
   **realize** [1] - 16:8
   **realized** [1] - 8:7
   **really** [8] - 12:10,
12:13, 20:21, 22:8,
27:24, 29:15, 44:15,
57:9
   **reason** [3] - 6:14,
27:12, 40:3
   **reasonable** [1] -
80:13
   **reasonably** [1] - 80:5
   **recants** [1] - 29:12
   **receive** [3] - 10:4,

36:14, 41:5
   **received** [6] - 5:2,
5:5, 5:12, 10:11,
16:23, 36:16
   **receiver** [13] - 28:22,
28:23, 28:25, 49:4,
49:6, 57:6, 57:12,
57:18, 57:20, 58:6,
58:18, 60:11, 60:13
   **receiver's** [2] - 57:7,
67:15
   **receivers** [4] - 66:18,
67:13, 67:17, 67:18
   **receivership** [3] -
51:1, 55:12, 57:9
   **receiving** [1] - 57:8
   **recently** [2] - 4:1, 5:6
   **reciprocation** [1] -
37:6
   **recognized** [1] - 8:11
   **recollection** [1] -
64:18
   **recommend** [1] -
82:1
   **recommendation** [2]
- 80:20, 81:16
   **record** [9] - 4:2,
34:21, 50:10, 72:20,
72:24, 75:2, 77:1,
77:18, 85:18
   **redirect** [1] - 47:21
   **redlining** [5] - 72:3,
75:7, 75:13, 75:22,
75:25
   **reference** [5] - 30:16,
35:16, 40:17, 68:5,
70:22
   **referenced** [1] -
10:14
   **referrals** [1] - 40:20
   **referred** [1] - 8:17
   **referring** [4] - 39:25,
44:21, 65:2, 65:3
   **refi'd** [1] - 77:4
   **refinance** [2] - 23:22,
32:1
   **reflection** [2] - 21:15,
29:11
   **refused** [2] - 29:5,
58:21
   **regarding** [2] - 35:9,
59:20
   **regards** [1] - 77:16
   **reinforced** [1] - 24:3
   **reiterated** [1] - 36:4
   **rejecting** [1] - 57:17
   **relating** [1] - 47:7
   **release** [3] - 79:12,
80:3, 80:7
   **released** [1] - 62:15

   **relevance** [1] - 64:9
   **relevant** [9] - 18:14,
18:18, 21:6, 27:13,
32:22, 32:23, 58:10,
58:16, 58:23
   **remain** [2] - 30:19,
78:7
   **remaining** [1] - 39:8
   **remains** [1] - 20:9
   **remember** [5] - 32:9,
32:11, 42:14, 54:7
   **remorse** [2] - 14:13,
14:14
   **remorseful** [1] -
16:19
   **remove** [1] - 10:9
   **removed** [2] - 77:10,
77:12
   **rent** [27] - 7:3, 8:20,
8:22, 10:12, 10:13,
13:2, 17:3, 17:4, 17:5,
17:12, 18:5, 18:6,
19:22, 29:3, 33:11,
52:1, 55:4, 58:6,
62:25, 65:2, 65:6,
65:15, 66:12, 66:19,
69:17, 74:18
   **rent-to-own** [2] -
65:6, 65:15
   **rental** [2] - 11:6, 40:7
   **rentals** [2] - 19:22,
57:9
   **rented** [4] - 17:7,
51:6, 66:12, 76:16
   **renters** [1] - 18:23,
20:1
   **renting** [3] - 8:21,
65:21
   **rents** [6] - 10:17,
13:2, 13:4, 17:7, 49:5,
49:9
   **repair** [7] - 48:19,
49:3, 51:5, 51:24,
52:3, 52:15, 54:24
   **repaired** [1] - 76:9
   **repairs** [6] - 7:14,
11:5, 52:7, 57:21,
66:24, 67:11
   **repeat** [2] - 65:22,
67:10
   **report** [11] - 3:24,
4:3, 4:3, 4:7, 5:2, 12:9,
17:24, 36:16, 48:16,
59:25, 75:19, 80:18
   **reported** [2] - 4:2,
4:6
   **Reporter** [1] - 1:22,
85:23
   **representations** [2] -
12:11, 16:12

   **Representative** [1] -
75:10
   **represented** [4] -
9:9, 10:18, 62:4,
65:20
   **representing** [2] -
3:6, 3:16
   **Republic** [36] - 7:7,
8:14, 9:14, 9:18, 9:21,
10:5, 10:8, 12:11,
13:1, 16:11, 18:2,
19:7, 20:18, 21:2,
22:12, 26:25, 31:15,
35:18, 35:20, 39:14,
43:7, 43:9, 43:16,
44:11, 46:11, 49:6,
57:3, 62:21, 63:23,
63:24, 64:17, 67:16,
77:1, 77:8, 78:2
   **Republic's** [1] - 27:5
   **reputation** [1] -
69:24
   **request** [5] - 6:3,
37:10, 49:6, 57:18,
80:17
   **requesting** [3] - 6:9,
6:13, 28:17
   **requests** [1] - 83:12
   **reside** [1] - 50:15
   **residents** [1] - 18:23
   **resolve** [2] - 36:22,
62:10
   **resources** [1] - 79:17
   **respect** [12] - 4:13,
9:18, 16:10, 17:20,
40:1, 42:1, 57:10,
58:2, 59:22, 62:10,
62:25, 83:3
   **respectfully** [5] -
19:11, 20:7, 21:6,
21:15, 28:10
   **responded** [1] -
76:22
   **response** [3] - 9:12,
57:7, 57:15
   **responsibility** [31] -
12:14, 12:15, 13:13,
13:15, 14:1, 15:10,
16:7, 16:14, 16:18,
17:13, 17:17, 18:1,
18:16, 18:25, 20:7,
20:22, 20:23, 21:7,
21:16, 21:17, 21:21,
25:15, 26:12, 29:13,
34:2, 57:22, 73:14,
77:19, 77:21
   **Responsibility** [1] -
80:1
   **responsible** [5] -
13:14, 26:19, 26:20,

26:22, 71:25
   **restitution** [6] - 4:12,
8:12, 79:15, 79:18,
80:6, 80:8
   **result** [9] - 6:11,
16:23, 21:10, 21:13,
25:18, 39:1, 40:22,
58:19
   **resulted** [1] - 21:24
   **retrying** [1] - 29:8
   **review** [1] - 19:16
   **reviewed** [1] - 35:5
   **reviewing** [1] - 62:23
   **revised** [3] - 3:25,
4:3, 4:12
   **Ricardo** [1] - 59:25
   **ride** [1] - 69:12
   **rights** [2] - 23:4,
82:19
   **rise** [3] - 68:11,
68:15, 68:16
   **risk** [1] - 6:17
   **risky** [1] - 7:17
   **River** [12] - 7:7, 8:5,
8:7, 13:3, 43:10,
43:11, 43:18, 62:11,
64:18, 67:16, 79:20
   **rob** [1] - 30:2
   **ROBERT** [2] - 1:6,
73:9
   **Robert** [2] - 3:5,
48:17
   **robert** [1] - 85:9
   **role** [3] - 14:16,
42:13, 55:10
   **rolls** [10] - 10:12,
17:4, 17:5, 17:12,
18:5, 18:6, 19:22,
62:25, 66:12
   **roofs** [1] - 53:20
   **room** [2] - 1:23,
38:24
   **rosy** [1] - 23:20
   **route** [1] - 15:15
   **royal** [1] - 32:10
   **RPR** [2] - 1:22, 85:23
   **rule** [1] - 11:3
   **run** [1] - 28:7

## S

   **saber** [1] - 82:9
   **safely** [1] - 10:15
   **sake** [1] - 23:5
   **sales** [2] - 7:3, 7:23
   **Sam** [1] - 75:10
   **sampling** [1] - 12:24
   **sat** [1] - 72:1
   **Saturday** [1] - 30:1

**save** [1] - 31:5
**savings** [1] - 40:22
**saw** [1] - 37:10
**scam** [1] - 17:15
**School** [1] - 74:21
**schools** [2] - 74:19, 74:20
**Sean** [2] - 2:2, 3:10
**seat** [1] - 30:22
**seated** [1] - 50:9
**second** [7] - 17:8, 44:20, 58:22, 59:19, 62:17, 80:8, 81:25
**Secretary** [1] - 37:20
**Section** [1] - 46:25
**section** [1] - 46:25
**securities** [1] - 62:7
**Security** [1] - 76:8
**see** [9] - 3:9, 3:12, 3:13, 29:10, 44:23, 47:8, 47:14, 52:21, 64:9
**seem** [1] - 54:23
**self** [1] - 80:18
**self-report** [1] - 80:18
**sell** [3] - 33:11, 76:3, 76:15
**send** [5] - 11:25, 29:3, 29:4, 39:12, 49:8
**sending** [1] - 36:9
**sense** [5] - 10:10, 15:18, 15:22, 16:24, 29:15
**sent** [3] - 11:15, 57:4, 58:19
**sentence** [9] - 6:5, 6:9, 6:13, 10:4, 44:20, 78:5, 79:11, 80:21, 82:21
**sentencing** [7] - 5:1, 6:2, 8:17, 22:6, 34:13, 72:24, 78:12
**SENTENCING** [1] - 1:11
**Sentencing** [1] - 79:6
**separate** [1] - 82:15
**September** [1] - 37:25
**series** [5] - 24:4, 24:24, 25:1, 32:15, 35:5
**serious** [9] - 14:9, 14:10, 78:15, 78:17, 78:18, 79:6, 79:7, 79:9, 82:15
**seriousness** [1] - 59:22

**set** [9] - 22:6, 24:2, 28:18, 31:17, 34:17, 34:25, 37:25, 38:9, 82:10
**setting** [1] - 38:1
**settlement** [3] - 37:25, 40:6, 62:13
**settlements** [1] - 33:22
**seven** [4] - 20:15, 64:17, 77:4, 77:12
**Seventh** [1] - 5:8
**several** [2] - 39:11, 70:5
**shall** [1] - 47:24
**shape** [1] - 33:11
**share** [1] - 71:11
**sheriff's** [1] - 7:23
**Sherman** [2] - 57:4
**shortfall** [1] - 40:7
**shorthand** [1] - 1:25
**shortly** [1] - 62:14
**show** [9] - 4:2, 14:13, 20:17, 20:18, 22:3, 23:19, 45:16, 58:17, 82:10
**showing** [1] - 13:12
**shown** [1] - 79:4
**shows** [6] - 19:18, 19:19, 20:13, 79:8
**shy** [1] - 73:3
**side** [1] - 19:11
**sign** [1] - 83:20
**signed** [3] - 37:1, 41:24, 47:16
**significant** [4] - 7:11, 7:13, 13:5, 79:25
**significantly** [1] - 21:9
**signing** [2] - 33:17, 41:4
**signs** [1] - 26:15
**similar** [1] - 70:18
**simply** [2] - 18:3, 72:19
**sitting** [2] - 34:18, 42:15
**situation** [2] - 22:13, 27:25
**situations** [3] - 49:20, 52:25, 72:2
**six** [4] - 64:17, 64:18, 77:4, 77:12
**skirmish** [1] - 62:10
**slightest** [1] - 15:18
**slum** [5] - 73:21, 73:25, 74:2, 74:10, 74:13, 74:24, 76:20, 76:24
**slumlord** [2] - 17:18,

29:18
**small** [5] - 13:4, 13:6, 13:7, 64:7, 64:19
**smaller** [1] - 21:18
**snowstorms** [1] - 53:6
**so-called** [1] - 64:2
**Social** [1] - 76:8
**sold** [2] - 75:3, 76:8
**someone** [1] - 57:24
**sometimes** [5] - 53:1, 54:1, 54:2, 54:4, 54:7
**somewhat** [1] - 23:12
**son** [1] - 23:15
**son's** [2] - 23:18, 40:7
**sophisticated** [1] - 9:2
**sorry** [13] - 13:11, 13:15, 30:25, 42:12, 43:2, 46:8, 57:11, 65:22, 68:19, 73:14, 73:18, 73:23, 77:14
**sort** [4] - 7:1, 16:24, 18:15, 48:15
**sought** [1] - 81:17
**sounds** [1] - 55:24
**Spanish** [1] - 76:17
**speaking** [1] - 54:21
**special** [1] - 80:10
**Special** [2] - 11:2, 12:25
**specializing** [1] - 62:7
**specific** [1] - 80:19
**specifically** [1] - 75:14
**spell** [4] - 30:23, 50:10, 61:17, 69:3
**spend** [4] - 54:2, 54:6, 54:7, 57:18
**spent** [3] - 16:16, 36:21, 69:18
**spoken** [1] - 44:18
**SR** [1] - 1:6
**stages** [1] - 31:15
**stakes** [1] - 23:1
**stand** [1] - 76:19
**standing** [2] - 30:19, 78:8
**start** [1] - 50:22
**started** [6] - 7:22, 28:24, 49:2, 50:24, 55:6, 75:2
**state** [5] - 28:23, 30:23, 50:10, 61:16, 69:3
**State** [1] - 75:9

**statement** [2] - 16:25
**statements** [2] - 17:1
**STATES** [3] - 1:1, 1:4, 1:14
**States** [3] - 1:15, 2:4, 3:4
**statute** [1] - 60:20
**statutory** [1] - 81:6
**stay** [1] - 79:6
**steal** [1] - 30:2
**step** [3] - 68:1, 68:23, 71:2
**stepped** [3] - 58:18, 64:5, 64:15
**STEWART** [1] - 1:10
**still** [5] - 4:4, 4:7, 24:11, 27:5, 27:6
**stipulated** [1] - 15:5
**stipulation** [2] - 14:4, 15:9
**stop** [2] - 60:19, 75:13
**stopped** [2] - 58:20, 66:19
**stories** [1] - 71:21
**story** [3] - 22:24, 30:1, 77:19
**stream** [1] - 41:17
**Street** [3] - 1:16, 1:23, 75:9
**strong** [1] - 15:7
**studiously** [1] - 57:23
**stuff** [1] - 20:11
**subject** [3] - 15:13, 47:7, 79:13
**submission** [5] - 14:6, 29:16, 48:17, 60:1, 62:20
**submissions** [3] - 5:4, 13:24, 18:7
**submit** [5] - 21:14, 28:8, 56:25, 58:7, 73:16
**submitted** [30] - 11:6, 17:6, 17:9, 17:11, 18:4, 18:7, 18:21, 18:23, 19:6, 20:4, 21:2, 21:11, 21:18, 24:2, 24:25, 25:2, 25:17, 26:2, 26:18, 28:14, 28:15, 30:15, 34:12, 58:24, 59:24, 63:1, 66:13, 68:5, 70:21
**submitting** [3] - 16:20, 21:22, 25:10
**subsequent** [1] - 47:12
**substantial** [1] -

59:14
**substantially** [1] - 61:7
**substantive** [1] - 25:4
**subsumed** [1] - 19:21
**success** [1] - 71:20
**successes** [1] - 71:23
**successful** [2] - 72:8, 76:6
**sued** [2] - 60:10, 60:13
**suffered** [1] - 21:13
**suggested** [2] - 23:17, 49:15
**suggesting** [9] - 17:14, 20:6, 20:16, 20:20, 28:1, 28:2, 29:8, 43:25, 61:6
**suggestion** [2] - 49:13, 60:7
**suggests** [1] - 9:13
**Suite** [2] - 1:16, 1:19
**summarize** [1] - 28:1
**summary** [1] - 32:21
**supersede** [1] - 47:5
**supervised** [3] - 79:12, 80:3, 80:7
**supplemental** [1] - 5:3
**supply** [1] - 80:3
**support** [4] - 11:7, 74:20, 74:23, 78:9
**suppose** [1] - 48:17
**surprise** [1] - 7:24
**surprising** [1] - 7:20
**surrender** [4] - 80:11, 80:13, 80:24, 82:10
**sustained** [3] - 63:12, 63:19
**swap** [2] - 7:5, 8:18
**sweatshops** [1] - 74:14
**SWORN** [6] - 30:21, 50:8, 61:15, 69:2, 71:5, 73:9
**systemic** [1] - 49:22
**Sánchez** [1] - 5:7

**T**

**talks** [2] - 9:21, 38:6
**tangential** [1] - 27:15
**telephone** [1] - 70:16
**tenant** [7] - 52:18, 64:1, 65:3, 73:15,

74:25, 75:1, 77:10
**tenants** [17] - 6:21,
10:22, 11:2, 11:23,
12:6, 14:17, 49:16,
49:18, 54:22, 59:17,
64:5, 66:19, 69:11,
69:13, 77:9, 77:11,
77:14
**tend** [1] - 6:15
**terminate** [1] - 50:23
**terms** [3] - 42:10,
42:12, 42:16
**terrible** [1] - 71:21
**testify** [10] - 20:11,
22:13, 24:20, 27:23,
27:25, 30:11, 48:11,
49:1, 70:11
**testimony** [5] - 24:3,
41:11, 43:14, 46:13,
70:18
**THE** [202] - 1:1, 1:2,
1:10, 1:14, 3:2, 3:4,
3:9, 3:12, 3:16, 3:19,
3:21, 3:22, 3:23, 4:6,
4:9, 4:17, 4:20, 4:23,
4:25, 5:14, 5:16, 5:23,
5:25, 6:7, 6:23, 9:4,
9:6, 9:9, 9:12, 10:21,
12:8, 12:19, 13:11,
13:20, 14:5, 14:8,
14:20, 15:2, 15:12,
15:17, 16:3, 16:6,
16:21, 17:19, 18:13,
19:2, 19:13, 20:24,
21:25, 22:4, 22:17,
22:25, 25:4, 25:7,
25:12, 25:14, 26:25,
27:3, 27:7, 27:10,
27:16, 27:18, 29:20,
30:6, 30:12, 30:14,
30:18, 30:19, 30:22,
30:24, 30:25, 31:1,
32:6, 32:10, 32:11,
34:5, 34:6, 34:9,
34:20, 34:22, 35:2,
39:17, 39:20, 42:6,
45:24, 46:1, 47:21,
47:23, 47:24, 47:25,
48:2, 48:4, 48:6, 48:9,
48:12, 48:24, 49:23,
49:25, 50:3, 50:5,
50:6, 50:9, 50:11,
50:12, 55:18, 56:23,
58:8, 58:13, 58:15,
60:10, 60:15, 60:19,
60:24, 61:8, 61:10,
61:13, 61:14, 61:16,
61:18, 61:20, 61:21,
61:22, 61:23, 61:24,
63:12, 63:19, 64:10,

64:13, 64:22, 64:24,
67:6, 67:21, 67:24,
68:1, 68:7, 68:13,
68:19, 68:22, 68:25,
69:3, 69:4, 69:5, 69:7,
69:8, 69:9, 70:7,
70:10, 70:13, 70:20,
70:23, 71:1, 71:3,
71:4, 71:6, 71:7, 71:8,
71:10, 71:12, 71:13,
72:11, 72:16, 72:18,
72:23, 73:6, 73:7,
73:8, 73:10, 73:13,
73:18, 73:19, 73:22,
73:23, 74:1, 74:2,
74:4, 74:8, 74:10,
78:7, 80:16, 81:2,
81:5, 81:8, 81:10,
81:12, 81:14, 81:16,
81:22, 82:1, 82:5,
82:12, 82:14, 82:17,
82:18, 82:23, 82:24,
83:7, 83:10, 83:18,
83:21, 83:24, 84:1,
84:5
**themselves** [1] -
12:6
**theoretically** [1] -
21:12
**theory** [1] - 48:16
**thereof** [1] - 47:7
**they've** [1] - 34:11
**thinking** [1] - 18:13
**third** [3] - 14:24,
25:10, 80:24
**THOMAS** [1] - 71:5
**Thomas** [3] - 71:7,
74:21, 85:8
**thorough** [1] - 5:2
**thousand** [2] - 76:8,
76:9, 76:10
**thousands** [4] - 7:14,
49:16, 49:18, 78:1
**threaded** [1] - 48:15
**threatened** [1] - 40:8
**Three** [1] - 12:15
**three** [10] - 14:20,
44:24, 48:25, 59:8,
61:11, 68:9, 68:20,
69:13, 76:14
**threw** [1] - 24:9
**throw** [1] - 13:7
**timely** [2] - 13:23,
14:25
**tip** [1] - 22:21
**title** [55] - 9:22,
24:22, 26:7, 26:9,
26:10, 26:11, 28:12,
28:18, 28:21, 32:18,
32:24, 33:1, 33:5,

33:19, 35:9, 36:1,
36:2, 36:4, 36:7,
36:14, 36:19, 37:2,
37:7, 37:12, 37:17,
37:23, 37:24, 38:3,
38:7, 38:8, 38:12,
38:14, 38:20, 38:22,
39:3, 39:10, 39:13,
40:3, 40:5, 40:6,
40:20, 40:23, 41:5,
41:13, 41:25, 43:14,
44:12, 45:1, 45:4,
45:7, 45:18, 46:14
**titled** [1] - 46:25
**titles** [2] - 33:24,
34:24
**today** [24] - 14:12,
14:13, 15:7, 19:17,
20:10, 20:15, 20:17,
21:17, 22:3, 22:23,
23:21, 24:4, 24:20,
25:3, 27:6, 43:14,
43:20, 70:16, 71:21,
76:19, 76:23, 82:22
**together** [5] - 3:4,
23:1, 25:8, 70:3,
78:10
**toilets** [1] - 53:10
**took** [6] - 5:9, 49:4,
50:25, 66:18, 77:5,
77:6
**top** [2] - 38:5, 39:7
**Toppin** [5] - 57:4,
57:5, 57:11
**totally** [1] - 17:1
**touch** [1] - 34:15
**touches** [1] - 58:22
**tough** [1] - 75:3
**toughest** [1] - 71:17
**toward** [2] - 55:2,
80:7
**towards** [2] - 7:13,
7:25
**tragedies** [2] - 71:21,
71:22
**Transcript** [1] - 1:25
**transcript** [1] - 85:17
**trauma** [2] - 8:2, 9:1
**treated** [1] - 69:11
**trees** [1] - 53:18
**tremendous** [1] - 8:2
**trial** [3] - 15:1, 31:6,
46:5
**trials** [1] - 22:25
**tried** [2] - 69:17,
77:11
**trouble** [1] - 5:10
**troubled** [1] - 24:12
**true** [13] - 4:7, 9:23,
10:24, 17:16, 25:23,

36:24, 43:24, 52:10,
58:17, 60:15, 63:5,
69:15, 73:16
**truly** [2] - 13:25,
14:19
**trusting** [1] - 82:6
**truth** [3] - 21:8, 48:19
**try** [5] - 8:6, 27:21,
36:22, 38:2, 51:4
**trying** [10] - 17:13,
20:10, 23:7, 25:4,
52:18, 54:23, 55:3,
74:15, 77:20, 78:4
**tunnel** [2] - 23:8,
23:10
**turn** [5] - 11:23,
11:25, 12:1, 46:22,
56:6
**turned** [1] - 10:16
**Two** [2] - 83:4, 83:6
**two** [14] - 15:2, 17:3,
22:13, 40:16, 58:10,
58:16, 61:11, 62:11,
68:9, 68:20, 69:22,
74:19, 75:25, 80:19

# U

**U.S** [3] - 1:23, 60:5,
81:1
**U.S.C** [1] - 79:10
**ultimately** [1] - 67:16
**um-hum** [6] - 50:5,
52:23, 53:15, 55:13,
55:15, 56:18
**under** [4] - 16:1,
27:1, 27:2, 79:22
**underserved** [1] -
71:16
**understandings** [1] -
47:6
**unencumbered** [2] -
7:22, 10:18
**uninhabitable** [1] -
11:4
**united** [1] - 2:4
**UNITED** [3] - 1:1,
1:4, 1:14
**United** [2] - 1:15, 3:4
**universe** [3] - 12:11,
65:5, 65:15
**unless** [2] - 24:22,
26:7
**unnecessary** [1] -
16:1
**unprofessional** [2] -
66:6
**unquestionably** [3] -
21:22, 24:2, 59:8

**unwritten** [1] - 47:13
**up** [40] - 11:16,
11:20, 24:4, 28:5,
28:25, 30:1, 30:13,
30:18, 31:17, 32:19,
33:10, 35:1, 36:9,
37:25, 38:1, 38:9,
40:8, 44:22, 53:2,
55:3, 55:11, 56:11,
56:14, 56:23, 56:24,
57:8, 57:13, 57:19,
59:19, 67:24, 68:23,
70:3, 71:2, 74:11,
75:8, 76:14, 78:5,
79:19, 82:10
**upset** [2] - 36:19
**upward** [11] - 5:18,
5:20, 6:4, 15:13,
15:22, 15:24, 15:25,
78:25, 79:3
**usual** [1] - 79:13

# V

**vacant** [3] - 11:15,
56:12, 65:21
**value** [5] - 24:15,
58:4, 59:6, 59:11,
59:12
**vandalism** [1] -
53:14
**variance** [7] - 5:20,
6:4, 15:14, 15:22,
15:24, 78:25, 79:3
**vast** [1] - 41:7
**verbal** [2] - 44:8,
44:10
**versus** [1] - 3:5
**via** [1] - 1:25
**victim** [17] - 6:16,
8:16, 9:14, 14:1,
14:15, 22:9, 22:10,
22:11, 22:17, 22:18,
29:14, 29:15, 59:1,
59:19, 62:11
**victim's** [1] - 79:19
**victimized** [3] -
25:23, 48:19, 64:2
**victims** [8] - 6:18,
6:19, 6:20, 8:5, 20:1,
21:9, 21:13, 79:23
**view** [2] - 12:16,
20:21
**Vincent** [1] - 60:4
**Vineland** [2] - 80:22,
81:20
**VIP** [1] - 79:22
**virtually** [1] - 28:21
**vital** [1] - 42:13

**W**

waiting [1] - 49:25
waive [1] - 80:9
waiver [1] - 23:4
wake [2] - 28:5, 30:1
walked [2] - 42:3, 42:16
Walter [5] - 28:25, 57:3, 57:7, 57:14, 57:15
wants [3] - 22:21, 29:9, 55:9
warrant [1] - 24:13
warranted [2] - 65:20, 79:10
waste [1] - 27:19
water [10] - 11:22, 11:23, 11:24, 11:25, 12:1, 12:2, 53:12, 56:7, 56:9
ways [1] - 28:3
wearing [1] - 61:7
week [4] - 48:23, 51:14, 51:15, 54:3
weekends [1] - 53:1
Weir [7] - 28:25, 57:3, 57:7, 57:16, 60:10, 60:13
Weir's [1] - 57:14
welcome [5] - 3:19, 3:21, 73:1, 78:7, 82:5
welfare [1] - 76:7
well-known [1] - 57:16
West [2] - 1:19, 75:4
whatsoever [2] - 14:14, 20:8
whole [9] - 17:10, 27:21, 29:10, 29:25, 65:5, 77:17, 77:18, 77:23
WIDMEIER [2] - 3:14, 4:15
Widmeier [8] - 2:3, 3:13, 3:25, 4:1, 4:12, 14:6, 17:23, 19:5
Widmeier's [2] - 5:2, 12:9
wife [3] - 55:8, 69:18, 70:24
windows [6] - 11:17, 11:18, 52:8, 53:16, 56:15
wire [1] - 29:19
witness [10] - 22:12,

27:24, 34:8, 45:22, 45:25, 48:10, 60:23, 70:9, 70:12, 70:19
WITNESS [25] - 30:21, 30:24, 31:1, 32:11, 34:6, 34:22, 39:20, 47:24, 50:5, 50:8, 50:11, 61:14, 61:15, 61:18, 61:21, 61:23, 67:23, 69:2, 69:4, 69:7, 69:9, 71:5, 71:7, 71:10, 71:13
WITNESSES [1] - 85:3
Witnesses [1] - 68:16
witnesses [8] - 20:11, 22:1, 27:23, 30:10, 61:12, 68:9, 68:15, 72:14
woman [2] - 69:13, 69:15
women [1] - 51:5
wondering [1] - 12:12
word [3] - 38:21, 41:5, 44:22
words [4] - 16:8, 41:12, 54:16, 55:2
workers [2] - 11:15, 11:25
works [1] - 5:7
world [1] - 15:14
write [2] - 5:10, 44:21
writing [3] - 37:21, 45:21, 46:18
written [5] - 16:25, 25:1, 44:8, 78:21, 83:7
wrote [4] - 16:11, 17:23, 29:2, 49:8

**Y**

year [4] - 26:10, 33:22, 80:6, 80:8
years [19] - 20:20, 31:11, 43:12, 43:13, 48:21, 49:1, 49:13, 49:17, 50:18, 50:20, 50:21, 51:21, 59:8, 69:6, 70:3, 74:13, 79:12
yesterday [5] - 4:1, 4:2, 52:22, 53:8, 54:1
young [2] - 74:11, 74:15
yourself [2] - 54:15,

64:1

**Z**

Z-E-R [1] - 61:23
Zayas [2] - 59:25, 60:1
zealous [1] - 17:22

**§**

§ [1] - 79:10

voluntary [1] - 23:4
vs [1] - 1:5